<u>EXHIBIT I</u>

**RYE SELECT BROAD MARKET XL FUND, LP**

**AMENDED AND RESTATED
LIMITED PARTNERSHIP AGREEMENT**

**November 1, 2007**

**RYE SELECT BROAD MARKET XL FUND, LP**
**AMENDED AND RESTATED**
**LIMITED PARTNERSHIP AGREEMENT**

Dated as of November 1, 2007

This AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT made as of November 1, 2007 (the "Agreement") among the undersigned (herein called the "Partners," which term shall include any persons hereafter admitted to the Partnership (as defined herein) pursuant to Article V of this Agreement and shall exclude any persons who cease to be Limited Partners (as defined herein) pursuant to Article VI of this Agreement) shall govern Rye Select Broad Market XL Fund, LP (the "Partnership"). The Partnership was formed as a limited partnership under the Delaware Revised Uniform Limited Partnership Act (6 Dec.C § 17-101 et.seq.) as amended from time to time (the "Act") by the filing of the Certificate of Limited Partnership of the Partnership with the Office of the Secretary of State of the State of Delaware.

## ARTICLE I

### General Provisions

Sec. 1.1        **Partnership Name and Address; General Partner.** The Partnership shall do business under the name of Rye Select Broad Market XL Fund, LP and shall have its registered office is at c/o The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19808, or at such other locations as the General Partner (as hereinafter defined) in the future may designate.  The General Partner shall be Tremont Partners, Inc. (the "General Partner") and its permitted successors and assignees.

Sec.1.2        **Fiscal Year.**  The fiscal year of the Partnership (herein called the "Fiscal Year") shall end on December 31st of each calendar year or on such other date as the General Partner shall determine.

Sec. 1.3        **Liability of Partners.**  The names of all of the Partners, the amounts of their respective contributions to the Partnership (herein called the "Capital Contributions" as defined in Sec. 3.1(e)) and their Ownership Percentages (as defined in Sec. 3.4) are set forth in a schedule entitled "Schedule of Capital Contributions and Ownership Percentages" (herein called the "Schedule") which shall be maintained with the records of the Partnership and is hereby incorporated by reference and made a part of this Agreement.

Those Partners who are designated in the Schedule as Limited Partners (the "Limited Partners") and former Limited Partners shall be liable for the repayment and discharge of all debts and obligations of the Partnership attributable to any Fiscal Year (or relevant portion thereof) during which they are or were Limited Partners of the Partnership only to the extent of their respective interests in the Partnership in the Fiscal Year (or relevant portion thereof) to which any such debts and obligations are attributable and shall not otherwise have any liability in respect of the debts and obligations of the Partnership.

The Limited Partners and all former Limited Partners shall share all losses, liabilities or expenses suffered or incurred by virtue of the operation of the preceding paragraphs of this Sec. 1.3 in proportion to their respective Ownership Percentages basis (as defined herein) for the Fiscal Year (or relevant portion

thereof) to which any debts or obligations of the Partnership are attributable. Limited Partners or former Limited Partners shall share all losses, liabilities or expenses up to the limit of their respective interests in the Partnership for such Fiscal Year (or relevant portion thereof).

As used in this Sec. 1.3, the terms "interests in the Partnership" and "interest in the Partnership" shall mean with respect to any Fiscal Year (or relevant portion thereof) and with respect to each Partner (or former Partner) its interest in its Capital Account (as defined in Sec. 3.3) that such Partner (or former Partner) would have received (or in fact did receive) pursuant to the terms and provisions of Article IV and VI upon withdrawal from the Partnership as of the end of such Fiscal Year (or relevant portion thereof).

Notwithstanding any other provision in this Agreement, in no event shall any Partner (or former Partner) be obligated to make any additional contribution to the Partnership, or have any liability for the repayment and discharge of the debts and obligations of the Partnership, except that a Partner (or former Partner) may be required, for purposes of meeting such Partner's obligations under this Sec. 1.3, to make additional contributions or payments, respectively, up to, but in no event in excess of, the aggregate amount of returns of capital and other amounts actually received by it from the Partnership during or after the Fiscal Year to which any debt or obligation is attributable.

As used in this Agreement, the term "former Partner" refers to any person or entity that hereafter from time to time ceases to be a Partner pursuant to the terms and provisions of this Agreement.

Sec. 1.4      **Purposes of the Partnership.** The Partnership is organized for the purposes of generating capital appreciation by utilizing the strategies discussed in the Partnership's Amended and Restated Confidential Private Placement Memorandum, as amended, restated or supplemented from time to time (the "Memorandum"), and engaging in all activities and transactions as the General Partner may deem necessary or advisable in connection therewith or to accomplish the Partnership's purposes, or objectives or business goals or anything relating to any of the foregoing, including, without limitation:

(a) to (i) enter into one or more Swaps (as defined in Sec. 3.1 herein) to obtain the investment returns of the Reference Entity (as defined in Sec. 3.1 herein) on a leveraged basis and (ii) enter into any option or any other derivative instrument of any kind or nature from time to time, in the General Partner's sole discretion;

(b) to invest and reinvest substantially all of the Partnership's assets directly or indirectly through the Reference Entity or through various portfolio managers and/or investment vehicles, within a broad range of financial instruments, securities and transactions, including, without limitation, equities, options, fixed income, derivatives, swaps, convertible securities of U.S. and non-U.S. issuers, distressed debt securities, trade claims, convertible debt securities, loans secured and unsecured, recourse and non-recourse to the borrower and guaranteed and non-guaranteed and other instruments (all such items collectively being called herein a "Security" or "Securities");

(c) to utilize a variety of investment techniques including, but not limited to, short selling, purchase and sale writing of options on securities (both covered and naked options), and the use of borrowed funds for investment or leverage purposes;

(d) to engage in such other lawful Securities or other transactions of any kind or nature as the General Partner may from time to time determine;

(e)  to possess, transfer, mortgage, pledge or otherwise deal in, and to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to, Securities and other property and funds and assets and rights of any kind or nature held or owned from time to time by the Partnership;

(f)  to acquire a long position or a short position with respect to any Security and to make purchases or sales increasing, decreasing or liquidating such position or changing from a long position to a short position or from a short position to a long position, without any limitation as to the frequency of the fluctuation in such positions or as to the frequency of the changes in the nature of such positions;

(g)  to purchase Securities and hold them for investment;

(h)  to maintain for the conduct of Partnership affairs one or more offices and in connection therewith, rent or acquire office space, and do such other acts as the General Partner may deem necessary or advisable in connection with the maintenance and administration of the Partnership;

(i)  to lend any of the Securities, funds or other properties of the Partnership and, from time to time, for speculative purposes or otherwise, borrow or raise funds and secure the payment of obligations of the Partnership by mortgage upon, or pledge or hypothecation of, all or any part of the property of the Partnership;

(j)  to engage personnel, whether part-time or full-time, and attorneys, independent accountants or such other persons as the General Partner may deem necessary or advisable;

(k)  to enter into custodial arrangements with banks and brokers, wherever located, regarding Securities owned beneficially by the Partnership including brokers, banks and custodians with whom the General Partner may be affiliated; and

(l)  to do such other acts as the General Partner may deem necessary or advisable in connection with the maintenance, administration or business of the Partnership.

Sec. 1.5    **Master Fund.**  The Partnership may, in the General Partner's sole discretion, invest all or substantially all of the Partnership's assets in a special purpose vehicle known as a master (the "Master Fund").  The Partnership would be a shareholder in a Master Fund, also called a "feeder fund."  Other entities may be feeder funds into a Master Fund as well. The Master Fund would be managed by the Investment Manager (or an affiliate), but at all times in accordance with the investment objective of the Partnership as set forth in the Memorandum.  The Master Fund would be considered a partnership for U.S. federal income tax purposes.

Sec. 1.6    **Classes of Interests.**  An interest in the Partnership means the entire ownership interest of a Partner in the Partnership at any particular time.  The Partnership may offer multiple interests from time to time.  As of the date set forth hereof, the Partnership is offering Class A Interests (the "Class A Interests") and Class B Interests (the "Class B Interests") pursuant to the Memorandum.  The Class A Interests and the Class B Interests are collectively referred to herein as the "Interests."  Unless otherwise specifically set forth herein, the Interests shall rank pari passu with one another with respect to the rights and obligations of Limited Partners under this Agreement.  The General Partner may, in its sole discretion, issue additional classes of Interests from time to time in addition to the Class A Interests and the Class B Interests pursuant to the Memorandum or pursuant to separate offering memoranda.

## ARTICLE II

### General Partner

Sec. 2.1    **Generally.**  The General Partner exercises ultimate authority over the Partnership and is responsible for the day-to-day and other operations and business of the Partnership.  Except as authorized by the General Partner, the Limited Partners shall have no authority or right to act on behalf of the Partnership in connection with any matter.  The General Partner has the right to delegate its responsibilities hereunder, including the responsibility of providing certain investment advisory, management, administrative and auditing services, to suitable parties that may be reasonably compensated by the Partnership.  The General Partner may also retain other parties to provide services to the Partnership, including, without limitation, legal, consulting, accounting, administrative and auditing services, which parties may be affiliated with the General Partner.  Furthermore, the General Partner may enter into agreements with such parties on behalf of the Partnership, which agreements may include provisions for the indemnification and exculpation of such parties, in certain circumstances, by the Partnership.

Sec. 2.2    **Authority of the General Partner.**  The General Partner shall have the power on behalf of and in the name of the Partnership, and without notice to the Limited Partners, to carry out, or designate such other agents (which may be affiliates of the General Partner) to carry out, any and all of the objects and purposes of the Partnership set forth in Sec. 1.4, and perform all acts and enter into and perform all contracts and other undertakings that it may deem necessary or advisable or incidental thereto, including, without limitation, the power to:

(a) open, maintain and close accounts, including margin and custodial accounts, with brokers, which power shall include the authority to issue all instructions and authorizations to brokers regarding the Securities and/or money therein;

(b) invest and reinvest substantially all of the Partnership's assets directly or indirectly through the Reference Entity or through various portfolio managers and/or investment vehicles within a broad range of financial instruments, Securities and transactions.

(c) open, maintain and close accounts, including custodial accounts, with institutions, including institutions located within and/or outside the United States, and draw checks or other orders for the payment of monies;

(d) lend any Securities, funds or other properties of the Partnership and borrow or raise funds and secure the payment of obligations of the Partnership by pledges or hypothecation of all or any part of the property of the Partnership;

(e) do any and all acts on behalf of the Partnership, and exercise all rights of the Partnership, or delegate such functions as it sees fit, with respect to its interest in any person, including, without limitation, the voting of Securities, participation in arrangements with creditors, the institution and settlement or compromise of suits and administrative proceedings and other similar matters;

(f) organize one or more corporations or other entities formed to hold record title, as nominee for the Partnership, to Securities or funds of the Partnership;

(g) combine purchase or sale orders on behalf of the Partnership with orders for other accounts to whom the General Partner or any of its affiliates provide investment services ("Other Accounts") and allocate the Securities or other assets so purchased or sold, on an average price basis, among such accounts;

(h) enter into "soft dollar" arrangements as contemplated in the Memorandum, including the use of soft dollars for items which are within the Section 28(e) "safe harbor";

(i) authorize any member, officer, employee or other agent of the General Partner or agent or employee of the Partnership to act for and on behalf of the Partnership in all matters incidental to the foregoing;

(j) engage attorneys, independent accountants, consultants, placement agents or such other service providers as the General Partner may deem necessary or advisable;

(k) provide research and analysis and direct the formulation of investment policies and strategies for the Partnership;

(l) appoint an Independent Client Representative as set forth in the Memorandum;

(m) issue one or more separate classes of partnership interests based on economic terms and conditions that may differ from those attributable to other classes of partnership interests and take all steps necessary to accomplish the same without the consent of any Limited Partner; and

(n) delegate any of its responsibilities and/or duties to others pursuant to separate agreements, which agreements may provide for indemnifications and exculpations such other service providers as deemed appropriate by the General Partner.

Sec. 2.3       **Management Fee; Investor Servicing Fee; Administration Fees.** (a)  There is no management fee payable to the General Partner by the Partnership.  However, there is an annual 1.00% management fee charged at the Reference Entity level on all assets invested in the Reference Entity. Because the return to the Partnership under a Swap will be based on the amount a hypothetical investor in the Reference Entity would receive upon redeeming its interest in the Reference Entity (i.e. net of the 1.00% management fee on the hypothetical investor's levered investment), the Partnership (and thus indirectly the Limited Partners) will effectively bear a 1.00% annual management fee on the amount of the Partnership's investment in each Swap as fully levered pursuant to each Swap's terms.

(b)     The General Partner on behalf of the Partnership has entered into one or more agreements with one or more unaffiliated third party placement agents (each a "Placement Agent") to place investors in the Class B Interests.  Any such Placement Agents who place investors in the Partnership will be entitled to receive a fee from Limited Partners holding Class B Interests in an amount up to 1.00% of the Net Asset Value of the Capital Account of Partners holdings Class B Interests per annum (the "Investor Servicing Fee").  The Investor Servicing Fee shall be payable monthly in arrears. The Investor Servicing Fee will be prorated based upon a Limited Partner's actual period of ownership of its Class B Interests. Payment of the Investor Servicing Fee is due as of the last day of each calendar month and is payable by the Partnership with respect to Class B Interests within a reasonable time thereafter.  The Investor Servicing Fee may waived or in the General Partner's sole discretion.

(c)     The Partnership's administrator receives a monthly administration fee (the "Administration Fee") which will be in accordance with reasonable and customary administration fees. The Administration Fee will be calculated and is payable as of the last Business Day of each calendar month. The Administrator is also entitled to reimbursement of actual out-of-pocket expenses incurred on behalf of the Partnership.

There is an annual administration fee of 0.50% charged on all assets invested in the Reference Entity. Because the return to the Partnership under a Swap will be based on the amount a hypothetical investor in the Reference Entity would receive upon redeeming its interest in the Reference Entity (i.e. net of the 0.50% administration fee on the hypothetical investor's levered investment, the Partnership (and thus indirectly the Limited Partners) will also effectively bear a 0.50% annual administration fee on the amount of the Partnership's investment in a Swap as fully levered pursuant to each Swap's terms.

Sec. 2.4       **Reliance by Third Parties.**  Persons dealing with the Partnership are entitled to rely conclusively upon the certificate of the General Partner to the effect that it is then acting as General Partner and upon the power and authority of the General Partner as herein set forth.

Sec. 2.5       **Activity of General Partner.**  The General Partner and its respective shareholders, officers, directors, employees or other agents (collectively "Affiliates") shall devote as much of their time to the investment activities of the Partnership as the General Partner deems reasonable under the circumstances. Nothing contained herein shall be deemed to preclude the General Partner or Affiliates from engaging directly or indirectly in any other activities, for its or their own accounts. No Limited Partner shall, by reason of being a Limited Partner in the Partnership, have any right to participate in any manner in any profits or income earned or derived by or accruing to the General Partner or Affiliate from the conduct of any activities other than the activities of the Partnership or from any transaction in Securities effected by the General Partner or Affiliate for any account other than that of the Partnership.

Sec. 2.6       **Exculpation.**  Neither the General Partner nor any Affiliate shall be liable to any Limited Partner or the Partnership for errors of judgment or for action or inaction, whether or not disclosed, which said party reasonably believed to be in the best interests of the Partnership, or for losses due to such errors, action or inaction or to the negligence, dishonesty or bad faith of any employee, broker or other agent of the General Partner or the Partnership, provided that such employee, broker or agent was selected, engaged or retained by the General Partner or the Partnership with reasonable care and in good faith. The General Partner and any Affiliate may consult with counsel and accountants in respect of Partnership affairs and be fully protected and justified in any action or inaction that is taken in accordance with the advice or opinion of such counsel or accountants, provided that they shall have been selected with reasonable care. Notwithstanding the foregoing, the provisions of this Sec. 2.6 shall not be construed so as to relieve (or attempt to relieve) the General Partner or any Affiliate of any liability to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the provisions of this Sec. 2.6 to the fullest extent permitted (including liability under U.S. securities laws which, under certain circumstances, impose liability even on persons acting in good faith) by law. Notwithstanding the foregoing, no person will be exculpated or exonerated from liability, or indemnified against loss, for violations of federal or state securities laws or for any other intentional or criminal wrongdoing.

Sec. 2.7       **Indemnification of General Partner.**  The Partnership shall indemnify and hold harmless the General Partner, the Investment Advisor, each Affiliate and the legal representatives of any of them (an "Indemnified Party"), from and against any loss, cost or expense suffered or sustained by it, including, without limitation, any judgment, award, settlement, reasonable attorneys' fees and other costs

or expenses incurred in connection with the defense of any actual or threatened action, proceeding or claim, by reason of (i) any acts, omissions, errors of judgment or alleged acts, omissions or errors of judgment arising out of or in connection with the Partnership, any investment made or held by the Partnership or this Agreement, if such activities were performed in good faith either on behalf of the Partnership or in furtherance of the interests of the Partnership and in a manner reasonably believed by the Indemnified Party to be within the scope of the authority conferred by this Agreement, by law or with the consent of the Partners, provided that such acts, omissions, errors of judgment or alleged acts, omissions or errors of judgment upon which such actual or threatened action, proceeding or claim are based were not made in bad faith or did not constitute fraud, willful misconduct or gross negligence (as that term is interpreted under Delaware law) by such Indemnified Party, or (ii) any acts, omissions, errors of judgment or alleged acts, omissions, or errors of judgment of any broker or agent of the Partnership, provided that such broker or agent was selected, engaged or retained by the Indemnified Party with reasonable care.  The Partnership may, in the sole discretion of the General Partner, advance any Indemnified Party reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action or proceeding which arises out of such conduct.  In the event that such an advance is made by the Partnership, the Indemnified Party shall agree to reimburse the Partnership for such fees, costs and expenses to the extent that it is determined, based upon final binding non-appealable judicial or administrative finding, ruling or order, that such Indemnified Party was not entitled to indemnification under this Sec. 2.7.  The foregoing provisions shall survive the termination of this Agreement.  Notwithstanding any of the foregoing to the contrary, the provisions of this Sec. 2.7 shall not be construed so as to provide for the indemnification of the General Partner, the Investment Advisor or any Affiliate for any liability, to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Sec. 2.7 to the fullest extent permitted by law.  The General Partner is authorized and instructed on behalf of the Partnership to enter into such agreements with all and any persons specified in this Sec. 2.7 as it may consider necessary or appropriate to give effect to the above provisions and make them binding and enforceable against the Partnership by such persons where such obligations may, by virtue of the fact that they are not parties to this Agreement, be held unenforceable by them against the Partnership.

Sec. 2.8.        **Identity of Securities.**  Notwithstanding Sec. 9.18 herein and unless otherwise required by US GAAP, in no event shall any Limited Partner directly or indirectly use for its own investment purposes or disclose to another person the identity of any Security held by the Partnership or the Master Fund; the General Partner shall have the right not to disclose to the Limited Partners the identity of any or all of the Securities held by the Partnership or the Master Fund.

Sec. 2.9        **Confidentiality, Privacy Policy.**  Any and all nonpublic personal information received by the Partnership and/or the General Partner in the course of business with respect to the Limited Partners who are natural persons shall not be shared with nonaffiliated third parties which are not service providers to the Partnership and/or the General Partner without prior notice to such Limited Partners.  Such service providers include but are not limited to the administrator, the auditors and the legal advisors of the Partnership.  Additionally, the Partnership and/or the General Partner may disclose such nonpublic personal information as required by law, including without limitation, the disclosure that may be required by the Uniting and Strengthening America Act by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001 and the rules and regulations promulgated thereunder.  Such policy shall also apply to the former Limited Partners.

Sec. 2.10.      **Removal of General Partner.**  (a)  The General Partner may be required to withdraw upon an affirmative vote of Limited Partners holding more than fifty percent (50%) of the Interests of the Limited Partners.  Following such a vote, the Limited Partners may elect a replacement general partner upon the affirmative vote of Limited Partners holding more than fifty (50%) of the

Interests of the Limited Partners, in which event the new general partner shall have the rights and responsibilities thereof effective five (5) Business Days following such vote. A vote to remove the General Partner shall have no effect unless Limited Partners holding in excess of fifty (50%) of the Interests of the Limited Partners elect a replacement general partner at the same meeting as the vote for removal. For purposes of this Section 4.3, in determining whether or not the Limited Partners have attained fifty (50%) of the Interests of the Limited Partners for purposes of a vote to remove the General Partner or to elect a replacement General Partner, any Interests that are held by the General Partner, or its affiliates, shall not be used in the calculation of such percentage.

(b) For purposes of this Sec. 2.10, a meeting of the Limited Partners shall be held only at the request of Limited Partners holding more than fifty (50%) of the Interests of the Limited Partners. Written notice stating the place, day and hour of the meeting and the purpose for which the meeting is called and indicating that such notice is being issued by or at the direction of the Limited Partner(s) calling the meeting shall be delivered no fewer than ten (10), nor more than fifty (50%), calendar days before the date of the meeting, either personally, by facsimile, by mail or by courier. Any action that may be taken at a meeting of Limited Partners may be taken without a meeting if a consent in writing setting forth the action to be taken is signed by Limited Partners owning not less than the minimum Interests that would be necessary to authorize or take such action at a meeting at which all the Limited Partners were present and voted.

(c) In the event that the Partnership receives a demand in writing from one or more Limited Partners to obtain a current list of the name and last known business, residence or mailing address, or similar information, of each Limited Partner in accordance with the Act and which request states the purpose of such demand, which may include the desire by such partner to obtain the requisite consent of the Limited Partners to remove the General Partner and elect a replacement general partner (the Limited Partner or Partners making such demand shall be referred to herein as a "Requesting Partner"), and the General Partner, in its reasonable judgment, determines that such demand is reasonably related to the Requesting Partner's interest as a limited partner, as required by the Act, then the Partnership shall proceed as follows:

(d) The General Partner shall send a notice in writing to each of the other Limited Partners in accordance with the terms of the Partnership Agreement stating that a demand has been made on the Partnership by the Requesting Partner to provide such Partner with the name and address information of each of the other Limited Partners and the reason communicated by such partner as the purpose for such demand. The notice shall request that each Limited Partner indicate whether or not it consents to the disclosure by the Partnership of such information pertaining to such Partner and, in the event such Limited Partner so consents, shall provide that the Limited Partner agrees to release the General Partner and the Partnership, together with their respective affiliates, from any and all expenses, claims or damages that may be suffered or incurred by such partner attributable to the disclosure by the Partnership of such information to the Requesting Partner. The notice shall instruct each Limited Partner to send to the General Partner such partner's response to such notice in order to be received by the General Partner within thirty (30) days of the date of such notice. The General Partner, in conjunction with the sending of such notices, shall send to the Requesting Partner a certification signed by the General Partner that all such notices were sent to each of the Limited Partners and stating the due date for responses to be received as established by the General Partner.

(e) In the event the General Partner has received affirmative responses from one or more Limited Partners, in the form required by the Partnership as described above, consenting to the disclosure by the General Partner of the name and address information of such partners to the Requesting Partner (the "Consenting Partners"), the General Partner shall notify the Requesting Partner of same and require

the Requesting Partner to execute, in such form reasonably required by the General Partner, a certification confirming the purpose for the demand made on the Partnership, together with an agreement to indemnify and hold harmless the Partnership and the General Partner, and their respective affiliates, from any and all expenses, claims or damages any such party may suffer or incur attributable to the disclosure of the information in respect of the Consenting Partners as described herein. Upon receipt of such certification signed by the Requesting Partner, the General Partner shall send to such partner the name and address information, as requested by the Requesting Partner, pertaining to the Consenting Partners.

(f) The Requesting Partner shall be responsible for any and all costs and expenses associated with the disclosure to such partner of the name and address information regarding the other Limited Partners as described above. In the event any such costs or expenses are incurred by the Partnership or the General Partner, as may be estimated in good faith by the General Partner, the amount of such costs or expenses may, upon notice to the Requesting Partner, be advanced to the Partnership or the General Partner, as the case may be, for the account of the Requesting Partner and withdrawn by the Partnership accordingly. Any necessary reconciliation shall be made by the Partnership upon the conclusion of the event giving rise to such costs or expenses. Any demand as described herein made more than once annually by any Limited Partner will not be honored by the Partnership or the General Partner.

## ARTICLE III

### Capital Accounts of Partners
### and Operation Thereof

Sec. 3.1      **Definitions.**  For the purposes of this Agreement, unless the context otherwise requires:

(a) The term "Accounting Period" shall mean the following periods: The initial Accounting Period will begin upon the initial opening of the Partnership and each subsequent Accounting Period will begin immediately after the close of the immediately preceding Accounting Period. Each Accounting Period will close at the close of business on the first to occur of (i) the date immediately prior to the effective date of the admission of a new Partner and/or an increase in a Partner's capital contribution; (ii) the effective date of any withdrawal by a Partner, (iii) the date when the Partnership dissolves and/or terminates, (iv) the last Business Day of each calendar month, (v) at such other time as may be required by governmental rules and regulations imposed upon the General Partner or the Partnership, or (vi) at such other times as the General Partner, in its sole discretion, may determine.

(b) The term "Beginning Value" shall mean, with respect to any Accounting Period, the value of the Partnership's Capital at the beginning of such Accounting Period.

(c) The term "Business Day" shall mean any day (other than Saturday and Sunday) on which securities markets in the United States are open for business.

(d) The term "Capital" shall mean the excess of the Partnership's assets over its liabilities as defined in Sec. 3.6.

(e) The term "Capital Contribution" shall mean the amount of capital contributed to the Partnership by a Partner.

(f)  The term "Confirmation" shall mean any confirmation or other documentation evidencing, or confirming a swap, option or other derivative transaction.

(g)  The term "Counterparty" shall mean one or more designated counterparties to any Swap.

(h)  The term "Ending Value" shall, with respect to any Accounting Period, mean the value of the Partnership's Capital at the end of such Accounting Period, before giving effect to withdrawals made during the Accounting Period or any Investor Servicing Fees paid or accrued during the Accounting Period.

(i)  The term "Net Asset Value" shall mean the Partnership's assets, at fair value, less its liabilities, at fair value, as calculated pursuant to Sec. 3.6.

(j)  The term "Net Capital Appreciation" shall, with respect to any Accounting Period, mean the excess, if any, of the Ending Value over the Beginning Value.

(k)  The term "Net Capital Depreciation" shall, with respect to any Accounting Period, mean the excess, if any, of the Beginning Value over the Ending.

(l)  The term "Reference Entity" shall mean Rye Select Broad Market Fund, LP or such other entity or entities as the General Partner may designate from time to time in its sole discretion.

(m)  The term "Swap" shall mean each total return or price return or other swap (or option or derivative transaction similar to the foregoing) entered into with one or more Counterparties on a leveraged basis.

(n)  The term "Swap Documents" shall mean any or all documentation of any kind relating to any swap, option or other derivative transaction of any kind or nature, including without limitation, any ISDA Master Agreement, Schedule, Credit Support Annex, definitions, a General Partner or Partnership or Reference Fund letter, a Confirmation and any other document referenced therein between the Counterparty and the Partnership and/or other parties relating to any of the foregoing.

Sec. 3.2        **Capital Contributions.**

(a)      The minimum initial investment in the Partnership is U.S.$500,000 for natural persons.  The minimum initial investment amount may be reduced at the sole discretion of the General Partner in appropriate circumstances).  The General Partner may, in its discretion, allow Capital Contributions in lesser amounts.  The General Partner has the right to accept or decline to accept any such Capital Contribution for any or no reason in its sole discretion.

(b)  Except as otherwise permitted by the General Partner, additional Capital Contributions in each instance may be made by Limited Partners as of the first Business Day of each calendar month, or at any other time in the General Partner's sole discretion.  The General Partner shall have the right to accept or decline to accept any such additional contributions or to change such amounts or the permitted frequency of making such contributions for any reason or for no reason.

(c)  Limited Partners will make Capital Contributions in U.S. Dollars or, at the General Partner's sole discretion, in kind.

(d) Nothing contained in this Agreement will prohibit the General Partner, by itself or through its Affiliates or employees, from contributing as a Limited Partner.

Sec. 3.3        **Capital Accounts.**

(a) A capital account ("Capital Account") shall be established on the books of the Partnership for each Partner, including the General Partner.  The Capital Account of each Partner shall be in an amount equal to such Partner's initial Capital Contribution, adjusted as hereinafter provided. At the beginning of each Accounting Period, the Capital Account of each Limited Partner will be increased by the amount of any additional Capital Contributions made by such Partner as of the beginning of such Accounting Period.

(b) At the end of each Accounting Period, each Partner's Capital Account shall be adjusted as follows: (i) each Partner's Capital Account shall be increased or decreased by any Net Capital Appreciation or Net Capital Depreciation for such Accounting Period allocated to such Partner pursuant to Sec. 3.5(b)(i); (ii) the Capital Account of each Partner holding Class B Interests shall be reduced by the aggregate amount of any and all Investor Servicing Fees charged to such Capital Account pursuant to Sec. 3.5(b)(ii) during such Accounting Period and (iii) each Partner's Capital Account shall be decreased by the amount of any withdrawals made by, or distributions made to, such Limited Partner as of the end of such Accounting Period.  When appropriate, the Capital Account of each Partner also shall be adjusted as provided in Sec. 3.5(c).  At the appropriate time, the Capital Account of each Partner that is a foreign individual, foreign corporation, foreign partnership or other foreign entity (a "Foreign Partner"), also shall be decreased by the amount of such Foreign Partner's respective share of any taxes withheld and paid over by the Partnership pursuant to Sec. 4.2.

(c) As the Partnership has more than one class of partnership interests, separate Capital Accounts shall be maintained to reflect each Partner's interest in each class.

Sec. 3.4        **Ownership Percentages.**  An "Ownership Percentage" shall mean, on any given date, (i) the balance of a Partner's Capital Account divided by the aggregate balance in all of the Partners' Capital Accounts as of such date, multiplied by (ii) one hundred percent (100%).  The Ownership Percentages shall be set forth in the Schedule.

Sec. 3.5        **Allocation of Net Capital Appreciation and Net Capital Depreciation; Debiting of Investor Servicing Fee.**

(a) At the beginning of each Accounting Period, the Capital Account of each Partner shall be increased by the amount of any additional Capital Contributions made by such Partner as of the beginning of such Accounting Period.

(b) At the end of each Accounting Period, the Capital Account of each Partner shall be (i) adjusted by crediting all Net Capital Appreciation or debiting all Net Capital Depreciation, as the case may be, to the Capital Accounts of all of the Partners in proportion to their respective Ownership Percentages as determined pursuant to Sec. 3.4. and (ii) reduced by all Investor Servicing Fees payable during such Accounting Period with respect to each Limited Partner holding Class B Interests pursuant to Sec. 2.3.

(c) The General Partner reserves the right to waive or reduce all or part of the Performance Allocation with respect to any Limited Partner, including, without limitation, its affiliates and/or employees.

Sec. 3.6 **Valuation of Capital.** The Partnership's net asset value (the "Net Asset Value") as well as the Net Asset Value for each class is equal to the Partnership's assets (and each Class' assets), at fair value, less its liabilities, and any accrued but unpaid expenses, as calculated pursuant to this Sec. 3.6. The Partnership's (and each Class') assets are calculated on a monthly basis as of the end of the last Business Day of the calendar month, or any other day that the General Partner so determines in its sole discretion (the "Valuation Date") in a manner consistent with the methodology described below or otherwise in accordance with U.S. generally accepted accounting principles as follows:

(a)      The value of the assets of the Partnership is based on the valuation of a Swap as calculated by the relevant Counterparty (or an affiliate thereof).

(b)      All other assets and liabilities of the Partnership (as applicable) are assigned such value as the Administrator, in consultation with the General Partner, may reasonably determine.

(c)      If the Administrator, in consultation with the General Partner, determines that any of the above valuation methodologies of any investments or other property does not fairly represent market value, the Administrator, in consultation with the General Partner, shall value such securities or other property as it shall reasonably determine and shall set forth the basis of such valuation in writing in the records of the Partnership.

(d)      All values assigned to securities and other assets and liabilities by the Administrator, in consultation with the General Partner, shall be final and conclusive.   Valuations provided by the Counterparty's affiliate will not be subject to independent review or investigation by the Partnership and the Partnership and the General Partner are entitled to rely on such valuations without independent verification.

All accrued debts and liabilities are deducted from the value of the Partnership's assets in determining the Partnership's Net Asset Value and, to the extent possible, from the value of the assets attributable to the Interests in determining the Net Asset Value per Class.  To the extent debts and liabilities cannot be determined to be attributable to any one Class, they are borne pro-rata by all Classes. These debts and liabilities include (a) any fees that have accrued, as of the date of computation, but are not yet payable (b) monthly amortization of organization costs (to the extent applicable), (c) the then current amount of any fees that have been earned in prior years, (d) any allowance for the Partnership's estimated annual audit and legal fees and other operating expenses, and (e) any contingencies for which reserves are determined to be required.  Net Asset Valuations are expressed in United States Dollars and any items denominated in other currencies are translated at prevailing exchange rates as determined by the Administrator in consultation with the General Partner.

Prospective investors should be aware that situations involving uncertainties as to the valuation of portfolio positions could have an adverse effect on the Net Asset Value if judgments regarding appropriate valuations should prove incorrect.

Sec. 3.7      **Temporary Suspension of Dealings and Determination of Net Asset Value**. The Partnership may temporarily declare a suspension of the determination of the Partnership's Net Asset Value and/or sale, allotment, issue or withdrawal of Interests or the payment of withdrawal proceeds during any period when in the opinion of the General Partner (after consultation with the Investment Manager):

(i)      the disposal by the Partnership of assets that constitute a substantial portion of its assets is not feasible;

(ii)      it is not possible to promptly transfer monies involved in the acquisition, disposition or realization of investments that constitute a material portion of the assets of the Partnership at normal rates of exchange;

(iii)     proceeds of any sale or withdrawal of the Interests cannot be transmitted to or from the Partnership's account;

(iv)     the Partnership is unable to reduce or terminate or receive a required payment under one or more Swaps;

(iv)     for any reason the prices of any investments that constitute a material portion of the assets of the Partnership cannot be reasonably, promptly or accurately ascertained;

(v)      any recognized exchange or market in which the Partnership's investments are normally dealt or traded is closed (other than customary holiday or weekend closings), or when trading thereon is restricted or suspended; or

(vi)     an event has occurred which may result in the dissolution of the Partnership.

Sec. 3.8      **Allocation for Tax Purposes.**  For each Fiscal Year, items of income, deduction, gain, loss or credit as determined for federal income tax purposes shall be allocated among the Partners in such manner as to reflect amounts allocated to the Capital Accounts of the Partners under this Agreement. Such allocation shall be made pursuant to the principles of Sections 704(b) and 704(c) of the Internal Revenue Code of 1986, as amended (the "Code"), and in conformity with Regulations § 1.704-1(b)(2)(iv)(f) and § 1.704-1(b)(4)(i) promulgated thereunder, or the successor provisions to such Section and Regulations. Notwithstanding anything to the contrary in this Agreement, there shall be allocated to the Partners such gains or income as shall be necessary to satisfy the "qualified income offset" requirements of Regulations § 1.704-1(b)(2)(ii)(d).

If the Partnership realizes capital gains (including short-term capital gains) or capital losses for federal income tax purposes for any Fiscal Year as of the end of which one or more Positive Basis Partners (as hereinafter defined) or Negative Basis Partners (as hereinafter defined) withdraw from the Partnership pursuant to Articles IV, VI or VII, the General Partner may elect to allocate such capital gains or capital losses as follows: (i) to allocate such capital gains among such Positive Basis Partners, pro rata in proportion to the respective Positive Basis (as hereinafter defined) of each such Positive Basis Partner, until either the full amount of such capital gains shall have been so allocated or the Positive Basis of each such Positive Basis Partner shall have been eliminated, (ii) to allocate any capital gains not so allocated to Positive Basis Partners to the other Partners in such manner as shall equitably reflect the amounts credited to such Partners' Capital Accounts pursuant to Sec. 3.5, (iii) to allocate such capital losses among such Negative Basis Partners, pro rata in proportion to the respective Negative Basis (as hereinafter defined) of each such Negative Basis Partner, until either the full amount of such capital losses shall have been so allocated or the Negative Basis of each such Negative Basis Partner shall have been eliminated, and (iv) to allocate any capital losses not so allocated to Negative Basis Partners to the other Partners in such manner as shall equitably reflect the amounts credited to such Partners' Capital Accounts pursuant to Sec. 3.5.

As used herein, (i) the term "Positive Basis" shall mean, with respect to any Partner and as of any time of calculation, the amount by which its interest in the Partnership as of such time exceeds its "adjusted tax basis" for Federal income tax purposes, in its interest in the Partnership as of such time

(determined without regard to any adjustments made to such "adjusted tax basis" by reason of any transfer or assignment of such interest, including by reason of death), (ii) the term "Positive Basis Partner" shall mean any Partner who withdraws from the Partnership and who has Positive Basis as of the effective date of its withdrawal, but such Partner shall cease to be a Positive Basis Partner at such time as it shall have received allocations pursuant to clause (i) of the preceding sentence equal to its Positive Basis as of the effective date of its withdrawal, (iii) the term "Negative Basis" shall mean, with respect to any Partner and as of any time of calculation, the amount by which its "adjusted tax basis" for Federal income tax purposes in its interest in the Partnership as of such time (determined without regard to any adjustments made to such "adjusted tax basis" by reason of any transfer or assignment of such interest, including by reason of death) exceeds its interest in the Partnership as of such time, and (iv) the term "Negative Basis Partner" shall mean any Partner who withdraws from the Partnership and who has Negative Basis as of the effective date of its withdrawal, but such Partner shall cease to be a Negative Basis Partner at such time as it shall have received allocations pursuant to clause (i) of the preceding sentence equal to its Negative Basis as of the effective date of its withdrawal.

Sec. 3.9     **Determination by the General Partner of Certain Matters.**   All matters concerning the valuation of Securities and other assets and liabilities of the Partnership, the allocation of profits, gains and losses among the Partners, including taxes thereon, and accounting procedures not expressly provided for by the terms of this Agreement shall be determined or approved by the General Partner, whose determination or approval shall be final and conclusive as to all of the Partners.

Sec. 3.10          **Adjustments to Take Account of Interim Year Events.**   If the Code or rules and/or regulations promulgated thereunder require a withholding of taxes or other adjustment of the Capital Account of a Partner or some other interim year event occurs necessitating in the General Partner's judgment an equitable adjustment, the General Partner shall make adjustments in the determination and allocation among the Partners of Net Capital Appreciation, Net Capital Depreciation, Capital Accounts, Ownership Percentages, allocations, any Management Fee, items of income, deduction, gain, loss, credit or withholding for tax purposes and accounting procedures or such other financial or tax items as shall equitably take into account such interim year event and applicable provisions of law, and the determination thereof by the General Partner shall be final and conclusive as to all of the Partners.

Sec. 3.11     **Organizational Expenses and Other Expenses.** The Partnership will pay for the organizational costs of the Partnership The Partnership pays for all routine and customary expenses associated with its administration and operation, including, but not limited to, the cost of maintaining the Partnership's registered office, brokerage commissions, communications, Partnership administration, other service providers expenses (including any custodian fees, if any), fees and expenses associated with the Transaction, insurance premiums, printing costs, and all tax, accounting (and audit) and legal, and similar ongoing operational expenses.  Fees and expenses that are identifiable with a particular Class are charged against that Class in computing its Net Asset Value for the Partnership.  Other fees and expenses will be charged to the Partnership as a whole or otherwise in the discretion of the General Partner.

## ARTICLE IV

### Withdrawals, Distributions of Capital and Transfers

Sec. 4.1     **Withdrawals and Distributions in General.**   No Limited Partner shall be entitled (i) to receive distributions from the Partnership, except as provided in Sec. 3.8 and 7.2; or (ii) to withdraw voluntarily any amount from its Capital Account other than upon its withdrawal from the Partnership as provided in Sec. 4.2.

Sec. 4.2        **Withdrawals.**

(a)        Except as otherwise provided herein, Limited Partners have the right, upon forty-five (45) days' prior written notice to the Administrator, to make a partial or total withdrawal from their Capital Accounts as of the last Business Day of each calendar quarter or at such other times as the General Partner determines in its sole discretion.  The withdrawal amount shall be calculated based upon the Partnership's Net Asset Value on the effective date of the withdrawal (the "Withdrawal Date").  The General Partner may shorten such notice period on a case by case basis in its sole discretion. Withdrawals will be effectuated on a first in first out basis.  Subject to the General Partner's right to establish reserves, at least ninety percent (90%) of the amount being withdrawn will be paid to the withdrawing Limited Partner within thirty (30) Business Days after the Withdrawal Date, with the balance payable within a reasonable time after the completion of the Partnership's year-end audit or at such earlier time as the General Partner determines, in its sole discretion. The Partnership shall have the right to require the compulsory withdrawal of all Interests held by a Partner at any time, in the General Partner's sole discretion. In addition, the Partnership may withhold a portion of any withdrawal if necessary to comply with applicable regulatory requirements or to establish reserves for contingent liabilities. All withdrawals shall also be subject to Article VI.  The General Partner reserves the right to temporarily suspend or limit withdrawals by the Limited Partners if it determines, in its sole discretion, that such withdrawals would negatively affect the Partnership's financial integrity.  In circumstances where the Partnership is unable to liquidate securities positions in an orderly manner in order to fund withdrawals, is unable to reduce or terminate or receive a required payment under a Swap, or where the value of the assets and liabilities of the Partnership cannot reasonably be determined, the Partnership may take longer than the aforementioned time periods to effect settlement of withdrawals. The Partnership, in the General Partner's sole discretion, may settle any given withdrawal, in whole or in part, in kind. The interest of a Limited Partner who gives notice of withdrawal pursuant to Sec. 4.2 shall not be included in calculating the Ownership Percentages of the Partners required to take any action under this Agreement.

(b)        Notwithstanding any provision of this Agreement to the contrary, the General Partner shall withhold and pay over to the Internal Revenue Service, pursuant to Sections 1441, 1445 and 1446 and any other withholding tax provisions of the Code, or any successor provision, at such times as required by such Section, such amounts as the Partnership is required to withhold under such Sections, as from time to time in effect, on account of each Foreign Partner's distributive share of the Partnership's items of gross income which are subject to withholding tax pursuant to such Section.  To the extent that a Foreign Partner claims to be entitled to a reduced rate of, or exemption from, U.S withholding tax pursuant to an applicable income tax treaty, or otherwise, the Foreign Partner shall furnish the General Partner with such information and forms as they may require and are necessary to comply with the regulations governing the obligations of withholding tax agents.  Each Foreign Partner represents and warrants that any such information and forms furnished by it shall be true and accurate, and agrees to indemnify the Partnership and each of the Partners from any and all damages, costs and expenses resulting from the filing of inaccurate or incomplete information or forms relating to such withholding taxes.

Any amount of withholding taxes withheld and paid over by the General Partner with respect to a Foreign Partner's distributive share of the Partnership's gross income shall be treated as a distribution to such Foreign Partner and shall be charged against the Capital Account of such Foreign Partner.

The General Partner may also suspend the payment of withdrawal proceeds in certain circumstances in accordance with Sec. 3.7 herein.

Sec. 4.3          **Limitations on Withdrawals.**  The right of any Limited Partner to withdraw any amount from its Capital Account pursuant to the provisions of Sec. 4.2 is subject to the provision by the General Partner for all Partnership liabilities in accordance with the Act, and for reserves for estimated accrued expenses, liabilities and contingencies, in accordance with the tax allocation provision of Sec. 3.8(a).

Sec 4.4          **Effective Date of Withdrawal.**  The Capital Account of a withdrawing Limited Partner shall be determined as of the effective date of its withdrawal.  The effective date of a Limited Partner's withdrawal with respect to a withdrawal required by the General Partner shall be the date determined by the General Partner.  To the extent the effective date of a Limited Partner's withdrawal shall be other than the last Business Day of a calendar quarter, the Capital Account of the withdrawing Limited Partner shall be adjusted pursuant to Article III as if the effective date of such Limited Partner's withdrawal were the last day of the Accounting Period.

Sec. 4.5          **Transferability and Assignability of Interest.**  A Limited Partner may not pledge, transfer or assign its interest in the Partnership in whole or in part to any person except by operation of law, nor shall it be entitled to substitute for itself as a Limited Partner any other person without the prior written consent of the General Partner, which consent may be withheld by the General Partner in its sole discretion for any reason or no reason at all. Any attempted transfer, pledge, assignment or substitution not made in accordance with the preceding sentence shall be void.

## ARTICLE V

### Admission of New Limited Partners

Subject only to the condition that each new Limited Partner shall execute an appropriate supplement to this Agreement pursuant to which it agrees to be bound by the terms and provisions hereof, the General Partner may admit one or more new Limited Partner(s) on a monthly basis as of the first Business Day of each calendar month, or at any other time in the General Partner's sole discretion.  Admission of a new Limited Partner shall not be a cause for dissolution of the Partnership.  The General Partner may refuse to admit any new Limited Partner to the Partnership at its discretion.  The General Partner may modify the frequency of permitted admissions.

## ARTICLE VI

### Withdrawal on Death, Disability, Etc.

Sec. 6.1          **Death, etc. of Limited Partners.**

(a)  The withdrawal, death, disability, incompetency, termination, bankruptcy, insolvency or dissolution of a Limited Partner shall not dissolve the Partnership.  The legal representatives of a Limited Partner shall succeed as assignee to the Limited Partner's interest in the Partnership upon the death, disability, incompetency, termination, bankruptcy, insolvency or dissolution of a Limited Partner, but shall not be admitted as a substituted limited partner without the consent of the General Partner.

(b)  In the event of death, disability, incompetency, termination, bankruptcy, insolvency or dissolution of a Limited Partner or the giving of notice of withdrawal by a Limited Partner, the interest of such Limited Partner shall continue at the risk of the Partnership's business until withdrawn pursuant to the terms of this Agreement.

(c)  The interest of a Limited Partner who gives notice of withdrawal pursuant to this Sec. 6.1 shall not be included in calculating the Ownership Percentages of the Partners required to take any action under this Agreement.

Sec. 6.2        **Limitations on Withdrawal of Capital Account.**  The right of any withdrawn Limited Partner or its legal representatives to have distributed the Capital Account of such Limited Partner pursuant to this Article VI is subject to the provision by the General Partner for all Partnership liabilities in accordance with the Act, and for reserves for estimated accrued expenses, liabilities and contingencies, all in accordance with Sec. 3.6 and Sec. 4.2.  The unused portion of any reserve shall be distributed after the General Partner has determined that the need therefor shall have ceased.

## ARTICLE VII

### Duration and Termination of Partnership; Termination of a Swap prior to its Schedule Termination

Sec. 7.1        **Duration.**  The Partnership shall continue until the first to occur of the following:  (i) the General Partner elects to terminate the Partnership in its sole discretion, (ii) the withdrawal, dissolution, bankruptcy or insolvency of the General Partner unless within thirty (30) days of such event, the written consent of Limited Partners having an aggregate Ownership Percentage in excess of fifty percent (50%) agree to continue the Partnership or (iii) any event which shall make unlawful the continued existence of the Partnership or requiring termination of the Partnership.

Sec. 7.2        **Termination.**  On termination of the business of the Partnership, the General Partner shall, within a reasonable time period after completion of a final audit of the Partnership's books and records (which shall be performed within ninety (90) days of such termination), make distributions out of Partnership net assets in the following manner and order:

(a)  to creditors, including Partners who are creditors, to the extent permitted by law, in satisfaction of liabilities of the Partnership (whether by payment or by establishment of reserves); and

(b)  to the Partners in the proportion of the value of their respective Capital Accounts.

For purposes of distributing the net assets of the Partnership upon termination, the General Partner shall be entitled to a return, on a pari passu basis with the Limited Partners, of the amount standing to its credit in its Capital Account.

Notwithstanding the foregoing, upon dissolution of the Partnership, the General Partner and/or any liquidator of the Partnership, in its sole discretion, shall have the authority to place the Partnership's net assets in a trust or some other arrangement rather than distribute such net assets in accordance with Section 7.2(a) and (b) above.  The investments therein and any proceeds from a disposition of such investments will be distributed to the Partners when appropriate, as determined by the General Partner and/or the liquidator in their sole and absolute discretion.

Sec. 7.3        Each Swap is subject to early termination by the relevant Counterparty on the occurrence of certain events (i.e. an Event of Default or Termination Events, and optional early termination by the Partnership (each as defined or provided for in the relevant Swap Documents)).  Upon termination of a Swap, the Partnership may no longer have the leverage it needs to provide leveraged

returns or may have reduced leverage, unless it is able to obtain alternative financing or an alternative Counterparty.

## ARTICLE VIII

### Tax Returns; Reports to Partners

Sec. 8.1 **Auditors.** The books and records of the Partnership shall be audited as of the end of each Fiscal Year of the Partnership by accountants selected by the General Partner.

Sec. 8.2 **Filing of Tax Returns.** The General Partner shall prepare and file, or cause a suitable accounting firm to prepare and file, federal income tax and information returns in compliance with the Code and any required state and local income tax and information returns for each tax year of the Partnership. The General Partner shall have the authority to prepare and submit tax returns on behalf of the Partnership during the winding up process.

Sec. 8.3 **Reports to Partners.** As soon as practicable following completion of the audit provided for in Sec. 8.1, the Partnership intends to prepare and mail, or cause to be prepared and mailed, to each Limited Partner a financial report presented in accordance with Generally Accepted Accounting Principles, together with the report thereon submitted by the accountants selected by the General Partner, setting forth, as of the end of such Fiscal Year:

(a) a balance sheet of the Partnership,

(b) an income statement of the Partnership and

(c) a statement showing the Net Capital Appreciation or Net Capital Depreciation of the Partnership for such year.

Tax information, including, but not limited to a Form K-1, will be provided and shall set forth in sufficient detail such information as shall enable each Limited Partner, or former Partner, as necessary, to prepare its respective federal income tax returns in accordance with the laws, rules and regulations then prevailing. Costs incurred with respect to such reporting shall be treated as an expense of the Partnership (or may be payable by the Investment Advisor, in its sole discretion). The Partnership makes no guarantee that such report will be received by Limited Partners by any particular time.

The General Partner reserves the right not to disclose its positions in all or some financial instruments, at its discretion.

Sec. 8.4 **Tax Matters Partner.** The General Partner shall at all times constitute, and have full powers and responsibilities as, the Tax Matters Partner of the Partnership for purposes of Section 6231(a)(7) of the Code. Each person (herein called a "Pass-Thru Partner") that holds or controls an interest as a Limited Partner on behalf of, or for the benefit of another person or persons, or which Pass-Thru Partner is beneficially owned (directly or indirectly) by another person or persons shall, within thirty (30) days following receipt from the Tax Matters Partner of any notice, demand, request for information or similar document, convey such notice or other document in writing to all holders of beneficial interests in the Partnership holding such interests through such Pass-Thru Partner. In the event the Partnership shall be the subject of an income tax audit by any federal, state or local authority, to the extent the Partnership is treated as an entity for purposes of such audit, including administrative settlement and judicial review, the Tax Matters Partner shall be authorized to act for, and its decision shall be final and

binding upon, the Partnership and each Partner thereof.  All expenses incurred in connection with any such audit, investigation, settlement or review shall be borne by the Partnership (or by the Investment Advisor, in its sole discretion).

## ARTICLE IX

### Miscellaneous

Sec. 9.1     **General.**  This Agreement: (i) shall be binding on the executors, administrators, estates, heirs, and legal successors and representatives of the Partners; and (ii) may be executed through the use of separate signature pages or in any number of counterparts with the same effect as if the parties executing such counterparts had all executed one counterpart; provided, however, that each such counterpart shall have been executed by the General Partner and that the counterparts, in the aggregate, shall have been signed by all of the Partners.

Sec. 9.2     **Method of Distribution.**  All distributions made pursuant to this Agreement shall be made in cash or in kind or both, as the General Partner, in its sole discretion, may determine.

Sec. 9.3     **Power of Attorney.**  Each of the Limited Partners hereby appoints the General Partner as its true and lawful representative and attorney-in-fact, in its name, place and stead to make, execute, sign, acknowledge, swear to and file:

(a)     Certificate of Limited Partnership of the Partnership and all amendments thereto as may be required under the Act, as amended from time to time;

(b)     any amendment to this Agreement duly approved as provided in Sec. 9.4 or by operation of Sec. 9.5;

(c)     any and all instruments, certificates, and other documents that may be deemed necessary or desirable to effect the winding-up and dissolution of the Partnership (including, but not limited to, Certificate of Cancellation of Limited Partnership; and

(d)     any business certificate, fictitious name certificate, amendment thereto, or other instrument or document of any kind necessary or desirable to accomplish the business, purpose and objectives of the Partnership, or required by any applicable federal, state or local law.

The power of attorney hereby granted by each of the Partners is coupled with an interest, is irrevocable, and shall survive, and shall not be affected by the subsequent death, disability, incompetency, termination, bankruptcy, insolvency or dissolution of such Limited Partner.

Sec. 9.4     **Amendments to this Agreement.**  The terms and provisions of this Agreement may be modified or amended at any time with the written consent of Limited Partners having an aggregate Ownership Percentage in excess of fifty percent (50%) and the written consent of the General Partner, insofar as is consistent with the laws governing this Agreement; provided, however, that, without the consent of the Limited Partners, the General Partner may (i) amend the Partnership's records to reflect changes validly made in the membership of this Partnership and the Capital Contributions and Ownership Percentages of the Partners or (ii) amend or modify this Agreement (a) to form, qualify or continue the Partnership as a limited partnership in all jurisdictions in which the Partnership conducts or plans to conduct business, (b) to satisfy any requirements, conditions, guidelines, or options contained in any opinion, directive, order, ruling or regulation of the Securities and Exchange Commission, the Internal Revenue

Service, Commodity Futures Trading Commission, National Futures Association, National Association of Securities Dealers, or any other federal or state agency, or in any federal or state statute, compliance with which the General Partner deems to be in the best interest of the Partnership including, without limitation, any amendment or modification necessary to prevent the Partnership from in any manner being deemed to be an "Investment Company" subject to the provisions of the Investment Company Act of 1940, as amended, to ensure that the Partnership will not be treated as a corporation for federal income tax purposes, or to comply with provisions of the Investment Advisers Act of 1940, as amended, if necessary, (c) to change the name of the Partnership, (d) to create a new class or group of Partnership interests that was not previously outstanding, (e) to make any change necessary to reflect (i) any change in the Act, (ii) if the Partnership elects to trade commodity futures contracts and the General Partner elects to register or file for an exemption from registration as a commodity pool operator and/or a commodity trading advisor, or (iii) the registration of the General Partner, Affiliates as an investment adviser under the Investment Advisers Act of 1940, as amended, or (f) to make any change that does not adversely affect the Limited Partners in any material respect or that is necessary or desirable to cure any ambiguity or correct or supplement any provision herein contained which may be incomplete or inconsistent with any other provision herein contained.  The General Partner will provide notice to the Limited Partners of any amendments or modifications made pursuant to (ii)(a)-(f) above as soon as practicable following such amendment or modification.  Without the specific prior written consent of each Limited Partner affected thereby, no modification of or amendment to this Agreement will (i) reduce the Capital Account of any Limited Partner or its rights of contribution or withdrawal with respect thereto; (ii) increase the amounts reallocated pursuant to Sec. 3.5(c); or (iii) amend this Sec. 9.4.

Sec. 9.5        **Actions by Written Consent; Consent by Silence; Certain Consent.**  All actions, votes or consents required or permitted to be taken by the Limited Partners will be taken by the written consent of Limited Partners holding in aggregate not less than the minimum Ownership Percentages specified herein as to the particular action, vote or consent. Notwithstanding the foregoing, for purposes of obtaining any such consent as to any matter proposed by the General Partner, the General Partner may, in the notice seeking consent of Limited Partners, require a response within a specified period (which will not be less than fourteen days) and failure to give the General Partner written notice of opposition to the proposed action within that period will constitute a vote and consent to approve the proposed action. Except as otherwise expressly provided in the proposal for an action, that action will be effective immediately after the required signatures have been obtained or, if applicable, the expiration of the period within which responses were required, if that requirement was imposed and there were not votes cast against such action in the amount necessary to prevent the action from becoming effective.

Sec. 9.6        **Adjustment of Basis of Partnership Property.**  In the event of a distribution of Partnership property to a Partner or an assignment or other transfer (including by reason of death) of all or part of the interest of a Partner in the Partnership, the Partnership may be required to, or, at the request of a Partner, the General Partner, in its discretion, may cause the Partnership to, elect, pursuant to Section 754 of the Code, or the corresponding provision of subsequent law, to adjust the basis of the Partnership property as provided by Sections 734 and 743 of the Code.

Sec. 9.7        **Choice of Law.**  Notwithstanding the place where this Agreement may be executed by any of the parties hereto, the parties expressly agree that all of the terms and provisions hereof shall be construed under the laws of the State of Delaware and, without limitations thereof, that the Act shall govern the partnership aspects of this Agreement.

Sec. 9.8        **Notices.**  Each notice relating to this Agreement shall be in writing and delivered in person or by registered or certified mail or a recognized overnight courier.  All notices to the Partnership shall be addressed to its principal office and place of business.  All notices addressed to a

Partner shall be addressed to such Partner at the address set forth in the Schedule.  Any Partner may designate a new address by written notice to that effect given to the Partnership.  Unless otherwise specifically provided in this Agreement, a notice shall be deemed to have been effectively given when mailed by registered or certified mail to the proper address or when delivered in person.

Sec. 9.9        **Good Will.**  No value shall be placed on the name or good will of the Partnership, which shall belong exclusively to the General Partner.

Sec. 9.10        **Headings.**  The titles of the Articles and the headings of the Sections of this Agreement are for convenience of reference only, and are not to be considered in construing the terms and provisions of this Agreement.

Sec. 9.11        **Pronouns.**  All pronouns shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the identity of the person or persons, firm or corporation may require in the context thereof.

Sec. 9.12        **Cross Reference to Specific Sections.**  The cross references made in one or more sections of this Agreement to another section or other sections in this Agreement (rather than such cross references only containing a general cross reference to other sections such as "except as otherwise stated or provided herein") are intended only as a guide to assist in the expeditious reading, understanding and interpretation of this Agreement; and such cross references are not intended to be, nor shall they be construed to be, the sole and only means by which the applicable section or sections of the Agreement, taken in its entirety, is to be interpreted.

Sec. 9.13        **Counterparts.**  This Agreement may be executed in facsimile counterparts and all such facsimile counterparts, taken together, shall constitute valid signatures with respect to this Agreement.

Sec. 9.14        **Entire Agreement**.  This Agreement constitutes and represents the entire Agreement between the parties hereto and supersedes any prior understandings or agreements, written or oral.

Sec. 9.15        **No Waiver**.  No waiver of any provision of this Agreement shall be effective unless it is in writing, signed by the party against whom it is asserted, and any such written waiver shall only be applicable to the specific instance to which is related and shall not be deemed to be a continuing or further waiver.

Sec. 9.16        **Jurisdiction**.  For purposes of any claim arising under this Agreement, each of the parties hereto hereby submits to the non-exclusive jurisdiction of the courts of the State of New York and of the United States having jurisdiction in the State of New York, and agrees not to raise and waives any objection to or defense based upon the venue of any such court or based upon *forum non conveniens*. Each of the parties consents to service of process by personal service in any manner in which notice may be delivered hereunder in accordance with Sec. 9.8 above.

Sec. 9.17        **Interpretation.**  This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

Sec. 9.18        **Confidentiality.**  Each Limited Partner hereby agrees that it shall not employ the General Partner's investment strategy or divulge to third parties, other than any such Limited Partner's legal and accounting advisors, the identity of any Security held by the Partnership (as discussed in Sec.

2.8 hereof) and the General Partner's trading strategy with respect to any positions in any such Limited Partner's Capital Account or Capital Accounts (as the case may be).  Furthermore, each Limited Partner understands and agrees that it does not have the right to know the names or identities of the other Limited Partners.

Notwithstanding the foregoing, the Partnership, the General Partner and each Limited Partner (and any employee, representative or other agent of the Partnership, the General Partner, the Investment Advisor, or any Limited Partner) may disclose to any and all persons, without limitation of any kind, the U.S. federal income tax treatment and tax structure of the transactions contemplated by the Partnership's Memorandum. However, any such information relating to the U.S. federal income tax treatment or tax structure is required to be kept confidential to the extent necessary to comply with any applicable U.S. federal or state securities laws.  For this purpose, tax treatment and tax structure shall not include (i) the identity of the Partnership, the General Partner or any Limited Partner (or, in each case, any affiliate thereof), (ii) any investment or transaction entered into by the Partnership, the General Partner or any Limited Partner (or, in each case, any affiliate thereof), (iii) any performance information relating to the Partnership, the General Partner, the Investment Advisor or any Limited Partner (or in each case, any affiliate thereof), (iv) any performance or other information relating to previous funds or investments sponsored by the General Partner or the Investment Advisor, or (v) other nonpublic business or financial information (including, without limitation, the amount of any fees, expenses, rates or payments) that is not relevant to an understanding of the U.S. tax treatment of the transactions contemplated by the Partnership's Memorandum.

Sec. 9.19     **Partial Invalidity.**   The invalidity of all or any part of any paragraph or subparagraph of this Agreement shall not render invalid the remainder of this Agreement or any such paragraph or subparagraph.

IN WITNESS WHEREOF, the undersigned have hereunto set their hands as of the date first set forth above.

**General Partner:**

Tremont Partners, Inc.

By:_____
    Name:
    Title:

**Limited Partner:**

Each person who shall sign a Limited Partner Signature Page in the form attached in the Subscription Agreement and who shall be accepted by the General Partner to the Partnership as a Limited Partner.