Name of Recipient _____

# RYE SELECT BROAD MARKET XL PORTFOLIO LIMITED

*A Cayman Islands Exempted Company*

**Private Offerings of Classes of Shares**

**AMENDED AND RESTATED
INFORMATION MEMORANDUM**

**February 1, 2008**

**Price per Share of each Class of the Fund: Initially U.S.$1,000 and thereafter
at Net Asset Value as discussed herein**

Investment Manager:    Tremont Partners, Inc.

Administrator:    The Bank of New York Mellon Corporation

**THE INVESTMENT MANAGER IS EXEMPT FROM REGISTRATION WITH THE COMMODITY FUTURES TRADING COMMISSION AS A COMMODITY POOL OPERATOR PURSUANT TO RULE 4.13(A)(4) AND THEREFORE, UNLIKE A REGISTERED COMMODITY POOL OPERATOR, IT IS NOT REQUIRED TO DELIVER A DISCLOSURE DOCUMENT AND A CERTIFIED ANNUAL REPORT TO PARTICIPANTS IN THE POOL.**

NOTICES

NEITHER RYE SELECT BROAD MARKET XL PORTFOLIO LIMITED, (THE "FUND") NOR THE CLASS A AND CLASS B SHARES OF THE FUND (THE "CLASS A SHARES," AND THE "CLASS B SHARES" RESPECTIVELY, AND TOGETHER, THE "SHARES") DESCRIBED IN THIS AMENDED AND RESTATED INFORMATION MEMORANDUM (THE "MEMORANDUM") HAVE BEEN OR WILL BE REGISTERED OR QUALIFIED UNDER THE SECURITIES LAWS OF THE UNITED STATES ("U.S.") OR ANY OTHER JURISDICTION. THIS MEMORANDUM SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SHARES, NOR SHALL THERE BE ANY SALE OF SHARES IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE IS NOT AUTHORIZED OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER, SOLICITATION OR SALE. NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATIONS CONCERNING THE FUND OR THE SHARES THAT ARE INCONSISTENT WITH THOSE CONTAINED IN THIS MEMORANDUM, AND, ACCORDINGLY, ANY SUCH REPRESENTATIONS SHOULD BE TREATED AS UNAUTHORIZED AND MAY NOT BE RELIED UPON BY THE PARTY TO WHOM SUCH REPRESENTATIONS ARE MADE.

PROSPECTIVE INVESTORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL, TAX, ERISA OR FINANCIAL ADVICE. ALL PROSPECTIVE INVESTORS SHOULD CONSULT THEIR OWN PROFESSIONAL ADVISORS AS TO THE LEGAL, TAX, ERISA, FINANCIAL OR OTHER MATTERS RELEVANT TO THE SUITABILITY OF AN INVESTMENT IN THE FUND FOR SUCH INVESTOR. SEE THE SECTION ENTITLED "CERTAIN RISK FACTORS" WITHIN THIS MEMORANDUM FOR A DESCRIPTION OF CERTAIN RISKS INVOLVED IN THE PURCHASE OF SHARES.

THIS MEMORANDUM IS BEING GIVEN TO THE RECIPIENT SOLELY FOR THE PURPOSE OF EVALUATING AN INVESTMENT IN THE SHARES DESCRIBED HEREIN.  IT MAY NOT BE REPRODUCED OR DISTRIBUTED TO ANYONE ELSE (OTHER THAN THE IDENTIFIED RECIPIENT'S PROFESSIONAL ADVISORS). THE RECIPIENT, BY ACCEPTING DELIVERY OF THIS MEMORANDUM AGREES TO RETURN IT AND ALL RELATED DOCUMENTS TO THE FUND IF THE RECIPIENT DETERMINES NOT TO SUBSCRIBE FOR SHARES.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OF THE SHARES TO ANY MEMBER OF THE PUBLIC IN THE CAYMAN ISLANDS AND THE SHARES MAY NOT BE OFFERED TO ANY MEMBER OF THE PUBLIC IN THE CAYMAN ISLANDS.

THE FUND HAS BEEN REGISTERED AS A MUTUAL FUND PURSUANT TO SECTION 4(3) OF THE MUTUAL FUNDS LAW (AS AMENDED) OF THE CAYMAN ISLANDS (THE "MUTUAL FUNDS LAW") WITH THE MUTUAL FUNDS DEPARTMENT OF THE MONETARY AUTHORITY OF THE CAYMAN ISLANDS (THE "MONETARY AUTHORITY").  SUCH REGISTRATION DOES NOT IMPLY THAT THE MONETARY AUTHORITY OR ANY OTHER REGULATORY AUTHORITY IN THE CAYMAN ISLANDS HAS PASSED UPON OR APPROVED THIS MEMORANDUM OR THE OFFERING OF THE SHARES HEREUNDER NOR IS IT INTENDED THAT THEY WILL.

THE FUND'S NET ASSET VALUE AND THE NET ASSET VALUE OF THE SHARES WILL BE CALCULATED IN THE CURRENCY IN WHICH THE SHARES ARE ISSUED.  INITIALLY, SHARES WILL ONLY BE ISSUED IN U.S. DOLLARS.  ACCORDINGLY, UNTIL SUCH TIME AS SHARES ARE ISSUED IN DIFFERENT CURRENCIES, EACH SHAREHOLDER, AND NOT THE FUND, WILL BEAR THE RISK OF ANY FOREIGN CURRENCY EXPOSURE RESULTING FROM DIFFERENCES, IF ANY, IN THE VALUE OF THE U.S. DOLLAR RELATIVE TO THE CURRENCY OF THE COUNTRY IN WHICH SUCH SHAREHOLDER RESIDES OR MAINTAINS ITS NET WORTH.

TO THE EXTENT THAT THESE MATERIALS CONTAIN STATEMENTS ABOUT THE FUTURE, SUCH STATEMENTS ARE FORWARD LOOKING AND SUBJECT TO A NUMBER OF RISKS AND UNCERTAINTIES,

INCLUDING, BUT NOT LIMITED TO, RISKS ASSOCIATED WITH FUTURE FINANCIAL RESULTS, DEVELOPMENT OF NEW PRODUCTS, GOVERNMENT APPROVAL PROCESSES, THE IMPACT OF COMPETING PRODUCTS OR PRICING, THE EFFECT OF ECONOMIC CONDITIONS AND OTHER UNCERTAINTIES.  THESE RISKS COULD AFFECT THE VALUE OF THE SHARES DESCRIBED HEREIN AND COULD CAUSE THE RESULTS FOR THE CURRENT FISCAL YEAR AND BEYOND TO DIFFER MATERIALLY FROM THOSE EXPRESSED IN ANY FORWARD LOOKING STATEMENTS MADE HEREIN.

INVESTORS (AND EACH EMPLOYEE, REPRESENTATIVE OR OTHER AGENT OF INVESTORS) MAY DISCLOSE TO ANY AND ALL PERSONS, WITHOUT LIMITATIONS OF ANY KIND, THE TAX TREATMENT AND TAX STRUCTURE OF THE TRANSACTION AND ALL MATERIALS OF ANY KIND (INCLUDING OPINIONS OR OTHER TAX ANALYSIS) THAT ARE PROVIDED TO INVESTORS RELATING TO SUCH TAX TREATMENT AND TAX STRUCTURE.  THIS AUTHORIZATION OF TAX DISCLOSURE IS RETROACTIVELY EFFECTIVE TO THE COMMENCEMENT OF THE FIRST DISCUSSIONS BETWEEN SUCH INVESTOR AND THE FUND REGARDING THE TRANSACTIONS CONTEMPLATED HEREIN.

DISCUSSIONS IN THIS MEMORANDUM BELOW AS THEY RELATE TO CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES ARE NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING UNITED STATES FEDERAL TAX PENALTIES.  SUCH DISCUSSIONS WERE WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED IN THIS MEMORANDUM, AND ANY TAXPAYER TO WHOM THE TRANSACTIONS OR MATTERS ARE BEING PROMOTED, MARKETED OR RECOMMENDED SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

---

UNLESS OTHERWISE NOTED, ALL MONETARY AMOUNTS
SET FORTH HEREIN ARE EXPRESSED IN U.S. DOLLARS ("$").

# RYE SELECT BROAD MARKET XL PORTFOLIO LIMITED

## SUMMARY

The information set out below is a summary of certain important terms and should be read in conjunction with, and is qualified in its entirety by, the full text of the Amended and Restated Information Memorandum (the "Memorandum") and Memorandum and Articles of Association of the Fund (as defined below) (the "Memorandum and Articles of Association") which are available upon request.

**Fund**

Rye Select Broad Market XL Portfolio Limited, (the "Fund") is a Cayman Islands exempted company which was incorporated with limited liability in the Cayman Islands on February 10, 2006. As of the date set forth hereof, the Fund is principally offering its Shares (as defined herein) to high net worth individuals and institutions that meet the suitability requirements described more fully herein. Shares of the Fund are issued in classes (each a "Class"). As of the date of this Memorandum, the Fund is offering Class A and Class B Shares (the "Class A Shares" and the "Class B Shares," respectively and together, the "Shares"), denominated in U.S. dollars. Class B Shares are subject to an Investor Servicing Fee (as defined herein). Share purchases shall be at the prevailing Net Asset Value per Share of the relevant Class of the Fund. Upon acquiring Shares, investors become shareholders in the Fund (each a "Shareholder" and collectively the "Shareholders"). See "SHARES OF THE FUND - The Fund's Share Capital."

*Additional Classes.* In addition to the Classes of Shares being offered, the Fund, from time to time, may offer additional voting or non-voting classes of shares which shares may be offered on terms that differ from those discussed herein. Such differing terms may include, but are not limited to, offering shares in a currency other than U.S. dollars or offering shares that utilize more leverage than the Shares. Such additional classes of shares may be offered pursuant to different offering documents.

**Investment Objective and Strategy**

*General.* The Fund seeks to provide investors with long-term capital growth through exposure, on an approximate three times levered basis, to the economic performance of the Rye Select Broad Market Portfolio Limited, a Cayman Islands exempted company (the "Reference Entity"). The Fund intends to achieve this return by entering into one or more total return or price return swaps and/or options (or transactions similar to any of the foregoing) with one or more designated counterparties (each a "Counterparty") on a leveraged basis (each, a "Swap" and collectively, the "Swaps"). Furthermore, if, at any time, it becomes advantageous to achieve the foregoing investment

objective by utilizing another type of investment transaction (e.g., note, option, etc.), the Fund may, in its sole discretion, discontinue its use of a, or enter into a new or different or additional, Swap, in whole or in part. At present, the Investment Manager (as defined herein) serves as sub-adviser to the Reference Entity. The Investment Manager may, from time to time in its sole discretion, invest the Fund's assets directly in the Reference Entity (and other investment vehicles of which the Investment Manager may or may not serve as investment manager or sub-adviser) or in any other manner that the Investment Manager, in its sole discretion, believes is consistent with the investment objective of the Fund.   For a complete description of the Fund's investment objective and strategy, see "INVESTMENT OBJECTIVE AND STRATEGY" herein.

*The Swaps.*  The Fund will enter into one or more Swaps with one or more Counterparties, whereby each Counterparty will contract to pay the Fund, on a leveraged basis, a payment equal to the increase in the net asset value of the Reference Entity subject to the Swap; in exchange, the Fund, will pay each Counterparty floating or fixed rate payments on any leverage embedded in the Swap.  Each Counterparty, or an affiliate thereof, is expected, but is not obligated, to invest directly in the Reference Entity in order to hedge the Counterparty's obligations to the Fund.  All payment calculations are to be determined by the relevant Counterparty (or an affiliate thereof) to each Swap in accordance with the relevant Swap Documents (as defined herein).

*Swap Documents.*   Each Swap will be evidenced by a Confirmation as referenced in the relevant ISDA Master Agreement along with any other documents between the Counterparty and the Fund and/or other parties (collectively, the "Swap Documents").

*Derivatives; Leverage.*  The Fund is authorized to use derivatives and leverage to enhance the returns to Shareholders. It is expected that a Swap and any other instrument will provide an enhanced return (or loss, as the case may be) for the Fund by providing for a return (or loss, as the case may be), subject to the terms of such Swap.  It is intended that each Swap will provide the Fund with a return equal to approximately three times (3x) the economic performance of the Reference Entity on a notional amount equal to the Fund's investment in the Swap, less associated costs and fees (including , without limitation, the above-referenced floating or fixed rate payments).

No assurance can be given that the strategy or strategies utilized will be successful under all or any market conditions or that the

Fund will outperform a direct investment in the Reference Entity.

There can be no assurance that the Investment Manager will be successful in pursuing the Fund's investment objective or that the strategies set forth herein will be successful. **Past results of the Investment Manager or its respective principals are not necessarily indicative of the future performance of the Fund.**

**Board of Directors**

The initial Board of Directors of the Fund (the "Board" or the "Directors") consists of three (3) Directors. The Board has complete authority over the operations and management of the Fund. Certain operations of the Fund, however, have been delegated by the Board to the Administrator and the management of the Fund's assets has been delegated to the Investment Manager (each of which is further described below). See "MANAGEMENT - Board of Directors."

**Investment Manager**

The Fund has retained Tremont Partners, Inc. to serve as investment manager to the Fund (the "Investment Manager") pursuant to a management agreement (the "Management Agreement"). The Investment Manager may engage other persons or entities to perform similar functions, as it deems necessary from time to time. The Investment Manager is registered as an investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act") and has attached hereto a copy of Part II of its most recent Form ADV as Exhibit I. The Investment Manager also serves as sub-advisor to the Reference Entity.

The Investment Manager is an unregistered commodity pool operator and an unregistered commodity trading advisor that has filed for an exemption from registration pursuant to Rule 4.13(a)(4) and Rule 4.14(a)(8) of the Commodity Exchange Act, as amended (the "CEA"). See "MANAGEMENT – Investment Manager."

**Administrator**

The Fund has entered into an agreement (the "Services Agreement") with The Bank of New York Mellon Corporation to provide administration services. The Administrator performs various administrative services for the Fund, including calculation of the Net Asset Value (as defined herein) of the Shares on a monthly basis. See "MANAGEMENT – Administrator."

**Subscriptions**

Shares of either Class may be purchased on a monthly basis, on the first Business Day (as defined herein) of each calendar month, or on any other day approved by the Board in its sole discretion (each a "Subscription Date"), at the relevant Class' prevailing Net Asset Value per Share. The term "Business Day"

refers to any day when the securities markets in the United States are open for business (other than a Saturday or Sunday), or such other day or days as may be determined by the Directors. The Directors have the right to reject any subscription for any or no reason. Investments in the Fund must be made in cash, unless otherwise agreed to by the Directors. Completed subscription materials must be received by the Administrator at least three (3) days prior to the Subscription Date on which prospective investors wish to subscribe for Shares, and cleared funds must be in the Fund's account at least one (1) Business Day before the Subscription Date. See "ELIGIBLE INVESTORS" and "SUBSCRIPTIONS."

**Minimum Investment**

The minimum investment in Class A and Class B Shares is $500,000. The minimum initial investment for Shares may be reduced in the Board's sole discretion. In all instances, the minimum initial investment for each Class will not be less than $50,000.

**Eligible Investors**

The Shares may be purchased only by "Eligible Investors" as described in this Memorandum. Persons interested in purchasing the Shares should inform themselves as to the legal requirements within their own countries for the purchase of the Shares and any foreign exchange restrictions with which they must comply. Shares may be sold to permitted U.S. investors ("Permitted U.S. investors"), but such Permitted U.S. investors may be required to provide such additional documents as the Board may determine. In the case of such Permitted U.S. investors, Shares may be sold only to investors who are "accredited investors" under Rule 501 of Regulation D under the U.S. Securities Act of 1933, as amended, "qualified purchasers" under the Investment Company Act of 1940, as amended, and meet any other eligibility standards that legal counsel to the Fund advises. The Fund reserves the right to reject subscriptions for Shares in its absolute discretion without assigning any reason therefor. See "ELIGIBLE INVESTORS," and "TAXATION."

**Valuation**

The Administrator shall calculate the Net Asset Value (as defined herein) of the Fund on a monthly basis, as of the last Business Day of the calendar month, or any other day that the Directors so determine in their sole discretion (each a "Valuation Date").

**Dividends**

The Fund does not currently expect to pay dividends or other distributions to Shareholders, other than the proceeds of redemptions.

**Redemptions**

*Generally.* The holders of Class A Shares and Class B Shares may request a redemption of Shares, on at least forty-five (45) days' prior written notice to the Administrator, on the last

Business Day of each calendar quarter, or on a date other than as at the end of a calendar quarter at the Board's discretion, at a redemption price equal to the Net Asset Value per Share of the relevant Class on such date. The Board may waive or shorten such notice period on a case by case basis in its sole discretion. Subject to the Board's right to establish reserves, generally at least ninety percent (90%) of redemption proceeds will be paid to the redeeming Shareholder within thirty (30) days after the redemption date, although the Fund reserves the right to retain up to ten percent (10%) of the redemption proceeds until after the annual audit for the year in which such redemption occurred is completed to confirm the accuracy of the payment.

The Fund may require the compulsory redemption of Shares for any or no reason. In circumstances where the Fund is unable to liquidate securities positions in an orderly manner in order to fund redemptions or where the value of the assets and liabilities of the Fund cannot reasonably be determined, the Fund may take longer than thirty (30) days to effect settlements of redemptions or it may even suspend redemptions. The Fund may, in its discretion or on advice from the Investment Manager, settle redemptions in cash or in kind (or partially in cash and partially in kind). In addition, the Fund may withhold a portion of any redemption if necessary to comply with any regulatory requirements.

For a more detailed description of Shareholder redemption rights, prospective shareholders should carefully review the "REDEMPTIONS" section.

**Fees and Expenses**

*Management Fees and Administrative Fees at the Reference Entity Level.* There is no management fee payable to the Investment Manager by the Fund. However, there is an annual 1.5% management fee charged at the Reference Entity level by the investment manager on all assets invested in the Reference Entity. Because the return to the Fund under a Swap will be based on the amount a hypothetical investor in the Reference Entity would receive upon redeeming its interest in the Reference Entity (i.e. net of the 1.5% management fee on the hypothetical investor's levered investment), the Fund (and thus indirectly the Shareholders) will effectively bear a 1.5% annual management fee on the amount of the Fund's investment in each Swap as fully levered pursuant to each Swap's terms.

There is no administration fee payable to the Investment Manager by the Fund. However, there is a monthly 0.20% administration fee charged at the Reference Entity level by the investment manager on all assets invested in the Reference Entity. Since the return to the Fund under a Swap will be based on the amount a hypothetical investor in the Reference Entity

would receive upon redeeming its interest in the Reference Entity (i.e. net of the 0.20% administration fee on the hypothetical investor's levered investment), the Fund (and thus indirectly the Shareholders) will effectively bear a 0.20% monthly administration fee on the amount of the Fund's investment in each Swap as fully levered pursuant to each Swap's terms.

*Investor Servicing Fee.* The Investment Manager on behalf of the Fund may enter into one or more agreements with one or more unaffiliated third party placement agents (each a "Placement Agent") to place investors in the Class B Shares of the Fund. Any such Placement Agents who place investors in the Fund will be entitled to receive a fee from Class B Shareholders in an amount up to 1.00% per annum of the Net Asset Value of the Class B Shares (the "Investor Servicing Fee"). The Investor Servicing Fee shall be payable monthly in arrears. The Investor Servicing Fee will be prorated based upon a Class B Shareholder's actual period of ownership of its Class B Shares. Payment of the Investor Servicing Fee is due as of the last day of each calendar month and is payable by the Fund within a reasonable time thereafter. The Investor Servicing Fee may be waived or reduced, by rebate or otherwise with respect to any Class B Shareholder.

*Administration Fee.* For its administrative duties the Administrator receives a monthly administration fee (the "Administration Fee") in an amount consistent with reasonable and customary administration fees. The Administration Fee will be calculated and is payable as of the last Business Day of each calendar month. The Administrator is also entitled to reimbursement of actual out-of-pocket expenses incurred on behalf of the Fund.

*Organizational Expenses.* The Fund will pay the organizational costs of the Fund.

*Ongoing Expenses.* The Fund pays for all routine and customary expenses associated with its administration and operation, including, but not limited to, the cost of maintaining the Fund's registered office, the Fund's annual government registration fee, brokerage commissions, communications, Directors' fees and expenses, Fund administration, other service providers expenses (including any custodian fees, if any), fees and expenses associated with a Swap, insurance premiums, printing costs, and all tax, accounting (and audit) and legal, and similar ongoing operational expenses. Fees and expenses that are identifiable with a particular Class of Shares are charged against that Class in computing its Net Asset Value. Other fees and expenses will be

charged to the Fund as a whole or otherwise in the discretion of the Board.

*Directors' Fees.* For their services, the Directors who are not affiliated with the Investment Manager receive a flat annual fee (in accordance with reasonable and customary fees) for serving in such capacity. The Directors will be entitled to be reimbursed for reasonable out of pocket expenses.

**Risk Factors; Conflicts of Interest**

The Fund is a relatively new entity and, as such, has limited operating history. Investment in the Fund is speculative and involves a high degree of risk. Past performance of the Investment Manager is no guarantee of the future performance of the Fund or any such party. There is no assurance that the Fund will be profitable. The risks of an investment in the Fund include, but are not limited to, the speculative nature of the Fund's strategies and the charges that the Fund will incur regardless of whether any profits are earned. See "CERTAIN RISK FACTORS." The Investment Manager may directly or indirectly manage the assets of other funds that in some respects compete with one or more of the Fund for certain investments. The Fund is also subject to certain conflicts of interest. See "POTENTIAL CONFLICTS OF INTEREST."

**Listing**

While it is not presently contemplated, the Board may list the Fund's Shares on The Irish Stock Exchange or any other stock exchange without prior notice to the Shareholders. There is no current public market for the resale of Shares, and notwithstanding an application for listing, no such market is likely to exist in the future.

**Reporting**

Shareholders will receive annual audited financial statements which are prepared in accordance with U.S. GAAP within six (6) months after the Fund's fiscal year-end (starting with the Fund's first fiscal year) and the Administrator will communicate the Fund's Net Asset Value and the Net Asset Value of the Shares to Shareholders on a monthly basis. See "ADDITIONAL AND GENERAL INFORMATION – Reports to Shareholders."

**Fiscal Year**

The Fund's fiscal year-end is December 31st.

**Tax Status**

Under current Cayman Islands law, the Fund will not be subject to any Cayman Islands taxation and under current laws of the United States, the Fund should not be subject to any U.S. income taxation (other than U.S. withholding taxes on dividends and certain interest income derived from U.S. sources). Certain dividend income, interest income and certain capital gains income realized by the Fund may be subject to income or

[817787-4]

ix

withholding taxes in the jurisdiction of the source of such income.

Investors should obtain their own legal or tax advice on the tax and other consequences of purchasing, holding, transferring and selling the Shares. See "TAXATION."

**Certain ERISA Considerations**

Investment in the Fund generally will be open to employee benefit plans and other funds subject to ERISA and/or Section 4975 of the Code (as defined herein). Except as described below under "Risk Factors - Compliance with ERISA Transfer Restrictions", the Investment Manager intends to use commercially reasonable efforts to cause "benefit plan investors" not to own a significant portion of any class of equity interests in the Fund, so that the assets of the Fund should not be considered "plan assets" for purposes of ERISA and Section 4975 of the Code, although there can be no assurance that non "plan asset" status will be obtained or maintained.  The Fund reserves the right to change this policy in its discretion with notice to the Shareholders.  Prospective purchasers and subsequent transferees of Shares in the Fund may be required to make certain representations regarding compliance with ERISA and Section 4975 of the Code. See "Certain ERISA Considerations".

**EACH PROSPECTIVE SHAREHOLDER THAT IS SUBJECT TO ERISA AND/OR SECTION 4975 OF THE CODE IS ADVISED TO CONSULT WITH ITS OWN LEGAL, TAX AND ERISA ADVISERS AS TO THE CONSEQUENCES OF AN INVESTMENT IN THE FUND.**

**Transfers**

Shareholders may only transfer their Shares with the prior written consent of the Directors, which consent may be arbitrarily withheld.

**Functional Currency**

The Fund's functional currency (*i.e.*, the currency in which it maintains its books, records, and financial statements) is the U.S. dollar.

**Privacy Notice**

Any and all nonpublic personal information received by the Fund, the Investment Manager and/or the Administrator with respect to the Shareholders which are natural persons, including the information provided to the Fund by a Shareholder in the subscription documents, will not be shared with nonaffiliated third parties which are not service providers to the Fund and/or the Investment Manager without prior notice to such Shareholders.  Such service providers include but are not limited to the Administrator, the auditors and the legal advisors of the Fund. Additionally, the Fund, the Investment Manager and/or the Administrator may disclose such nonpublic personal information as required by law (such as to respond to a subpoena or to

prevent fraud).  In particular, this provision is subject at all times to the anti-money laundering rules promulgated by the jurisdictions wherein the Fund is domiciled or operating, such as, without limitation, the Cayman Islands, and to the Executive Order on Terrorist Financing as issued by the United States of America, and to similar governmental action.  See Exhibit II attached hereto.

## DIRECTORY

**Registered Office of the Fund**
Walkers SPV Limited
Walker House
KY1-9002
Mary Street
George Town, Grand Cayman
Cayman Islands

**Investment Manager**
Tremont Partners, Inc.
555 Theodore Fremd Avenue, Suite C-300
Corporate Center at Rye
Rye, New York 10580
Telephone: (914) 925-1140
Telecopier: (914) 925-4090

**Administrator**
The Bank of New York Mellon Corporation
101 Barclay Street
13th Floor West
New York, NY 10286
Telephone: (212) 815-4090
Facsimile: (212) 644-6669

**Auditors**
KPMG
Century Yard
Cricket Square
P.O. Box 493
Grand Cayman, KY1-1106
Cayman Islands
Telephone. (345) 949-4800
Facsimile: (345) 949-7164

**Legal Advisors**

*As to United States Law:*
Tannenbaum Helpern
Syracuse & Hirschtritt LLP
900 Third Avenue
New York, N.Y. 10022
U.S.A.
Attn: Michael G. Tannenbaum, Esq
Telephone: (212) 508-6700
Facsimile: (212) 371-1084

*As to Cayman Islands Law:*
Walkers
Walker House
KY1-9001
Mary Street
George Town, Grand Cayman
Cayman Islands
Attn: Mark P. Lewis, Esq.
Telephone: (345) 914-4223
Facsimile: (345) 949-7886

[817787-4]

Table of Contents

Page

SUMMARY ....................................................................................................................iii

DIRECTORY ..................................................................................................................xii

THE FUNDS ...................................................................................................................1

INVESTMENT OBJECTIVE AND STRATEGY .........................................................1

MANAGEMENT.............................................................................................................5
    Board of Directors ...................................................................................................5
    Investment Manager.................................................................................................6
    The Placement Agent ...............................................................................................7
    Administrator ...........................................................................................................7
    Independent Client Representative ..........................................................................9

FEES AND EXPENSES...................................................................................................9
    Fees of the Investment Manager ............................................................................9
    Fees of the Administrator.......................................................................................10
    Organizational and Other Expenses.......................................................................10
    Directors' Fees .......................................................................................................10

SHARES OF THE FUND ..............................................................................................10
    Funds Share Capital ...............................................................................................10
    Temporary Suspension of Dealings and Determination of Net Asset Value.........11
    Voting and Other Rights .........................................................................................11
    Registration and Transfer of Shares.......................................................................12

SUBSCRIPTIONS..........................................................................................................12
    Generally.................................................................................................................12

ELIGIBLE INVESTORS................................................................................................13

REDEMPTIONS..............................................................................................................14
    Inability to Liquidate ..............................................................................................14
    Compulsory Redemptions.......................................................................................14
    Miscellaneous .........................................................................................................14

CERTAIN RISK FACTORS .........................................................................................16
    General Considerations...........................................................................................16
    Directors..................................................................................................................27
    Common Counsel ....................................................................................................27

TAX CONSIDERATIONS..............................................................................................28
    Introduction.............................................................................................................28
    The Funds ................................................................................................................28
    Shareholders of the Funds.......................................................................................29
    Unrelated Business Taxable Income .......................................................................30
    Information Returns .................................................................................................30

ERISA CONSIDERATIONS ................................................................................................ 30

ADDITIONAL AND GENERAL INFORMATION ............................................................ 33
    Cayman Islands Mutual Funds Law ........................................................................ 33
    Cayman Islands Anti Money laundering Regulations ........................................... 34
    Other Jurisdictions ................................................................................................... 35
    Further Issues of Shares ........................................................................................... 35
    Principal Object ....................................................................................................... 36
    Share Premium Account ......................................................................................... 36
    Repurchase of Shares .............................................................................................. 36
    Alterations to a Fund's Share Capital ..................................................................... 36
    Variation of Class Rights ......................................................................................... 36
    Amendment of Memorandum and Articles of Association ..................................... 36
    Directors' Interest in Contracts ............................................................................... 37
    Directors' Powers .................................................................................................... 37
    Removal of Directors .............................................................................................. 37
    Reports to the Shareholders .................................................................................... 37
    Meetings of Shareholders ........................................................................................ 38
    Inquiries ................................................................................................................... 38

EXHIBITS:

I.   TREMONT PARTNERS, INC.'S FORM ADV PART II

II.  PRIVACY NOTICE

# RYE SELECT BROAD MARKET XL PORTFOLIO LIMITED

## THE FUND

*Generally.* Rye Select Broad Market XL Portfolio Limited (the "Fund") was incorporated as an exempted company under the laws of the Cayman Islands on February 10, 2006. As of the date set forth hereof, the Fund is principally offering its Shares (as defined herein) to high net worth individuals and institutions that meet the suitability requirements described more fully herein. Shares of the Fund are issued in classes (each a "Class"). The Fund is presently offering Class A and Class B Shares (the "Class A Shares" and "Class B Shares," respectively and together, the "Shares") denominated in U.S. dollars pursuant to this Amended and Restated Information Memorandum (the "Memorandum"). See "SHARES OF THE FUND–Fund Share Capital" herein for a description of the different Classes of Shares. Share purchases shall be at the prevailing Net Asset Value per Share of the relevant Class of the Fund. Upon acquiring Shares, investors become shareholders in the Fund (each a "Shareholder" and collectively the "Shareholders"). The Fund qualifies as a "Mutual Fund" under the Mutual Funds Law (as amended) of the Cayman Islands and is or will be so registered in the Cayman Islands.

*Additional Classes.* In addition to the Classes of Shares being offered, the Fund, from time to time, may offer additional voting or non-voting classes of shares which shares may be offered on terms that differ from those discussed herein. Such differing terms may include, but are not limited to, offering shares in a currency other than U.S. dollars or offering shares that utilize more leverage than the Shares. Such additional classes of shares may be offered pursuant to different offering documents or pursuant to side letters.

The information in this Memorandum is qualified in its entirety by the Fund's Memorandum and Articles of Association (the "Memorandum and Articles of Association") which are available upon request.

## INVESTMENT OBJECTIVE AND STRATEGY

**Investment Objective and Strategy**

*General*

The Fund seeks to provide investors with long-term capital growth through exposure, on an approximate three times levered basis, to the economic performance of the Rye Select Broad Market Portfolio Limited, a Cayman Islands exempted company (the "Reference Entity"). The Fund intends to achieve this return by entering into one or more total return or price return swaps and/or options (or transactions similar to any of the foregoing) with one or more designated counterparties (each a "Counterparty") on a leveraged basis (each, a "Swap" and collectively, the "Swaps"). Furthermore, if, at any time, it becomes advantageous to achieve the foregoing investment objective by utilizing another type of investment transaction (e.g., note, option, etc.), the Fund may, in its sole discretion, discontinue its use of a or enter into a new or different or additional Swap, in whole or in part. At present, the Investment

Manager (as defined herein) serves as sub-adviser to the Reference Entity. The Investment Manager may, from time to time in its sole discretion, invest the Fund's assets directly in the Reference Entity (and other investment vehicles of which the Investment Manager may or may not serve as investment manager) or in any other manner that the Investment Manager, in its sole discretion, believes is consistent with the investment objective of the Fund.

**The Swaps; Counterparty**

*Swaps.* The Fund will enter into one or more Swaps with one or more Counterparties, whereby each Counterparty will contract to pay the Fund, on a leveraged basis, a payment equal to the increase in the net asset value of the Reference Entity subject to the Swap; in exchange, the Fund, will pay each Counterparty floating or fixed rate payments on any leverage embedded in the Swap. Each Counterparty, or an affiliate thereof, is expected, but is not obligated, to invest directly in the Reference Entity in order to hedge the Counterparty's obligations to the Fund. All payment calculations are to be determined by the relevant Counterparty (or an affiliate thereof) to each Swap in accordance with the relevant Swap Documents (as defined herein).

It is expected that the Swaps will provide an enhanced return (or loss, as the case may be) for the Fund by providing for a return (or loss, as the case may be), subject to the terms of the relevant Swap. It is intended that each Swap will provide the Fund with a return equal to approximately three times (3x) the economic performance of the Reference Entity on a notional amount equal to the Fund's investment in the Swap, less associated costs and fees (including , without limitation, the above-referenced floating or fixed rate payments). Further details of floating or fixed rate payments to the Counterparty will be available to Shareholders on request. The Swaps do not and will not directly or indirectly grant any rights of ownership in the Reference Entity or any other rights in the Reference Entity to the Fund or the Shareholders.

*Swap Documents.* A Swap may be evidenced by an ISDA Master Agreement with a Schedule, a Credit Support Annex, definitions, an Investment Manager or Fund or Reference Fund letter, a Confirmation (as further described below) and any other document between the Counterparty and the Fund and/or other parties relating to any of the foregoing(collectively, the "Swap Documents"). A Swap may be governed by a confirmation or other documentation evidencing or confirming the Swap (a "Confirmation"). In the case of any discrepancy between this Memorandum and the Swap Documents, the Swap Documents shall prevail. The Investment Manager will make available to Shareholders, at its office, those documents comprising any Swap Documents or summaries thereof which are not subject to confidentiality restrictions in accordance with such Swap Document's terms.

*Termination of the Swap prior to its Scheduled Termination.* Generally, each Swap will be subject to early termination by the Counterparty on the occurrence of certain events (i.e. Events of Default or other Termination Events as provided for by each Swap, and optional early termination by the Fund) as provided for in each Swap Document. Upon termination of a Swap, the Fund may no longer have the leverage it needs to provide leveraged returns or may have reduced leverage, unless it is able to obtain alternative financing or an alternative Counterparty.

*Counterparty.* With respect to each Swap, the Fund will retain an "eligible counterparty" (as defined below) to serve as Counterparty for each Swap (an "Eligible Counterparty"). The Fund reserves the right, in its discretion and without Shareholder consent, to change the appointment of Eligible Counterparties with additional and/or replacement Eligible Counterparties. In addition, the Fund may enter into replacement and/or additional derivative instruments, as the case may be (including, but not limited to, other swaps and

options) with other Eligible Counterparties. The Fund may also discontinue such relationships without prior notice to the Fund or the Shareholders.

An "Eligible Counterparty" means a bank or other financial institution which has a rating at the effective date of the Swap transaction or other derivative instruments, which is in one of the three highest long-term credit rating categories or one of the two highest short-term credit rating categories, utilized by at least one of the rating agencies rating the securities and which has total assets of at least USD 1 billion. An "Eligible Counterparty" may also be an affiliate of a bank or other financial institution counterparty described immediately above, and such affiliate may not satisfy the rating criteria or total asset test set forth above.

**The Reference Entity**

Through each Swap, the Fund will indirectly receive the returns of the Rye Select Broad Market Portfolio Limited (the "Reference Entity"). The Fund's Investment Manager also serves as sub-adviser to the Reference Entity. The Reference Entity's objective is to seek to (i) achieve long term capital appreciation and (ii) consistently generate positive returns irrespective of stock market volatility or direction, while focusing on preservation of capital. The Reference Entity attempts to accomplish its investment objective by presently investing the majority of the assets with one investment manager (the "Manager") who employs a "split strike conversion" strategy. However, the Reference Entity's investment manager reserves the right to allocate the Reference Entity's assets to other managers other than the Manager at any time in its sole discretion. The Reference Entity's offering materials will be made available to Shareholders upon written request.

**Borrowing and Lending**

The Fund is authorized to borrow in order to fund redemption requests. The Fund may use the Credit Facility (as defined below) for this purpose. There are no restrictions on the Fund's borrowing capacity other than limitations imposed by lenders, Swap Counterparties and any applicable credit regulations. Loans are generally secured by lending institutions (including the Counterparty) taking security over securities or other assets of the Fund. Loans of cash or securities may also be made from or to other investment companies on such terms as are commercially reasonable, including without limitation, from or to investment companies similar to the Fund. While the presence of leverage increases the potential for profit, it also involves a higher degree of risk of loss. Currently, the Fund has no Credit Facility.

**Information Regarding the Credit Facility**

Other than the Swaps, one or more banks, financial institutions or other entities (the "Credit Facility Lenders") may provide the Fund with a revolving credit facility (a "Credit Facility") for short term borrowing (i.e. in order to fund redemptions). All fees relating to a Credit Facility with respect to the Fund arrangement will be borne by the Fund. In the event of a default in the payment of any amount due under the Credit Facility, a higher default rate of interest will likely be charged on all amounts then outstanding.

Generally, a Credit Facility can be refinanced and other lenders brought in, at the Fund's discretion, in each case at terms which may or may not be as favorable as the initial terms of such Credit Facility.

**Distributions and Reinvestment**

The Fund does not intend that any dividends or other distributions will be paid to the Shareholders out of the Fund's current earnings and profits, but rather that such income will be reinvested. Potential investors should keep this limitation in mind when determining whether or not an investment in the Fund is suitable for their particular circumstances. The Fund reserves the right to change such policy without the consent of the Shareholders, and in the event the Fund changes its policy regarding dividends or distributions such distributions or dividends may be made in cash or in kind.

**Plan of Distribution and Use of Proceeds**

Securities issued hereunder will be privately placed with a limited number of sophisticated investors (see "SUITABILITY"). The net proceeds of the private offering contemplated herein (after payment of expenses) are expected to be invested at all times in accordance with the policies set forth under "INVESTMENT OBJECTIVE AND STRATEGY."

**Use of Cash and Cash Equivalents**

The Fund may hold cash or invest in cash equivalents. Among the cash equivalents in which the Fund may invest are: obligations of the U.S. Government, its agencies or instrumentalities (U.S. Government Securities, U.S. Treasury Bills); commercial paper; and repurchase agreements, money market mutual funds, and certificates of deposit and bankers' acceptances issued by U.S. branches of U.S. banks that are members of the Federal Deposit Insurance Corporation or other similar banks. While not presently contemplated, the Investment Manager may also enter in repurchase and reverse repurchase agreements involving the preceding instruments, as well as invest in money market mutual funds.

\* \* \* \* \*

The foregoing description is general and is not intended to be exhaustive. Investors must recognize that there are inherent limitations on all descriptions of investment processes due to the complexity, confidentiality and subjectivity of such processes. In addition, the description of virtually every strategy must be qualified by the fact that investment approaches are continually changing, as are the markets invested in by the Fund. Finally, the Investment Manager may pursue additional strategies, in its individual and sole discretion, in its pursuit of the Fund's investment objective.

# MANAGEMENT

## Board of Directors

The Board of Directors of the Fund (the "Board") consists of three (3) Directors, each of whom serves in accordance with the laws of the Cayman Islands and in accordance with the Fund's Articles of Association. The Directors' primary function is to supervise the general conduct of the affairs of the Fund. The Directors have appointed the Investment Manager to perform and/or delegate certain management and administrative tasks on behalf of the Fund. There is no mandatory age of retirement for directors. The Memorandum and Articles of Association of the Fund provide that every Director shall be indemnified and secured harmless by the Fund out of its assets against all actions, proceedings, costs, charges, expenses, losses, damages or liabilities incurred or sustained by him otherwise than by reason of his own dishonesty in or about the conduct of the Fund's business or affairs or in the execution or discharge of his duties other than as a result of his dishonesty or by reason of his breach of fiduciary duties to the Fund. A brief biographical description of each of the Directors follows:

**Darren Johnston.** Darren Johnston is the Director of Rye Investment Management, a division of Tremont Group Holdings, Inc. (formerly named Tremont Capital Management, Inc. ("Tremont") that manages, sells and administers the Tremont's platform of single manager funds. In this capacity, Mr. Johnston is responsible for managing and growing Tremont's single manager business globally, and for providing a focal point for all of the related business initiatives within Tremont. Prior to his current position, Mr. Johnston served as Vice President and Chief Operating Officer of Tremont's Canadian subsidiary, Tremont Capital Management, Corp., where he was responsible for the execution of Tremont's business plan for the Canadian marketplace.

Mr. Johnston earned a Master of Business Administration degree from the Richard Ivey School of Business at the University of Western Ontario in London, Ontario in 1999. He attended Queen's University in Kingston, Ontario for his undergraduate studies.

**James V. Mitchell.** James Mitchell is head of Tremont's Investment Management Department in London, where he is responsible for building out Tremont's European investment research team including manager selection and portfolio management activities. In addition, he oversees the Investment Relationship Management department in London. Mr. Mitchell is also member of Tremont's Investment Committee. Previously at Tremont, Mr. Mitchell was a member of Tremont's Investment Relationship Management team in New York where he was responsible for many advisory and consulting clients. He played an integral role in portfolio construction, ongoing manager monitoring, performance measurement and administration. Prior to joining Tremont, Mr. Mitchell served as Vice President of Investments for Hennessee Group, where he was responsible for overseeing the group's asset allocation and manager selection processes, as well as acting as a relationship manager to many of the firm's larger high net worth and institutional clients. Additionally, he was a Vice President with Citibank Alternative Investments where his responsibilities included product development for many hedge fund and structured products. He was also involved with portfolio risk management within Citibank's quantitative group. Mr. Mitchell started his career at Bankers Trust where he served as a Relationship Manager for six years to many of the firm's global custody pension clients.

**Andrew Edgington.** Andrew Edgington is a Senior Vice President at Walkers Fund Services Limited a Cayman Islands licensed Trust Company and Mutual Fund Administrator. Mr. Edgington

joined Walkers from Baring Asset Management in London where he was the Director responsible for Global Product and Fund Development for 4 years. Whilst at Barings Mr. Edgington led the establishment of their hedge fund capability and platform. Prior to this he was Product Director for Northern Trust Global Investments responsible for all international investment products. Mr. Edgington's career also includes Gartmore and Invesco.

Mr. Edgington has over 20 years experience of the global investment fund market and his extensive career has encompassed product development and fund operation and implementation functions at strategic, tactical and operational levels. Mr. Edgington has extensive knowledge of offshore fund regulation, governance and compliance. This has enabled Mr. Edgington to be instrumental in the creation of investment solutions for institutional, private and high net worth investors. Mr. Edgington has held directorships on a range of investment approaches.

Mr. Edgington has a BSc (Hons) from Reading University, UK.

**Investment Manager**

The Fund has retained Tremont Partners, Inc., a Connecticut corporation, to serve as its investment manager (the "Investment Manager") pursuant to a management agreement (the "Management Agreement"). The Investment Manager is registered as an investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act") and has attached hereto a copy of Part II of its most recent Form ADV attached hereto as Exhibit I. The Investment Manager also serves as sub-advisor to the Reference Entity. The Investment Manager is principally engaged in the business of providing consulting and specialized investment services to financial institutions, mutual funds, other investment companies, investment managers and individuals. The Investment Manager also develops, manages and provides consulting services to other of its own proprietary multi-advisor funds. The Investment Manager is a wholly-owned subsidiary of Tremont, which was acquired on October 1, 2001 by Oppenheimer Acquisition Corp. and the parent corporation of OppenheimerFunds, Inc., the widely known mutual fund manager.

The Investment Manager is an unregistered commodity pool operator and unregistered commodity trading advisor that has filed for an exemption from registration pursuant to Rule 4.13(a)(4) and Rule 4.14(a)(8) of the Commodity Exchange Act, as amended (the "CEA").

The following is a brief description of the principal decision-makers of the Investment Manager:

**Robert Schulman** joined Tremont Group Holdings, Inc. in 1994. Following his tenure as Chief Executive Officer of the Tremont organization, Mr. Schulman now serves as President and Chief Executive Officer of Rye Investment Management, Tremont's single manager division. He also serves as Chairman of the Board of Tremont Group Holdings, Inc. and is a member of the Tremont Capital Management Investment Advisory Board.

Mr. Schulman's Wall Street career spans more than 30 years, which includes a distinguished tenure at Smith Barney Inc. and predecessor firms, including Shearson Lehman Brothers, Inc. and E.F. Hutton & Company. Prior to joining Tremont, Mr. Schulman was a Senior Executive Vice President for Smith Barney in New York where he headed up Smith Barney's $60 billion Consulting Services Division, as well as the Retail New Product Development Group.

Mr. Schulman began his career in finance and investment management as a retail broker at E.F. Hutton. He went on to create the Leveraged Product Division at E.F. Hutton in 1982 and was responsible for the development of various derivative products, as well as growth index and financial futures and

options trading. In 1986, Mr. Schulman assumed responsibility for all retail products offered at E.F. Hutton.

Mr. Schulman is a graduate of New York University and received a Master of Business Administration degree in finance from the Lubin School of Business.

**Patrick Kelly** is a Senior Vice President of Tremont and the Investment Manager and oversees the management of proprietary products. He coordinates the efforts of all departments involved in the development and management of the firm's funds. Additionally, Mr. Kelly works closely with financial services firms to develop new products, enhance existing products and distribution channels. Mr. Kelly has been with the firm for several years and has held several senior management positions including Director of Risk Management, Director of Manager Research, and Director of Investment Technology.

Previously, Mr. Kelly served as Vice President and Risk Manager for Parker Global Strategies. He managed risk in Parker's investment programs and directed the development of allocation, portfolio management and risk measurement analytics. Prior to that, Mr. Kelly worked as a Senior Portfolio Analyst at Ferrell Capital Management and as an analyst, for Kidder, Peabody, & Co.

Mr. Kelly earned a Bachelor of Science degree in Computer Science, Electrical Engineering and Mathematics from Hofstra University and earned his Master of Business Administration degree in Finance from the Frank Zarb School of Business at Hofstra University. Mr. Kelly is a Chartered Financial Analyst, a member of the Association for Investment Management & Research, and of the Stamford Society of Investment Analysts.

See "FEES AND EXPENSES" herein for a general description of the fees payable to the Investment Manager.

**The Placement Agents**

Placement Agents (as defined herein) will be retained by the Investment Manager on behalf of the Fund to place investors in the Class B Shares of the Fund. Class B Shareholders will pay an Investor Servicing Fee (as defined herein) to any such Placement Agents. Class A Shareholders will not be subject to the Investor Servicing Fee.

**Administrator**

The Fund has appointed The Bank of New York Mellon Corporation (the "Administrator"), as administrator for the Fund. The Administrator serves pursuant to an administration agreement (the "Administration Agreement") with the Fund. Its primary objective is to provide a quality accounting and administrative service tailored to complex investment vehicles. At this time, the Alternative Investment Services division works with over 133 hedge funds and money management firms and services over 643 entities representing net assets of approximately $175 billion. The Administrator has offices located in Hamilton, Bermuda; New York, New York; Dublin, Ireland; Somerset, New Jersey and San Francisco, California.

The Administrator will assist the Fund in performing certain day-to-day tasks on behalf of the Fund, including: (i) calculating daily or periodic portfolio valuations using the pricing sources as agreed, (ii) reconciling cash and portfolio positions, (iii) providing portfolio reporting, (iv) maintaining books and records, (v) calculating all fees (performance and asset based), (vii) reconciling general ledger accounts,

(vii) calculating and disseminating daily or periodic Net Asset Values, (viii) preparing periodic financial statements, (ix) coordinating annual audits, (x) communicating with Shareholders, (xi) processing subscriptions and redemptions, (xii) maintaining the Fund's register of Shareholders, (xiii) disbursing distributions with respect to the Shares, legal fees, accounting fees, and officers' and Directors' fees, and (xvii) participating in meetings of the Fund's Shareholders or Directors.

The Administrator receives, as negotiated from time to time, an administration fee consistent with its customary charges for providing accounting, shareholder record keeping and administrative services to the Fund and is also entitled to be reimbursed for actual out-of-pocket expenses incurred in the performance of its duties. The fees to be received by the Administrator for providing administrative services are based on the net assets of the Fund subject to an annual minimum.

Either party may terminate the Administration Agreement at any time provided that at least sixty (60) days' written notice has been given to the other party.

The Administrator will not, in the absence of gross negligence, willful default or fraud on its part or on the part of its directors, officers, employees or delegates, be liable to the Fund or any Shareholder for any act or omission, in the course of, or in connection with, the services rendered by it under the Administration Agreement or for any loss or damage which the Fund may sustain or suffer as the result of, or in the course of, the discharge by the Administrator or its directors, officers, employees or delegates of its duties under or pursuant to the Administration Agreement.

Pursuant to the Administration Agreement, the Fund will separately indemnify the Administrator and its directors, officers, employees and delegates from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements or any kind or nature whatsoever (other than those resulting from the gross negligence, willful default or fraud on the part of the Administrator or its directors, officers, employees or delegates) which may be imposed on, incurred by, or asserted against the Administrator or its directors, officers, employees or delegates in performing its obligations or duties hereunder.

See "FEES AND EXPENSES" herein for a description of the fees payable to the Administrator pursuant to the Administration Agreement.

**Brokerage**

Generally, the Manager's portfolio transactions will be cleared through and held in custody at brokerage accounts maintained at a selected broker-dealer. While the Manager is entitled to utilize various broker-dealers to execute, settle and clear securities transactions, it intends to only use the services of one broker-dealer, of which the Manager is the sole principal. In selecting broker-dealers to effect portfolio transactions, the Manager may also consider such factors as price, the ability of a broker-dealer to effect transactions, as well as a broker-dealer's facilities, reliability and financial responsibility. Accordingly, if the Manager determines in good faith that the amount of commissions charged by a broker-dealer is reasonable in relation to the value of the foregoing, the Reference Entity may pay commissions to such broker-dealer in an amount greater than the amount another broker might charge.

Section 28(e) of the United States Securities Exchange Act of 1934, as amended (the "Exchange Act"), permits the use of soft dollar items in certain circumstances, provided that the Reference Entity does not pay a rate of commissions in excess of what is competitively available from comparable brokerage firms for comparable services, taking into account various factors, including commission rates, financial responsibility and strength and ability of the broker to efficiently execute transactions. Non-

research products and "soft dollars" which are not generated through agency transactions in securities are outside the parameters of Section 28(e)'s "safe harbor." The Manager may use soft dollars within the safe harbor if it believes it provides the Reference Entity with benefits.

**Independent Client Representative**

The Fund has the authority to appoint a person (the "Independent Client Representative") unaffiliated with the Investment Manager or any of its affiliates to act as the agent of the Fund to give or withhold any consent of the Fund required under applicable law to a transaction in which the Investment Manager causes the Fund to purchase securities or other instruments from or sell securities or other instruments to, the Investment Manager, or its affiliates or to engage in brokerage transactions in which any of the Investment Manager's affiliates acts as broker for another person on the other side of the transaction as the Fund. If appointed, the Independent Client Representative may be paid by the Fund and will receive an indemnity from the Fund for claims arising out of activity in such capacity. The provisions of this section are designed to meet the requirements of Section 206 of the Advisers Act, and should be construed accordingly.

---

# FEES AND EXPENSES

---

**Fees of the Investment Manager**

*Management Fees and Administrative Fees at the Reference Entity Level.* There is no management fee payable to the Investment Manager by the Fund. However, there is an annual 1.5% management fee charged at the Reference Entity level by the investment manager on all assets invested in the Reference Entity. Since the return to the Fund under a Swap will be based on the amount a hypothetical investor in the Reference Entity would receive upon redeeming its interest in the Reference Entity (i.e. net of the 1.5% management fee on the hypothetical investor's levered investment), the Fund (and thus indirectly the Shareholders) will effectively bear a 1.5% annual management fee on the amount of the Fund's investment in each Swap as fully levered pursuant to each Swap's terms.

There is no administration fee payable to the Investment Manager by the Fund. However, there is a monthly 0.20% administration fee charged at the Reference Entity level by the investment manager on all assets invested in the Reference Entity. Since the return to the Fund under a Swap will be based on the amount a hypothetical investor in the Reference Entity would receive upon redeeming its interest in the Reference Entity (i.e. net of the 0.20% administration fee on the hypothetical investor's levered investment), the Fund (and thus indirectly the Shareholders) will effectively bear a 0.20% monthly administration fee on the amount of the Fund's investment in each Swap as fully levered pursuant to each Swap's terms.

*Investor Servicing Fee.* The Investment Manager on behalf of the Fund may enter into one or more agreements with one or more unaffiliated third party placement agents (each a "Placement Agent") to place investors in the Class B Shares of the Fund. Any such Placement Agents who place investors in the Fund will be entitled to receive a fee from Class B Shareholders in an amount up to 1.00% per annum of the Net Asset Value of the Class B Shares (the "Investor Servicing Fee"). The Investor Servicing Fee shall be payable monthly in arrears. The Investor Servicing Fee will be prorated based upon a Class B Shareholder's actual period of ownership of its Class B Shares. Payment of the Investor Servicing Fee is

due as of the last day of each calendar month and is payable by the Fund within a reasonable time thereafter. The Investor Servicing Fee may waived or reduced, by rebate or otherwise with respect to any Class B Shareholder.

## Fees of the Administrator

For its administrative duties, the Administrator receives a monthly administration fee in an amount consistent with reasonable and customary fees. The Administrator is entitled to reimbursement of actual out-of-pocket expenses incurred on behalf of the Fund.

## Organizational and Ongoing Expenses

*Organizational Expenses.* The Fund will pay the organizational costs of the Fund.

*Ongoing Expenses.* The Fund pays for all routine and customary expenses associated with its administration and operation, including, but not limited to, the cost of maintaining the Fund's registered office, the Fund's annual government registration fee, brokerage commissions, communications, Directors' fees and expenses, Fund administration and other service providers expenses (including custodian fees, if any), fees and expenses associated with a Swap, insurance premiums, printing costs, and all tax, accounting (and audit) and legal, and similar ongoing operational expenses. Fees and expenses that are identifiable with a particular Class of Shares are charged against that Class in computing its Net Asset Value. Other fees and expenses will be charged to the Fund as a whole or otherwise in the discretion of the Board.

The Investment Manager and any affiliates retained by it will be reimbursed for certain out-of-pocket expenses incurred on behalf of the Fund. Such reimbursable expenses shall not include any expense attributable to their provision of office personnel and space required for the performance of its services.

## Directors' Fees

For their services, the Directors who are not affiliated with the Investment Manager receive a flat annual fee (in accordance with reasonable and customary fees) for serving in such capacity. The Directors will be entitled to be reimbursed for reasonable out of pocket expenses.

# SHARES OF THE FUND

## Funds Share Capital

*Generally.* The share capital of the Fund is US$100,000.00 divided into 10,000,000 unclassified Shares of U.S.$0.01 par value each. The Shares offered pursuant to this Memorandum will be denominated in U.S. dollars and will further be issued as either Class A Shares and/or Class B Shares. Class B Shares may be subject to an Investor Servicing Fee. Each of the outstanding Classes of the Fund participates ratably with all other outstanding Classes in the Fund's fees, expenses, assets and earnings. There are no outstanding options relating to any shares, nor has it been agreed conditionally or unconditionally to put shares under option. Subject to the provisions herein, the Fund, in its sole

discretion, may issue additional Classes of shares without notice to, or the consent of, the Shareholders, which Classes may be subject to different terms.

Each Share of a Class has equal dividend, distribution and liquidation rights.

**Temporary Suspension of Dealings and Determination of Net Asset Value**

The Fund may temporarily declare a suspension of the determination of the Fund's Net Asset Value and/or sale, allotment, issue or redemption of Shares or the payment of redemption proceeds in such circumstances as the Directors may determine in their sole discretion including, without limitation, during any period when in the opinion of the Directors (after consultation with the Investment Manager):

(i) the disposal by the Fund of assets that constitute a substantial portion of its assets is not feasible;

(ii) it is not possible to promptly transfer monies involved in the acquisition, disposition or realization of investments that constitute a material portion of the assets of the Fund at normal rates of exchange;

(iii) proceeds of any sale or redemption of the Shares cannot be transmitted to or from the Fund's account;

(iv) the Fund is unable to reduce or terminate or receive a required payment under one or more Swaps;

(v) for any reason the prices of any investments that constitute a material portion of the assets of the Fund cannot be reasonably, promptly or accurately ascertained;

(vi) any recognized exchange or market in which the Fund's investments are normally dealt or traded is closed (other than customary holiday or weekend closings), or when trading thereon is restricted or suspended; or

(vii) an event has occurred which may result in the dissolution of the Fund.

**Voting and Other Rights**

Subject to any rights or restrictions for the time being attached to any Class or Classes of Shares, every Shareholder present in person or by proxy and entitled to vote at any general meeting of the Fund's Shareholders or at any meeting of any Class of the Fund's Shareholders, will have one (1) vote on a show of hands. On a poll, every Shareholder entitled to vote will have one (1) vote for each Share of which it is the holder. On a poll, a Shareholder entitled to more than one (1) vote need not use any or all of its votes or cast all of the votes it uses in the same way. General meetings of the Fund's Shareholders may, but need not, be held annually to approve the selection of auditors and attend to such other business as may properly be placed before such a meeting. Shareholders will receive at least seven (7) days' notice of any Shareholders' meeting and will be entitled to vote their shares either personally or by proxy. If the form of proxy sent with the notice of meeting is not completed and returned prior to the meeting and the Shareholder does not appear personally at such meeting, such Shareholder's shares will be voted in the discretion of the proxy and the attorney-in-fact designated in the Subscription Agreement executed by such Shareholder.

**Registration and Transfer of Shares**

Shares are issued only in registered form; the Fund does not issue bearer shares. The Administrator will maintain a current register of the names and addresses of the Shareholders, and the Administrator's entry in the share register is conclusive evidence of ownership of such Shares. Certificates representing Shares will not be issued save in exceptional circumstances and then only at the discretion of the Directors.

Shareholders may only transfer their Shares with the prior written consent of the Directors, which consent may be arbitrarily withheld. Any transferee of Shares is required to furnish the same information that would be required in connection with a direct subscription in order for a transfer application to be considered by the Fund. Violation of applicable ownership and transfer restrictions may result in a compulsory redemption.

The Shares are not currently listed on any securities exchange, and it is not anticipated that there will be any secondary market for trading in the Shares.

## SUBSCRIPTIONS

**Generally**

Shares of either Class of the Fund may be purchased monthly on the first Business Day of each calendar month, or on any other day approved by the Board in its sole discretion (each a "Subscription Date") at the prevailing Net Asset Value per Share for such Class. The term "Business Day" refers to any day when the securities markets in the United States are open for business (other than a Saturday or Sunday), or such other day or days as may be determined by the Directors. The Directors have the right to reject any subscription for any or no reason.

Completed subscription materials must be received by the Administrator at least three (3) days prior to the Subscription Date on which prospective investors wish to subscribe for Shares, and cleared funds must be in the Fund's account at least one (1) Business Day before the Subscription Date. See "ELIGIBLE INVESTORS." The minimum investment in the Shares is $500,000. The minimum initial investment for Shares may be reduced in the Board's sole discretion. In all instances, the minimum initial investment for each Class will not be less than $50,000 or such other amount specified under Cayman Islands law from time to time. The Fund may establish different minimum subscriptions in the future, subject to a minimum initial subscription of the U.S. dollar (or other currency, as applicable equivalent to U.S.$50,000). Subscriptions for the Shares are payable only in U.S. dollars. Investments in the Fund must be made in cash, unless otherwise agreed to by the Directors. The acceptance of subscriptions is subject to confirmation of the prior receipt of cleared funds credited to the Fund's subscription account and the receipt of completed subscription documents in a form acceptable to the Administrator. The Fund and the Administrator reserve the right to reject subscriptions in their absolute discretion in whole or in part. A purchaser acceptable to the Fund will be sold that number of Shares (including fractional Shares) which its subscription payment will purchase (to the extent accepted).

Subscriptions may be suspended under certain circumstances. See "SHARES OF THE FUND - Temporary Suspension of Dealings."

## ELIGIBLE INVESTORS

Investment in the Fund is suitable only for investors or entities that can afford to make high risk investments and that have adequate means of providing for their current needs and contingencies and have no need for liquidity in such an investment.

There is no public market for the Shares now, nor is one expected to develop in the future. The Shares have not been registered under the Securities Act and are being offered in reliance upon the exemption provided in Section 4(2) of the Securities Act and Regulation D thereunder. The Shares have not been registered under the securities laws of any state or other jurisdiction and will not be offered in any state of the United States except pursuant to an exemption from registration. In addition, the Fund is not registered under the U.S. Investment Company Act of 1940, as amended (the "Company Act").

In no event, however, may Shares be acquired directly or indirectly for the account or benefit of any member of the public in the Cayman Islands, who are non-eligible for the purposes of this offering.

It is the responsibility of each investor to verify that the purchase and payment for the Shares is in compliance with all relevant laws of the investor's jurisdiction or residence.

U.S. investors purchasing Shares will need to meet certain eligibility standards such as being an "accredited investor" within the meaning of the Securities Act, a "qualified purchaser" within the meaning of the Company Act and other standards as set forth from time to time by the Fund in the U.S. Supplemental materials for U.S. investors.

Moreover, each prospective investor will be required to make the representations set forth in the Subscription Agreement annexed and to indemnify the Fund, the Investment Manager, the Administrator and each of their respective directors, officers and employees against any liability, costs and expenses (including, without limitation, reasonable attorneys fees) resulting from a breach of such representations. Appropriate legends may be placed on Share certificates, if any, setting forth restrictions described in this Memorandum.

## REDEMPTIONS

*Generally.* Holders of Class A Shares and Class B Shares may request a redemption of Shares, on at least forty-five (45) days' prior written notice to the Administrator, on the last Business Day of each calendar quarter, or on a date other than as at the end of a calendar quarter at the Board's discretion, at a redemption price equal to the Net Asset Value per Share of the relevant Class on such redemption date. The Board may waive or shorten such notice period on a case by case basis in its sole discretion. Subject to the Board's right to establish reserves, generally at least ninety percent (90%) of redemption proceeds will be paid to the redeeming Shareholder within thirty (30) days after the redemption date, although the Fund reserves the right to retain up to ten percent (10%) of the redemption proceeds until after the annual audit for the year in which such redemption occurred is completed to confirm the accuracy of the payment.

The Directors reserve the right to temporarily suspend or limit redemptions by Shareholders if they determine, in their sole discretion, that such redemptions would negatively affect the Fund's financial integrity. The Fund also may withhold a portion of any proceeds of redemption if necessary to comply with applicable legal or regulatory requirements.

### Inability to Liquidate

In circumstances where the Fund is unable to liquidate securities positions in an orderly manner in order to fund redemptions, is unable to reduce or terminate or receive a required payment under a Swap, or where the value of the assets and liabilities of the Fund cannot reasonably be determined, the Fund may take longer than the time periods mentioned above to effect settlements of redemptions or may even suspend redemptions. In the discretion of the Directors, the Fund may settle redemptions in kind and provide for liquidation using a liquidation trust or similar structure. Any such distributions in kind will not materially prejudice the interests of the remaining shareholders.

### Compulsory Redemptions

The Fund may require the compulsory redemption of Shares for any or no reason. Compulsory redemptions will be made at the relevant Class' Net Asset Value per Share as of the date specified in such notice.

### Miscellaneous

The Administrator will redeem the Shares at the relevant Class' Net Asset Value per Share on the Redemption Date less any applicable charges and expenses referred to herein. Redemption requests may initially be sent by fax, however, Shareholders should be aware of the risks associated with sending documentation in this manner and that the Administrator will not be responsible in the event of non-receipt of any redemption request sent by fax. In any event, the original redemption request must be sent to the Administrator. Redemption payments will be made in U.S. Dollars, unless made in kind (or partially in cash and partially in kind), and will be remitted either by wire transfer to an account designated by the Shareholder at the bank from which the subscription price was paid or by check posted at the Shareholder's risk (as specified by the Shareholder in its written redemption notice). Additionally, the Fund may provide for liquidation using a liquidation trust or similar structure. If Shares are held in

certificated form, the redemption payment will not be remitted until certificates have been tendered to the Administrator. A request for redemption received after 5:00 p.m. New York time will be treated as a request for redemption as of the next Business Day.

---

## DETERMINATION OF NET ASSET VALUE

---

**Net Asset Valuation**

The Net Asset Value of the Fund means the Fund's assets, at fair value, less liabilities, and any accrued but unpaid expenses. Each Class' Net Asset Value per Share will be calculated by dividing the particular Class' Net Asset Value by the number of that Class' Shares then outstanding. The Fund's Net Asset Value and the Net Asset Value of the Shares are valued, on a trade date basis, as of the end of the last Business Day of each calendar month or any other day that the Directors so determine in their sole discretion (the "Valuation Date"). Such determination is made by the Administrator (in consultation with the Investment Manager and the Directors) acting in good faith as follows:

1. The value of the assets of the Fund is based on the valuation of each Swap as calculated in each case by the Counterparty to each such Swap (or by an affiliate of such Counterparty).

2. All other assets and liabilities of the Fund (as applicable) are assigned such value as the Administrator, in consultation with the Investment Manager and the Directors, may reasonably determine.

3. Subject to the rights set forth in the Swap Documents, if the Administrator, in consultation with the Investment Manager and the Directors, determines that any of the above valuation methodologies of any investments or other property does not fairly represent market value, the Administrator, in consultation with the Investment Manager and the Directors, shall value such securities or other property as it shall reasonably determine and shall set forth the basis of such valuation in writing in the records of the Fund.

4. All values assigned to securities and other assets and liabilities by the Administrator, in consultation with the Investment Manager and the Directors, shall be final and conclusive. Valuations provided by the Counterparties (or their affiliates) will not be subject to independent review or investigation by the Fund and the Fund and the Investment Manager are entitled to rely on such valuations without independent verification.

All accrued debts and liabilities are deducted from the value of the Fund's assets in determining the Fund's Net Asset Value and, to the extent possible, from the value of the assets attributable to the Interests in determining the Net Asset Value per Class. To the extent debts and liabilities cannot be determined to be attributable to any one Class, they are borne pro-rata by all Classes. These debts and liabilities include (a) any fees that have accrued, as of the date of computation, but are not yet payable (b) monthly amortization of organization costs (to the extent applicable), (c) the then current amount of any fees that have been earned in prior years, (d) any allowance for the Fund's estimated annual audit and legal fees and other operating expenses, and (e) any contingencies for which reserves are determined to be required. Net Asset Valuations are expressed in United States Dollars and any items denominated in other currencies are translated at prevailing exchange rates as determined by the Administrator in consultation with the Investment Manager.

In computing the Net Asset Value in order to determine the fees for a current period, (i) the fees earned but not yet paid (*i.e.*, the amount referred to in clause (b) of the immediately preceding paragraph) shall not be subtracted and (ii) such current fee shall be computed with regard to investment activity only and without reference to other expenses of the Fund. The Fund's auditors shall be entitled to rely on invoices from others (including, without limitation, the Investment Manager) with regard to allocations of expenses.

Prospective investors should be aware that situations involving uncertainties as to the valuation of portfolio positions could have an adverse effect on the Net Asset Value if judgments regarding appropriate valuations should prove incorrect.

## CERTAIN RISK FACTORS

Prospective investors should give careful consideration to the following risk factors in evaluating the merits and suitability of an investment in the Fund as they relate specifically to Shares or to the Fund in general, as the context requires. The following does not purport to be a comprehensive summary of all of the risks associated with an investment in the Fund. Accordingly, the following are only certain risks to which the Fund is subject and that the Directors wish to encourage prospective investors to consult his own legal, tax and financial advisors regarding the desirability of an investment in the Fund.

It should be noted that risks associated with the Reference Entity (and thus the Manager in which the Reference Entity invests with) are set forth below as the Fund, through the Swaps, will realize, on a leveraged basis, the investment returns of the Reference Entity which, in turn, invests with the Manager.

It should be further noted that all investments in securities are speculative and subject to risk of loss of capital as does an investment in the Fund.

**General Considerations**

1.  *Achievement of the Fund's Investment Objective.*  No assurance can be given that the Fund will achieve its overall investment objective of seeking substantial capital appreciation. Additionally, the profitability of a significant portion of the Fund's investment program depends to a great extent on correct assessments of the future course of the price movements of securities and other investments. There can be no assurance that Manager retained on behalf of the Reference Entity will be able to accurately predict such price movements.  The securities markets have in recent years been characterized by volatility and unpredictability.  In addition to market risk, there is unpredictability as to changes in general economic conditions which may affect the profitability of the Fund's investment program.  With respect to the investment strategies utilized by Manager retained by the Reference Entity, there is always some, and occasionally a significant, degree of market risk.

2.  *Lack of Certain Registration and Regulatory Protection.*  The Manager chosen by the Reference Entity to manage assets may, but need not, be registered investment advisers under the Advisers Act.  The Manager is not likely to be offered pursuant to registration statements effective under the Securities Act, nor are they likely to be subject to the periodic information and reporting provisions under

the 1934 Act or the Company Act. As a result, the amount of publicly available information that may be used by the Reference Entity's investment manager in selecting the Manager may be relatively small.

Also, the Manager investments may not be subject to any substantive or effective regulatory oversight and may be established in jurisdictions where there are no established or effective investor protection laws and therefore will not have the equivalent level of investor protection as that provided under laws, regulations and conditions governing registered collective investment vehicles.

3.    *Dependence on Managers.*  The Reference Entity is highly dependent upon the expertise and abilities of the underlying Manager who has investment discretion over the Reference Entity's (and thus the Fund's) assets and, therefore, the death, incapacity or retirement of any key personnel of the Manager may adversely affect investment results.

4.    *ERISA Considerations.*  The Investment Manager intends to use commercially reasonable efforts to cause employee benefit plans subject to ERISA and/or Section 4975 of the Code and other "benefit plan investors," as defined in the Plan Asset Regulation, in the aggregate hold less than 25% of each class of shares in the Fund and of any other class of shares in the Fund. The Investment Manager shall use commercially reasonable efforts to restrict transfers of any shares in the Fund so that ownership of each class of shares in the Fund by benefit plan investors will remain below the 25% threshold contained in the Plan Asset Regulation. In this event, although there can be no assurance that such will be the case, the assets of the Fund should not constitute "plan assets" for purposes of ERISA and Section 4975 of the Code. Notwithstanding the foregoing, the Investment Manager may exceed 25% at any time in its sole discretion.

If the assets of the Fund were to become "plan assets" subject to ERISA and Section 4975 of the Code, certain investments made or to be made by the Fund in the normal course of its operations might result in non-exempt prohibited transactions and might have to be rescinded (see "CERTAIN ERISA CONSIDERATIONS"). If at any time the Investment Manager determines that assets of the Fund may be deemed to be "plan assets" subject to ERISA and Section 4975 of the Code, the Investment Manager may take certain actions it may determine necessary or appropriate, including requiring one or more investors to redeem or otherwise dispose of all or part of their Shares in the Fund or terminating and liquidating the Fund. See "CERTAIN ERISA CONSIDERATIONS."

5.    *Concentration of Assets with a Single Prime Broker.*  All or a substantial proportion of the assets of the Reference Entity may be held by a single prime broker. Cash held by such prime broker will not be treated as client money and will not be segregated from the prime broker's own money and will be used by the prime broker in the course of its investment business and the Reference Entity would therefore rank as one of the prime broker's general creditors in relation thereto. In relation to the Manager's rights to the return of assets equivalent to those of the Reference Entity investments which the prime broker borrows, lends or otherwise uses for its own purposes, the Reference Entity will rank as an unsecured creditor of the prime broker and, in the event of the insolvency of the prime broker, the Reference Entity may not be able to recover such equivalent assets in full. The Reference Entity may, through its investments, be exposed to credit risk of the prime broker. The Reference Entity may be subject to the possibility of the insolvency of the prime broker which could result in substantial losses to the Reference Entity (and indirectly the Fund through the Swap).

The Manager may use substantial leverage for its investments. During periods when the Reference Entity is leveraged, any event which may adversely affect its value could indirectly affect the value of the Fund through a Swap.

6.      *Restriction on Transfer.*  Because of the limitations on redemptions and the fact that Shares are not tradeable, an investment in the Fund is an illiquid investment.  The consent of the Directors must be obtained prior to any transfers of Shares.  In light of the restrictions imposed on the transfer of Shares and in light of the limitation's placed on a Shareholder's ability to redeem all or part of its Shares from the Fund, an investment in the Fund is an illiquid investment.

7.      *Current Income.*  The Fund's investment policies should be considered speculative, as there can be no assurance that the Investment Manager's assessments of the short-term or long-term prospects of investments will generate a profit.  In view of the fact that the Fund will likely not pay dividends, an investment in the Fund is not suitable for investors seeking current income for financial or tax planning purposes.

8.      *Registration.*  The Fund is not registered as an investment company under the Company Act (or any similar state laws).  Investors, therefore, will not be accorded the protective measures provided by such legislation.  Further, the Investment Manager is not registered with the Commodity Futures Trading Commission ("CFTC") as a commodity pool operator or a commodity trading advisor and is not a member of the National Futures Association ("NFA").  Registered commodity pool operators and commodity trading advisors are subject to extensive regulation and disclosure requirements.  Investors, therefore, will not be accorded the protective measures they would have if the Investment Manager were registered.

9.      *Counsel does not represent Shareholders.*  Tannenbaum Helpern Syracuse & Hirschtritt LLP (for purposes of this paragraph "THSH") acts as counsel to the Fund in connection with this offering of Interests; THSH also acts as counsel to the Investment Manager.  In connection with this offering of Interests and ongoing advice to the Fund, the Investment Manager and their affiliates, THSH has not and will not be representing the Shareholders.  No independent counsel has been retained to represent the Shareholders.  THSH's representation of the Fund and its Investment Manager and their affiliates is limited to those specific matters upon which it has been consulted.  There may exist other matters which would have a bearing on the Fund and its Investment Manager and their affiliates upon which THSH has not been consulted.  THSH does not undertake to monitor the compliance of the Fund and its Investment Manager and their affiliates with the investment program, valuation procedures and other guidelines set out herein, nor does it monitor compliance with applicable laws.  Additionally, in all cases, including the preparation of this Memorandum, THSH relies upon information furnished to it by the Fund and its Investment Manager and their affiliates, and does not investigate or verify the accuracy and completeness of such information.  In the course of advising the Fund and its Investment Manager and their affiliates, there may be times when the interests of the Investment Manager may differ from those of the Shareholders.  THSH does not represent the interests of the Shareholders in resolving such issues.

**Risks of Certain Investments Made by the Manager**

The Reference Entity is engaged in a diversified investment strategy concentrating primarily on investing in securities through the Manager, some of which may not be marketable.  The securities business is speculative, prices are volatile, and market movements are difficult to predict.  Supply and demand for securities change rapidly and are affected by a variety of factors, including interest rates, merger activities and general economic trends.

In addition to these general investment risks, the Manager may use investment techniques that may subject the Manager's portfolio as well as the Reference Entity to certain risks; some, but not all, of these techniques and risks are summarized below.

1.    *Options*.    The Manager may engage from time to time in various types of options transactions.  An option gives the purchaser the right, but not the obligation, upon exercise of the option, either (i) to buy or sell a specific amount of the underlying security at a specific price (the "strike" price or "exercise" price), or (ii) in the case of a stock index option, to receive a specified cash settlement.  To purchase an option, the purchaser must pay a "premium," which consists of a single, nonrefundable payment.  Unless the price of the securities interest underlying the option changes and it becomes profitable to exercise or offset the option before it expires, the Manager may lose the entire amount of the premium.  The purchaser of an option runs the risk of losing the entire investment.  Thus, a Manager may incur significant losses in a relatively short period of time.  The ability to trade in or exercise options also may be restricted in the event that trading in the underlying securities interest becomes restricted.  Options trading may also be illiquid in the event that the Manager's assets are invested in contracts with extended expirations.  The Manager may purchase and write put and call options on specific securities, on stock indexes or on other financial instruments and, to close out its positions in options, may make a closing purchase transaction or closing sale transaction.

2.    *Short Selling*.  The Manager may engage in the short-selling of securities in certain circumstances.  Short-selling is the selling of securities the seller does not own.  Short sales may only be maintained if the securities can be borrowed.  If the security cannot remain borrowed, the Fund could be required to cover the short sale at a loss or at an inopportune time for the Manager.  If securities are sold short, the Manager would fulfill their obligation to deliver such securities with borrowed securities.  It would only profit from such a practice if they could fulfill their obligation to the lender of the securities by repaying the lender with securities which they have purchased at a price lower than the price they received for the short sale.  If the price of a security that has been sold short increases, there is no limit to the loss that could be incurred in covering a short sale.

3.    *Forward Trading*.  The Manager may invest in forward contracts and options thereon.  Such contracts and options, unlike futures contracts, are not traded on exchanges and are not standardized; rather banks and dealers act as principals in these markets, negotiating each transaction on an individual basis.  Forward and "cash" trading is substantially unregulated; there is no limitation on daily price movements and speculative position limits are not applicable.  The principals who deal in the forward markets are not required to continue to make markets in the currencies or commodities they trade, and these markets can experience periods of illiquidity, sometimes of significant duration.  There have been periods during which certain participants in these markets have refused to quote prices for certain currencies or commodities or have quoted prices with an unusually wide spread between the price at which they were prepared to buy and that at which they were prepared to sell.

4.    *Futures*.  The Manager may engage in futures transactions.  Futures contracts are usually made on a futures exchange which call for the future delivery of a specified "commodity" at a specified time and place.  These contractual obligations, depending on whether one is a buyer or a seller, may be satisfied either by taking or making physical delivery of the "commodity" or by making an offsetting sale or purchase of an equivalent futures contract on the same exchange prior to the end of trading in the contract month.  Futures prices are highly volatile.  Financial instrument and foreign currency futures prices are influenced by, among other things, interest rates, changes in balances of payments and trade, domestic and international rates of inflation, international trade restrictions and currency devaluations and revaluations.  Profitability will depend on the Manager's ability to analyze price movements in those markets.  Because low margin deposits are normally required, an extremely high degree of leverage is obtainable in futures trading.  A relatively small price movement in a futures contract, consequently, may result in large losses.  Thus, like other highly leveraged investments, any purchase or sale of a futures contract may result in losses which exceed the amount invested.

Most U.S. futures exchanges limit fluctuations during a single day in futures contract prices by regulations referred to as "daily price fluctuation limits" or "daily limits." During a single trading day, no trade may be executed at prices beyond the daily limits, and positions in a particular contract can neither be taken nor liquidated at a price beyond the applicable limit. Futures prices in various commodities have occasionally moved the daily limit for several consecutive days with little or no trading. Similar occurrences could prevent the Manager from promptly liquidating unfavorable positions and subject the Fund to substantial losses, which could exceed the margin initially committed to such trades. In addition, even if futures prices have not moved the daily limit, the Manager may not be able to execute futures trades at favorable prices if little trading in the contracts the Manager wishes to trade is taking place. It is also possible that an exchange or regulatory authority may suspend trading in a particular contract or order that trading in a contract be conducted for liquidation of open positions only.

5.     *Use of Swap Agreements.* The Manager may use swap agreements. The use of swaps is a highly specialized activity that involves investment techniques and risks different from those associated with ordinary securities transactions. Interest rate swaps, for example, do not typically involve the delivery of securities, other underlying assets or principal. Accordingly, the market risk of loss with respect to an interest rate swap is often limited to the amount of interest payments that the Reference Entity is contractually obligated to make on a net basis. If the other party to an interest rate swap defaults, the risk of Reference Entity's credit loss may be the amount of interest payments that Reference Entity is contractually entitled to receive on a net basis. However, where swap agreements require one party's payments to be "up-front" and timed differently than the other party's payments (such as is often the case with currency swaps), the entire principal value of the swap may be subject to the risk that the other party to the swap will default on its contractual delivery obligations. If there is a default by the counterparty, the Reference Entity may have contractual remedies pursuant to the agreements related to the transaction. The swap market has grown substantially in recent years, and has become relatively more liquid, with a large number of banks and investment banking firms acting both as principals and as agents utilizing standardized swap documentation. The investment performance of the Reference Entity, however, may be adversely affected by the use of swaps if its forecasts of market values, interest rates or currency exchange rates are inaccurate.

6.     *Over-the-Counter Trading.* The Manager may use derivative instruments. Derivative instruments that may be purchased or sold by the Reference Entity are expected to regularly consist of instruments not traded on an exchange. The risk of nonperformance by the obligor on such an instrument may be greater, and the ease with which the Fund can dispose of or enter into closing transactions with respect to such an instrument may be less, than in the case of an exchange-traded instrument. In addition, significant disparities may exist between bid and asked prices for derivative instruments that are not traded on an exchange. Derivative instruments not traded on exchanges are also not subject to the same type of government regulation as exchange traded instruments, and many of the protections afforded to participants in a regulated environment may not be available in connection with such transactions.

7.     *Certain Non-U.S. Securities.* The Manager may invest in securities and other instruments of certain non-U.S. corporations and countries. Investing in the securities of companies (and governments) in certain countries (such as emerging nations or countries with less well regulated securities markets than the U.S. or other European Union countries, for that matter) involves certain considerations not usually associated with investing in securities of United States companies or the United States Government, including among other things, political and economic considerations, such as greater risks of expropriation, nationalization and general social, political and economic instability; the small size of the securities markets in such countries and the low volume of trading, resulting in potential lack of liquidity and in price volatility; fluctuations in the rate of exchange between currencies and costs associated with currency conversion; certain government policies that may restrict the Manager's investment opportunities; and in some cases less effective government regulation than is the case with securities markets in the United States.

8.      *Leverage: Interest Rates.* The Manager may use leverage, including borrowing to buy securities on margin or make other investments. The Manager may also leverage assets by entering into reverse repurchase agreements whereby they effectively borrow funds on a secured basis by "selling" their interests in investments to a financial institution for cash and agreeing to "repurchase" such investments at a specified future date for the sales price paid plus interest at a negotiated rate.

9.      *Transaction Expenses.* The Manager may make frequent trades in securities. Frequent trades typically result in correspondingly high transaction costs. This could affect the returns of the Reference Entity.

10.     *Hedging Transactions.* The Manager may utilize a variety of financial instruments such as derivatives, options, interest rate swaps, caps and floors and forward contracts, both for investment purposes and for risk management purposes. Hedging also involves special risks including the possible default by the other party to the transaction, illiquidity and, to the extent the Manager's assessment of certain market movements is incorrect, the risk that the use of hedging could result in losses greater than if hedging had not been used. The Manager is subject to the risk of the failure or default of any counterparty to a fund's transactions. If there is a failure or default by the counterparty to such a transaction, the Manager will have contractual remedies pursuant to the agreements related to the transaction (which may or may not be meaningful depending on the financial position of the defaulting counterparty).

11.     *Risks of Derivatives.* The Manager may trade derivatives. The risks posed by derivatives include (1) credit risks (the exposure to the possibility of loss resulting from a counterparty's failure to meet its financial obligations); (2) market risks (adverse movements in the price of a financial asset or commodity); (3) legal risks (an action by a court or by a regulatory or legislative body that could invalidate a financial contract); (4) operations risks (inadequate controls, deficient procedures, human error, system failure or fraud); (5) documentation risks (exposure to losses resulting from inadequate documentation); (6) liquidity risks (exposure to losses created by the inability to prematurely terminate a derivative); (7) systemic risks (the risk that financial difficulties in one institution or a major market disruption will cause uncontrollable financial harm to the financial system); (8) concentration risks (exposure to losses from concentration of closely-related risks such as exposure to a particular industry or exposure linked to a particular entity); and (9) settlement risks (the risk that the Reference Entity and/or the Manager face when they have performed its obligations under a contract but have not yet received value from its counterparty). Derivatives augment the potential for losses because of the high leverage provided by such transactions. See **"Risks Associated with the Swaps."**

12.     *Performance-Based Fees.* The Manager may receive performance based fees and/or incentive allocations. It is possible that the Manager will earn a performance based fee or allocation while its fund's overall investments are at a loss. Performance based fees or allocations may create an incentive for the Manager to engage in investment strategies and to make investments that are more speculative and riskier than would be the case in the absence of such performance-based fees or allocations. This could affect the returns of the Reference Entity (and thus the Fund).

**Risks of Investing in the Fund**

1.      *Limited Operating History.* The Fund is a relatively new enterprise with a limited operating history. Accordingly, an investment in the Fund entails a high degree of risk. **Past performance of the Manager or the success of the Investment Manager in any similar venture is no assurance of future success.**

2.    *Illiquidity.*  Investments of the Fund's assets will, in certain cases, be long-term in nature and may require several years before they are suitable for sale.  Realization of value from such investments may be difficult in the short-term, or may have to be made at a substantial discount compared to other freely tradeable investments.  The Fund may be restricted in its ability to provide redemption requests by Shareholders or to pay expenses or fees.  There is not now, and there is not likely to develop, any market for the resale of the Shares.  The Shares are subject to limited redemption rights.  Accordingly, since the Fund does not plan to make any distributions, Shareholders will be required to have sufficient liquid assets, separate from their investment in the Fund, to meet their individual tax obligations.  Furthermore, the Fund may be unable to liquidate some of its investments to fund redemptions in a timely manner.  Neither the Fund, the Investment Manager nor each of their affiliates have agreed to purchase or otherwise acquire from any Shareholder any Shares or assume the responsibility for locating prospective purchasers of Shareholders' Shares.  Even if a purchaser for a Shareholder's Shares were available, approval of the transfer by the Fund and satisfaction of certain requirements specified in the Articles would be required before any transfer may occur.  In addition, the Shares have not been registered under the securities laws of any jurisdiction and the Fund have no plans to, and are under no obligation to, register the Shares under any such law.  Accordingly, Shares may not be transferred unless registered under applicable securities laws or unless appropriate exemptions from such laws are available.

3.    *Lack of Management Control by Investors.*  Investors will become Shareholders of the Fund.  The Shareholders cannot take part in the management or control of the Fund's business, which is the sole responsibility of the Directors (who have delegated certain of these responsibilities to the Investment Manager).  The Investment Manager has wide latitude in making investment decisions.  The Shareholders do not have such rights.  The Shareholders have certain limited voting rights, but do not have any authority or power to act for or bind the Fund.  The Directors may require any Shareholder, at any time, to redeem, in whole or in part, from the Fund.

4.    *Dependence upon Investment Manager.*  The success of the Fund and its ability to generate profits largely depends on the success of the Investment Manager.

5.    *Limited Liability.*  No Shareholder will be liable for the losses or debts of the Fund such Shareholder is invested in beyond that Shareholder's Shares, nor may any Shareholder be assessed or otherwise required to contribute additional capital.

6.    *Conflicts of Interest.*  Conflicts of interest between the Fund on the one hand, and the Investment Manager and/or its officers and directors on the other hand, may raise issues discussed in "CONFLICTS OF INTEREST" below.

7.    *Early Termination.*  In the event of the early termination of the Fund, the Fund would have to distribute to the Shareholders *pro rata* to their shareholdings in the assets of the Fund.  Certain assets held by the Fund may be highly illiquid and might have little or no marketable value.

8.    *Effects of Substantial Redemptions.*  Substantial redemptions by Shareholders within a short period of time could require the Investment Manager to arrange for the Fund's positions to be liquidated more rapidly than would otherwise be desirable, which could adversely affect the value of the remaining Shares.  In addition, regardless of the period of time in which withdrawals occur, the resulting reduction in the Fund's assets could make it more difficult to generate a positive rate of return or recoup losses due to a reduced equity base.

9.    *Valuations.*  Profits and losses are allocated to the Shareholders for each accounting period which may end at times other than the end of the Fund's fiscal and tax year.  Such allocations are based on

the value of the assets at the time. Where such values are established by trading on an active securities market or the equivalent, the Investment Manager, or a party designated by the Investment Manager, will use those values in allocating the profits and losses. In other cases, the Investment Manager, or the party designated by the Investment Manager, will exercise its best judgment as to value, based on all the facts known to it at the time. However, the Investment Manager, or the party designated by the Investment Manager, might not be able to obtain full information about the values of assets invested with the Manager except as of the end of its fund's respective reporting periods, which may not necessarily be coterminous with the Fund's fiscal or tax year or other accounting period. Nevertheless, the valuations based on the best judgment of the Investment Manager, or the party designated by the Investment Manager, and the resulting allocations, are binding on the Shareholders.

10. *Changes in Applicable Law*. The Fund must comply with various legal requirements, including requirements imposed by the federal securities laws, tax laws and pension laws. Should any of those laws change over the scheduled term of the Fund, the legal requirements to which the Fund and the Shareholders may be subject could differ materially from current requirements.

11. *Market Considerations*. The investments of the Fund are subject to normal market fluctuations and there can be no assurances that appreciation will occur.

12. *Lack of Diversification*. The Fund has no requirements for diversification. At present, the only asset of the Fund will be the Swaps.

13. *Borrowing; Use of Leverage*. The Fund may use short term borrowing from a Credit Facility in order to fund redemptions. The Fund may also obtain leverage by entering into the Swaps. If the assets under management are not sufficient to pay the principal of, and interest on, any debts or to satisfy any obligations when due, the Fund could sustain losses.

14. *Risk Factors Regarding Revolving Credit Facility*. Loans to the Fund under a Credit Facility bear interest at variable rates. If interest rates under a Credit Facility should rise, then the Fund's interest expense would be increased. Illiquidity or declining market value of the Fund's investments will decrease the amount of capital available to the Fund to pay principal of or interest on its obligations to Credit Facility Lenders. Since these obligations are secured by various liens, Credit Facility Lenders could institute foreclosure, thereby reducing the Fund's Net Asset Value. Furthermore, a foreclosure by Credit Facility Lenders could result in the liquidation of the Fund's assets in a manner that does not maximize investor value and will be senior to the interest of the Shareholders.

Credit Facility Lenders have the discretion to decide which of the Fund's investments qualify for loans under the agreement. As such, there is a risk that the Fund will not receive a loan under the Credit Facility and will not be able to make investments on a leveraged basis. The decision to extend any loans under a Credit Facility is at such Credit Facility Lender's discretion.

In order to receive leverage under a Credit Facility, the Fund's assets may be valued by the Credit Facility Lenders to determine the amount of collateral securing capital borrowed by the Fund. As Credit Facility Lenders are not shareholders, they are not subject to the Net Asset Valuation procedures set forth therein. Furthermore, in determining the value of the Fund's assets, the Credit Facility Lenders, in their discretion, will attach a fair market value to such assets. Although the criteria in determining such fair market value are objective, if Credit Facility Lenders attach a low fair market value to the Fund's assets, the Fund may be required to (i) deposit additional collateral with a Credit Facility Lender, and/or (ii) make immediate prepayment of the then outstanding loans pursuant to such Credit Facility Agreements, thereby

impairing the Fund's ability to obtain the desired leverage for investment of its assets with the Reference Entity and reducing the capital of the Fund available for investment.

Credit Facility Lenders hold security interests in the underlying assets of the Fund. If the Fund defaults on any interest payment, or there is otherwise an event of default under a Credit Facility, a Credit Facility Lender will have certain remedies such as foreclosing on its security interests. Credit Facility Lenders, when liquidating the Fund's assets may sell such assets at a loss. Any remedy of a Credit Facility Lender could reduce the Fund's Net Asset Value.

15.     *Reserve for Contingent Liabilities*.   Under certain circumstances, the Fund may find it necessary to establish a reserve for contingent liabilities or withhold a portion of the Shareholder's settlement proceeds at the time of redemption, in which case, the reserved portion would remain at the risk of the Fund's activities.

16.     *Liquidation*.   If the Fund should become insolvent, the Shareholders may be required to return with interest any property distributed that represented a return of capital or distributions wrongfully made to them and forfeit undistributed profits.

17.     *Side Letters*.   The Fund, by consent of the Directors, in consultation with the Investment Manager, may from time to time seek to induce investment in the Fund by offering investment terms to certain prospective investors which are not available to existing investors in the Fund. In such cases the parties will enter into a written side arrangement varying the standard terms of offer herein. Such variations may include, without limitation, variations to fees, minimum investment or redemptions, with the effect that not all investors in the Fund will invest on the same terms and some investors may be expected to enjoy more favorable terms than others.

18.     *Side Pockets*.   The Directors, in consultation with the Investment Manager may determine to create a "side pocket" within the Fund at their absolute discretion and such "side pocket" shall be capable of being constituted as a separate division of Shares of the Fund, to which the Directors, in consultation with the Investment Manager, may determine to allocate or attribute particular investments or assets, including but not limited to investments or assets which are illiquid, difficult to value, subject to lock up or non-redemption provisions, subject to special circumstances in the opinion of the Directors, in consultation with the Investment Manager, or such assets and investments which it may be prudent, necessary or desirable in the opinion of the Directors, in consultation with the Investment Manager, to segregate from other assets or investments of the Fund. The Directors, in consultation with the Investment Manager, may determine to apply and or impose particular investment restrictions with respect to the side pocketed assets.

**Risks Associated with the Swaps**

1.     *Counterparty Credit Risk*.   By entering into a Swap, the Fund incurs the credit risk of the Counterparty, in addition to the risk of the Reference Entity. Generally, unless the Fund can negotiate security for a Counterparty's obligation to the Fund, the obligations of a Counterparty to the Fund are unsecured. Although the Reference Entity underlying a Swap may be successful, the Fund will not benefit from any gain in the Reference Entity if the Counterparty is unable to meet its obligation under the respective Swap (this risk increases if the Counterparty does not hedge its obligations under a Swap by investing directly in the Reference Entity). In the event the Counterparty is unable to fulfill its obligations under a Swap for whatever reason (i.e., bankruptcy, dissolution or if the Counterparty does not have sufficient assets to fulfill its obligations to the Fund) any investment by the Fund in connection

with a Swap may also be lost, and the Fund's liquidity could be materially impaired which could cause losses to the Fund that the Fund may not be able to recover from the counterparty.

2.    *Other Risks.*  In addition to counterparty credit risk, the Fund faces other risks common to derivatives transactions.  See "Risks Associated With The Managers - *Risks of Derivatives.*"

3.    *Risk of Termination and Events of Default.*  By its terms, a Swap terminates after a period of time as specified in the relevant Swap Documents.  In addition, under the relevant Swap Documents, a Counterparty may be able to terminate a Swap before the scheduled termination date upon the occurrence of specified Events of Default and Termination Events (as each term is defined in the respective Swap Documents).  Upon termination of a Swap, the Fund may be subject to early termination fees and/or the Fund will no longer have the enhanced returns unless it is able to obtain an alternative Counterparty.

4.    *No Guarantee of Profit.*  The Swaps entail a high degree of financial risk, which could result in loss of the Fund's entire investment.  There is no guarantee that the Fund will profit from a Swap or any additional Swaps.

5.    *Lack of Centralized Clearing or Guaranty.*  As there is no central clearing or guaranty function for over-the-counter derivatives, if a Counterparty fails to make the cash payments required to settle the initial and any additional Swaps, the Fund will lose any payments it has made under each Swap as well as any anticipated benefit of any such Swap.

6.    *Volatility of Swaps.*  The value of a Swap depends on the performance of the Reference Entity, and each Swap is expected to be highly leveraged.  The Reference Entity and the Manager may use leverage and may also utilize over-the-counter derivative instruments.  As a result, relatively small movements in the market prices of the instruments traded by the Manager can result in immediate and substantial losses in the value.  Such losses ultimately can adversely affect the economic return of a Swap.

7.    *Valuation Risks.*  The valuation of a Swap will not be subject to verification through price transparency, which typically results from secondary market trading.  Instead, a calculation agent will determine the value of a Swap in its sole discretion.  The value of a Swap will be based upon the economic performance of the Reference Entity and the securities held thereby.  These securities can be illiquid and/or difficult to value.  For purposes of valuing a Swap, a calculation agent may rely in whole or in part upon, among other things, verbal or written statements produced by the Reference Entity or unaffiliated third parties, and/or its own estimates.  A calculation agent may adjust a Swap's value to reflect valuation uncertainty, liquidity restrictions and/or other factors that a calculation agent determines in its judgment to be necessary or appropriate.  Generally, a calculation agent has the right to restate the value of a Swap based on new information it receives.  All calculation, valuations and determinations made by a calculation agent with respect to a Swap are generally non-negotiable and binding on the Fund.

8.    *Lack of Standardization and Regulation of a Swap.*  A Swap is not traded on exchanges and does not have standardized terms.  A Swap is purchased from or sold to securities dealers, financial institutions or other counterparties through direct bilateral agreements, which are individually negotiated.  Such other-the-counter transactions are substantially unregulated.  This is in contrast to exchange-listed derivatives, which generally have standardized terms and performance mechanics.

9.    *Dependency on Counterparty for Leverage Strategy.*  The ability of the Fund to use leverage through a Swap, and to maintain the desired leverage ratio, is dependent on a Counterparty's willingness and ability to execute a Swap and to releverage any gains or subsequent investments by Shareholders in the Fund.  A Counterparty is under no obligation to execute any Swap with the Fund,

presently or in the future, or (subject to more favorable terms which may or may not be negotiated by the Fund) to releverage gains or subsequent investments, and/or may cease doing so at any time and for any reason, without notice.

10.     *Lack of Secondary Market Liquidity*.  There is no established secondary trading market for a Swap and it is unlikely that a secondary market will develop.

11.     *Limited Liquidity*.  Shareholders may be subject to limited liquidity by a Counterparty based on liquidity restrictions as set forth in the relevant Swap Documents (including, without limitation, if the Counterparty does not permit a Swap to be reduced or terminated and the result of such refusal suspends or prevents Shareholder redemptions).

## POTENTIAL CONFLICTS OF INTEREST

### Certain Investment Manager Activities

The Investment Manager manages accounts and performs investment management for its own account and for others, or may so do in the future, including for other investment funds similar in nature to the Fund and for managed accounts.  Also, the Investment Manager and/or its affiliates and/or employees may from time to time, have an interest, direct or indirect, in a security whose purchase or sale is recommended or which is purchased, sold or otherwise traded for the Fund.  As a result, the Investment Manager may sell or recommend the sale of a particular security for certain accounts including accounts in which it has an interest and it or others may buy or recommend the purchase of such security for other accounts, including accounts in which it has an interest and, accordingly, transactions in particular accounts may not be consistent with transactions in other accounts or with the Investment Manager's investment recommendations.  For example, the Investment Manager may recommend that the Fund sell a security, while not recommending such sale for other accounts in order to enable the Fund to have sufficient liquidity to honor Shareholders' redemption requests.  Where there is a limited supply of investments, the Investment Manager will ensure reasonable efforts to allocate or rotate investment opportunities on a fair and equitable basis, but the Investment Manager cannot assure absolute equality among all accounts and clients.  From time to time the Fund may buy (or sell) securities, which are being sold (or bought) for other managed accounts.

The Investment Manager and its affiliates may engage in other business ventures.  In managing the operations of more than one entity, conflicts of interest may arise with respect to allocating time, personnel and other resources.  The decision makers will devote such time to the affairs of the Fund, as they, in their sole discretion, deem necessary.

The Investment Manager believes that it will continue to have sufficient staff personnel and resources to perform all of its duties with respect to the Fund.  However, because some of the officers of the Investment Manager may have duties in connection with other investment funds and other matters, such officers may have conflicts of interest in the allocation of responsibilities, services and functions among the Fund and other entities similar to the Fund.

Investors should be aware that the Manager selected by the Reference Entity may be subject to similar conflicts of interest as described above.

**Investment Manager**

The Investment Manager serves as investment manager to the Reference Entity. The Investment Manager (and/or any affiliate of the Investment Manager) may serve as a Manager to which the Reference Entity allocates assets. This creates an incentive for the investment manager of the Reference Entity to invest with a Manager of which it serves as investment manager as it may receive fees from the investments made by the Reference Entity.

Furthermore, as the Investment Manager serves as the Reference Entity's investment manager, the Investment Manager will indirectly be entitled to receive fees from the Fund (and thus Shareholders) as a result of the terms of a Swap.

**Manager**

The Manager will charge and retain brokerage commissions as it relates to the Reference Entity's securities trading transactions. As such, the Manager has an interest in acting as the broker-dealer. While the Manager is entitled to utilize various broker-dealers to execute, settle and clear securities transactions of the Reference Entity, the Manager intends to utilize the services of one broker-dealer, of which the Manager is the sole principal. To the extent the Manager utilizes the services of such broker-dealer, a portion of the commissions generated by the trades may be shared with the Manager in its capacity as sole principal.

**Counterparty**

Each Swap may terminate if any of the termination events (as set forth in the relevant Swap Documents) are triggered. It should be noted that the Reference Entity has no obligation to follow the guidelines established by a Swap for continuation of such Swap as such guidelines may conflict with the investment strategy pursued by the Reference Entity.

**Directors**

Darren Johnston and James Mitchell are officers of Tremont, the parent company of the Investment Manager. As such, a certain level of independent judgment as it relates to matters adversely affecting the Investment Manager may be absent.

The Directors and the service providers may have conflicts of interest in relation to their duties to the Fund. However, each shall, at all times, pay regard to its obligation to act in the best interests of the Fund and the Directors will ensure that all such potential conflicts of interest are resolved fairly and in the interests of Shareholders. When allocating investment opportunities, the Investment Manager will ensure that all such investments will be allocated in a fair and equitable manner.

**Common Counsel**

The law firms of Tannenbaum Helpern Syracuse & Hirschtritt LLP and Walkers serve as legal counsel to the Fund and the Investment Manager and to one or more of its affiliates. Counsel has attempted to be fair and reasonable in dealing with all parties involved and believes that it has acted consistent with its professional responsibilities. Should a future dispute arise between the Fund and the Investment Manager, the Fund may retain separate counsel depending upon the particular circumstances then existing. Counsel does not represent the interests of the Shareholders.

# TAX CONSIDERATIONS

## Introduction

This summary of the principal tax consequences applicable to the Fund and its Shareholders is based upon advice received from the Fund's Cayman Islands and U.S. legal and tax advisors. Moreover, while this summary is considered to be a correct interpretation of existing laws in force on the date of this Memorandum, no assurance can be given that courts or fiscal authorities responsible for the administration of such laws will agree with such interpretation or that changes in such laws will not occur.

THIS SUMMARY IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING UNITED STATES FEDERAL TAX PENALTIES. THIS SUMMARY WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN, AND ANY TAXPAYER TO WHOM THE TRANSACTIONS OR MATTERS ARE BEING PROMOTED, MARKETED OR RECOMMENDED SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## The Fund

*Cayman Islands Tax Considerations.* The following is a summary of certain Cayman Islands tax consequences to persons who purchase Shares in the Fund. The discussion is based upon applicable law of the Cayman Islands and on the advice of Walkers, Cayman Islands counsel. The discussion does not address all of the tax consequences that may be relevant to a particular Shareholder. Prospective investors must consult their own tax advisers as to the Cayman Islands tax consequences of acquiring, holding and disposing of Shares, as well as the effects of tax laws of the jurisdictions of which they are citizens, residents or domiciliaries or in which they conduct business.

There is, at present, no direct taxation in the Cayman Islands and interest, dividends and gains payable to the Fund will be received free of all Cayman Islands taxes. The Fund is incorporated as an "exempted company" pursuant to the Companies Law (as amended). The Fund has received an undertaking from the Governor in Cabinet of the Cayman Islands to the effect that, for a period of 20 years from such date, no law that thereafter is enacted in the Cayman Islands imposing any tax or duty to be levied on profits, income or on gains or appreciation, or any tax in the nature of estate duty or inheritance tax, will apply to any property comprised in or any income arising under the Fund, or to the Shareholders thereof, in respect of any such property or income.

The Fund's only Cayman Islands regulatory liability is to pay the applicable Cayman Islands Annual registration fee payable to the Cayman Islands government under the Companies Law (as amended) of the Cayman Islands and an annual registration fee in respect of the registration of the Fund under the Mutual Funds Law.

*U.S. Federal Income Taxation.* The Fund has been advised that it should not be subject to U.S. federal income taxes on any U.S. source income or gains from its trading (except in respect of any dividends received in the course of such trading), provided that it does not engage in a trade or business within the U.S. to which such income or gains are effectively connected. Pursuant to a safe harbor under

the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, a non-U.S. corporation which trades stock or securities for its own account should not be treated as engaged in a trade or business within the U.S. provided that the non-U.S. corporation is not a dealer in stock or securities. The Fund intends to conduct its business in a manner so as to meet the requirements of the safe harbor. If the activities of the Fund were not covered by the foregoing safe harbor, there would be a risk that the Fund (but not any investor) would be required to file a U.S. federal income tax return for such year and pay tax at full U.S. corporate income tax rates as well as an additional thirty percent (30%) branch profits tax.

The Fund should not be subject to U.S. federal income or withholding tax on U.S. source interest income (other than in the case of certain contingent interest or interest received from a borrower ten percent (10%) or more of the equity of which is owned by the Fund, neither of which the Fund anticipates receiving) provided that the Fund is not engaged in a trade or business within the U.S. to which such interest income is effectively connected, and provided that the Fund's interest-bearing securities qualify as registered obligations and that the Fund periodically supplies an Internal Revenue Service Form W-8 BEN or its equivalent.

*Other Jurisdictions.*  The Fund should not be generally subject to any tax on its entire income or revenues in any other jurisdiction, although the Fund may be subject to income taxes or withholding taxes at source on dividend, interest and capital gain income derived from certain jurisdictions. The Fund will be responsible for payment of such taxes should they become liable.

Persons interested in purchasing the Fund's Shares should inform themselves as to any tax consequences particular to their circumstances arising in the jurisdiction in which they are resident or domiciled for tax purposes in connection with the acquisition, ownership, redemption or disposition of the Fund's Shares.

*Changes in Law.*  All laws, including laws relating to taxation in the Cayman Islands, the United States and other jurisdictions are subject to change without notice.

## Shareholders of the Fund

Shareholders who are not otherwise subject to Cayman Islands or United States taxes by reason of their residence, domicile or other particular circumstances should not become subject to any such taxes by reason of the ownership, transfer or redemption of the Shares.

Shareholders who are or may be subject to U.S. Federal income tax on their worldwide income should be aware of certain tax consequences of investing directly or indirectly in Shares and should be certain to consult with their own tax advisors in this regard.

U.S. tax-exempt investors should review the materials set forth below under "CERTAIN ERISA CONSIDERATIONS."

Dividend and redemption payments made by the Fund to Shareholders who are not U.S. Persons should not be subject to U.S. Federal income tax, provided that Shares are not held in connection with a U.S. trade or business of the Shareholder in the year of receipt. Individual holders of Shares who are neither present or former U.S. citizens nor U.S. residents (as determined for U.S. estate and gift tax purposes) should not be subject to U.S. estate and gift taxes with respect to their ownership of such Shares. A Shareholder's change in status to a U.S. Person could result in adverse U.S. tax consequences

and will constitute a violation of the terms of this Memorandum, resulting in a compulsory redemption of Shares.

**Unrelated Business Taxable Income**

The term "Permitted U.S. Person" means a U.S. Person that is subject to ERISA, or is otherwise exempt from payment of U.S. Federal income tax. Generally, a Permitted U.S. Person is exempt from Federal income tax on certain categories of income, such as dividends, interest, capital gains and similar income realized from securities investment or trading activity. This general exemption from tax does not apply to the "unrelated business taxable income" ("UBTI") of a Permitted U.S. Person. Generally, except as noted above with respect to certain categories of exempt trading activity, UBTI includes income or gain derived from a trade or business, the conduct of which is substantially unrelated to the exercise or performance of the Permitted U.S. Person's exempt purpose or function. UBTI also includes (i) income derived by a Permitted U.S. Person from debt-financed property and (ii) gains derived by a Permitted U.S. Person from the disposition of debt-financed property.

A Permitted U.S. Person investing in a foreign corporation such as the Fund should not realize UBTI with respect to an unleveraged investment in Shares. Permitted U.S. Persons are urged to consult their own tax advisors concerning the U.S. tax consequences of an investment in the Fund.

**Information Returns**

Any U.S. Person transferring cash or other property to a foreign corporation such as the Fund or owning ten percent (10%) or more of the value or voting power of the shares of a foreign corporation such as the Fund will, with certain limited exceptions, likely be required to file an information return with the U.S. Internal Revenue Service containing certain disclosure concerning the filing shareholder, other shareholders and the corporation. The Fund has not committed itself to provide the information about the Fund or its Shareholders needed to complete the return.

*   *   *   *

The foregoing summary does not address tax considerations which may be applicable to certain Shareholders under the laws of jurisdictions other than the Cayman Islands or the U.S. The Fund has no present plans to apply for any certifications or registrations, or to take any other actions under the laws of any jurisdictions which would afford relief to local investors therein from the normal tax regime otherwise applicable to an investment in the Shares. It is the responsibility of all persons interested in purchasing the Shares to inform themselves as to any income or other tax consequences arising in the jurisdictions in which they are resident or domiciled for tax purposes, as well as any foreign exchange or other fiscal or legal restrictions, which are relevant to their particular circumstances in connection with the acquisition, holding or disposition of the Shares. The value of the Fund's investments may also be affected by repatriation and exchange control regulations.

## CERTAIN ERISA CONSIDERATIONS

The United States Employee Retirement Income Security Act of 1974, as amended ("ERISA") imposes certain requirements on "employee benefit plans" (as defined in Section 3(3) of ERISA) subject

to ERISA, including entities such as collective investment funds and separate accounts whose underlying assets include the assets of such plans (collectively, "ERISA Plans") and on those persons who are fiduciaries with respect to ERISA Plans. Investments by ERISA Plans are subject to ERISA's general fiduciary requirements, including the requirement of investment prudence and diversification and the requirement that an ERISA Plan's investments be made in accordance with the documents governing the plan. The prudence of a particular investment must be determined by the responsible fiduciary of an ERISA Plan by taking into account the ERISA Plan's particular circumstances, including the ERISA Plan's existing investment portfolio, and all of the facts and circumstances of the investment including, but not limited to, the matters discussed above under "RISK FACTORS."

Section 406 of ERISA and Section 4975 of the Code prohibit certain transactions involving the assets of an ERISA Plan (as well as those plans that are not subject to ERISA but which are subject to Section 4975 of the Code, such as individual retirement accounts (together with ERISA Plans, "Plans")) and certain persons (referred to as "parties in interest" for purposes of ERISA and "disqualified persons" for purposes of the Code) having certain relationships to such Plans, unless a statutory or administrative exemption is applicable to the transaction. A party in interest or disqualified person who engages in a nonexempt prohibited transaction may be subject to excise taxes and other penalties and liabilities under ERISA and the Code, and the transaction might have to be rescinded.

The U.S. Department of Labor has promulgated a regulation, 29 C.F.R. Section 2510.3-101(as modified by Section 3(42) of ERISA (the "Plan Asset Regulation"), describing what constitutes the assets of a Plan with respect to the Plan's investment in an entity for purposes of certain provisions of ERISA, including the fiduciary responsibility and prohibited transaction provisions of Title I of ERISA and the related prohibited transaction provisions under Section 4975 of the Code. Under the Plan Asset Regulation, if a Plan invests in an "equity interest" of an entity that is neither a "publicly offered security" nor a security issued by an investment company registered under the Investment Company Act, the Plan's assets include both the equity interest and an undivided interest in each of the entity's underlying assets, unless it is established that the entity is an "operating company", which includes for purposes of the Plan Asset Regulation a "venture capital operating company", or that equity participation in the entity by "Benefit Plan Investors" (as defined below) is not "significant".

Under the Plan Asset Regulation, equity participation in an entity by Benefit Plan Investors (as defined below) is "significant" on any date if, immediately after the most recent acquisition of any equity interest in the entity, 25% or more of the value of any class of equity interests in the entity is held by Benefit Plan Investors. The term "Benefit Plan Investor" is defined in the Plan Asset Regulation as: (a) any employee benefit plan (as defined in Section 3(3) of ERISA), subject to part 4 of subtitle B of Title I of ERISA; (b) any plan subject to Section 4975(e)(1) of the Code; and (c) any entity whose underlying assets include plan assets by reason of the investment in the entity by such employee benefit plan and/or plan. For purposes of this determination, (i) the value of equity interests held by a person (other than a Benefit Plan Investor) that has discretionary authority or control with respect to the assets of the entity or that provides investment advice for a fee (direct or indirect) with respect to such assets (or any affiliate of any such person) is disregarded and (ii) only that portion of the equity interests of an entity described in clause (c) of the preceding sentence investing in another entity that is held by employee benefit plans or other plans described in clauses (a) or (b) of the preceding sentence are included in the testing of such other entity.

Shares in the Fund should be considered to be an "equity interest" in the Fund for purposes of the Plan Asset Regulation, and the Shares will not constitute "publicly offered securities" for purposes of the Plan Asset Regulation. In addition, the Fund will not be registered under the Investment Company Act and is not expected to qualify as a "venture capital operating company."

The Investment Manager intends to use commercially reasonable efforts to restrict transfers of any equity interest in the Fund so that ownership of each class of shares in the Fund by Benefit Plan Investors will remain below the 25% threshold contained in the Plan Asset Regulation. Although there can be no assurance that such will be the case, the assets of the Fund should not constitute "plan assets" for purposes of ERISA and Section 4975 of the Code. The Investment Manager and the Fund may change this position in their sole discretion and with notice to the Shareholders.

If the assets of the Fund were deemed to constitute the assets of a Plan, the fiduciary making an investment in the Fund on behalf of an ERISA Plan could be deemed to have improperly delegated its asset management responsibility, the assets of the Fund could be subject to ERISA's reporting and disclosure requirements, and transactions involving the assets of the Fund would be subject to the fiduciary responsibility and prohibited transaction provisions of ERISA and the prohibited transaction rules of Section 4975 of the Code. Accordingly, certain transactions that the Fund may enter into, or may have entered into, in the normal course of its operations might result in non-exempt prohibited transactions and might have to be rescinded. A party in interest or disqualified person that engaged in a non-exempt prohibited transaction may be subject to nondeductible excise taxes and other penalties and liabilities under ERISA and the Code. In addition, such "plan asset" treatment would subject the calculation and payment of the Investment Manager's fees to applicable prohibited transaction and certain conflict of interest provisions of ERISA and the Code. Consequently, if at any time the Investment Manager determines that assets of the Fund may be deemed to be "plan assets" subject to ERISA and Section 4975 of the Code, the Investment Manager may take certain actions it may determine to be necessary or appropriate, including requiring one or more investors to redeem otherwise dispose of all or part of their Shares in the Fund or termination and liquidating the Fund.

Each Plan fiduciary who is responsible for making the investment decisions whether to invest in the Fund should determine whether, under the general fiduciary standards of investment prudence and diversification and under the documents and instruments governing the Plan, an investment in the Shares is appropriate for the Plan, taking into account the overall investment policy of the Plan and the composition of the Plan's investment portfolio. Any Plan proposing to invest in the Fund should consult with its counsel to confirm that such investment will not result in a prohibited transaction and will satisfy the other requirements of ERISA and the Code.

The sale of any Shares to a Benefit Plan Investor is in no respect a representation by the Fund or the Investment Manager and their affiliates or any other placement agent or arranger that such an investment meets all relevant legal requirements with respect to investments by Plans generally or any particular Plan, or that such an investment is appropriate for Plans generally or any particular Plan.

Regardless of whether the assets of the Fund are deemed to be "plan assets", the acquisition of Shares by a Plan could, depending upon the facts and circumstances of such acquisition, be a prohibited transaction, for example, if any of the Fund or the Investment Manager and their affiliates were a party in interest or disqualified person with respect to the Plan. However, such a prohibited transaction may be treated as exempt under ERISA and the Code if the Shares were acquired pursuant to and in accordance with one or more "class exemptions" issued by the U.S. Department of Labor, such as the QPAM Exemption, Prohibited Transaction Class Exemption ("PTCE") 90-1 (a class exemption for certain transactions involving an insurance company pooled separate account), PTCE 91-38 (a class exemption for certain transactions involving a bank collective investment fund), PTCE 95-60 (a class exemption for certain transactions involving an insurance company general account), and PTCE 96-23 (a class exemption for certain transactions determined by an in-house asset manager).

Any insurance company proposing to invest assets of its general account in the Fund should also consider the extent to which such investment would be subject to the requirements of ERISA in light of the U.S. Supreme Court's decision in John Hancock Mutual Life Insurance Co. v. Harris Trust and Savings Bank and under any subsequent legislation or other guidance that has or may become available relating to that decision, including Section 401(c) of ERISA and the regulations thereunder published by the U.S. Department of Labor in January, 2000.

The Investment Manager will require a fiduciary of an ERISA Plan that proposes to acquire Interests to represent that it has been informed of and understands the Fund's investment objectives, policies, strategies and limitations, fee structure and that the decision to acquire Shares was made in accordance with its fiduciary responsibilities under ERISA and that neither the Fund, the Investment Manager, or any of their affiliates has provided investment advice with respect to such decision. The Investment Manager will also require any investor that is, or is acting on behalf of, a Plan to represent and warrant that its acquisition and holding of Shares will not result in a nonexempt prohibited transaction under ERISA and/or Section 4975 of the Code.

Governmental plans and certain church plans, while not subject to the fiduciary responsibility provisions of ERISA or the provisions of Section 4975 of the Code, may nevertheless be subject to state or other federal laws that are substantially similar to the foregoing provisions of ERISA and the Code. The Investment Manager will require similar representations and warranties with respect to the purchase of Shares by any such plan. Fiduciaries of such plans should consult with their counsel before purchasing any Shares.

The discussion of ERISA and Section 4975 of the Code contained in this Memorandum is, of necessity, general and does not purport to be complete. Moreover, the provisions of ERISA and Section 4975 of the Code are subject to extensive and continuing administrative and judicial interpretation and review. Therefore, the matters discussed above may be affected by future regulations, rulings and court decisions, some of which may have retroactive application and effect.

**ANY POTENTIAL INVESTOR CONSIDERING AN INVESTMENT IN THE FUND THAT IS, OR IS ACTING ON BEHALF OF, A PLAN (OR A GOVERNMENTAL PLAN SUBJECT TO LAWS SIMILAR TO ERISA AND/OR SECTION 4975 OF THE CODE) IS STRONGLY URGED TO CONSULT ITS OWN LEGAL, TAX AND ERISA ADVISORS REGARDING THE CONSEQUENCES OF SUCH AN INVESTMENT AND THE ABILITY TO MAKE THE REPRESENTATIONS DESCRIBED ABOVE.**

## ADDITIONAL AND GENERAL INFORMATION

### Cayman Islands Mutual Funds Law

The Fund falls within the definition of a "Mutual Fund" in terms of the Mutual Funds Law (as amended) (the "Law") and accordingly is regulated in terms of that Law. However, the Fund is not required to be licensed or employ a licensed mutual fund administrator since the minimum aggregate investment purchasable by a prospective investor in the Fund exceeds $50,000 or its equivalent in any other currency.

As a regulated mutual fund, the Fund is subject to the supervision of the Cayman Islands Monetary Authority (the "Monetary Authority"). The Fund must file this Memorandum and any changes that materially affect any information in this document with the Monetary Authority. The Monetary Authority may, at any time, instruct the Fund to have its accounts audited and to submit them to the Monetary Authority within such time as the Monetary Authority specifies. In addition, the Monetary Authority may ask the Directors to give the Monetary Authority such information or such explanation in respect of the Fund as the Monetary Authority may reasonably require to enable it to carry out its duty under the Law.

The Directors must give the Monetary Authority access to or provide at any reasonable time all records relating to the Fund and the Monetary Authority may copy or take an extract of a record it is given access to. Failure to comply with these requests by the Monetary Authority may result in substantial fines on the part of the Directors and may result in the Monetary Authority applying to a court to have the Fund wound up.

The Monetary Authority may take certain actions if it is satisfied that a regulated mutual fund:

(a)   is or is likely to become unable to meets its obligations as they fall due;

(b)   is carrying on or is attempting to carry on business or is winding up its business voluntarily in a manner that is prejudicial to its investor or creditors;

(c)   is not being managed in a fit and proper manner; or

(d)   has persons appointed as Director, manager or officer that is not a fit and proper person to hold the respective position.

The powers of the Monetary Authority include *inter alia* the power to require the substitution of Directors, to appoint the person to advise the Fund on the proper conduct of its affairs or to appoint a person to assume control of the affairs of the Fund. There are other remedies available to the Monetary Authority including the ability to apply to the court for approval of other actions.

**Cayman Islands Anti Money laundering Regulations**

As part of the Fund's responsibility for the prevention of money laundering, the Fund and the Administrator (including its affiliates, subsidiaries or associates) will require a detailed verification of the applicant's identity and the source of payment. Depending on the circumstances of each application, a detailed verification might not be required where:

(a)   the applicant is a recognised financial institution which is regulated by a recognised regulatory authority and carries on business in a recognised jurisdiction; or

(b)   the application is made through a recognised intermediary which is regulated by a recognised regulatory authority and carries on business in a recognised jurisdiction. In this situation the Fund may rely on a written assurance from the intermediary that the requisite identification procedures on the applicant for business have been carried out; or

(c)   the subscription payment is remitted from an account (or joint account) held in the applicant's name at a regulated bank in a recognised jurisdiction. In this situation the Fund may require evidence identifying the branch or office of the bank from which the

monies have been transferred, verify that the account is in the name of the applicant and retain a written record of such details.

The Fund and the Administrator reserve the right to request such information as is necessary to verify the identity of an applicant. In the event of delay or failure by the applicant to produce any information required for verification purposes, the Administrator will refuse to accept the application and the subscription monies relating thereto.

If any person who is resident in the Cayman Islands (including the Administrator) has a suspicion that a payment to the Fund (by way of subscription or otherwise) contains the proceeds of criminal conduct that person is required to report such suspicion pursuant to The Proceeds of Criminal Conduct Law (as amended).

By subscribing, applicants consent to the disclosure by the Fund and the Administrator of any information about them to regulators and others upon request in connection with money laundering and similar matters both in the Cayman Islands and in other jurisdictions.

## Other Jurisdictions

The Fund will comply with applicable U.S. anti-money laundering regulations. In addition, many jurisdictions are in the process of changing or creating anti-money laundering, embargo and trade sanctions, or similar laws, regulations, requirements (whether or not with force of law) or regulatory policies and many financial intermediaries are in the process of changing or creating responsive disclosure and compliance policies (collectively "Requirements") and the Fund could be requested or required to obtain certain assurances from subscribers subscribing for Shares, disclose information pertaining to them to governmental, regulatory or other authorities or to financial intermediaries or engage in due diligence or take other related actions in the future. It is the Fund's policy to comply with Requirements to which it is or may become subject to and to interpret them broadly in favor of disclosure. Each subscriber will be required to agree in the Subscription Agreement, and will be deemed to have agreed by reason of owning any Shares, that it will provide additional information or take such other actions as may be necessary or advisable for the Fund (in the sole judgment of the Fund and/or Administrator) to comply with any Requirements, related legal process or appropriate requests (whether formal or informal) or otherwise. Each subscriber by executing the Subscription Agreement consents, and by owning Shares is deemed to have consented, to disclosure by the Fund and its agents to relevant third parties of information pertaining to it in respect of Requirements or information requests related thereto. Failure to honor any such request may result in redemption by the Fund or a forced sale to another investor of such subscriber's Shares.

## Further Issues of Shares

The Fund may, by resolution of the Board, at any time decide to offer further voting or non-voting shares up to the amount of authorized share capital and, without prejudice to any special rights previously conferred on the holders of existing Shares, to allot, issue, grant options over or otherwise dispose of the shares or any other Classes of shares (including fractions of shares) with or without preferred, deferred or other special rights or restrictions, whether with regard to dividend, voting or otherwise and to such persons, at such times and on such other terms as the Board will think proper, but not in a manner to reduce the financial rights of Shareholders without their consent.

**Principal Object**

The objects of the Fund, as provided for in the Memorandum of Association, are not restricted. The Fund therefore has the full power and authority to carry out any object not prohibited by the Companies Law or any other law of the Cayman Islands.

**Share Premium Account**

The initial offer price of U.S. $1,000 per Share of Class A and Class B Shares of the Fund represents a par value of U.S.$0.01 and a share premium of U.S.$999.99 (the "Share Premium"). The Share Premium received by way of subscriptions for Shares will be credited to the Fund's Share Premium account and will be included in the Net Asset Value. The Share Premium account may be used in any manner allowed under the Companies Law.

**Repurchase of Shares**

Under the Companies Law, subject to certain conditions, the Fund is permitted to repurchase or redeem its shares (i) out of surplus, (ii) in exchange for newly issued shares of equal value or, provided that the Fund is able to pay its obligations as they fall due in the ordinary course of its business, (iii) out of capital. Repurchased or redeemed shares will be treated as cancelled but will continue to form part of the authorized share capital of the Fund and will be available for reissue by the Fund at any time. Redemptions of Shares will be made in accordance with the terms of this Memorandum.

**Alterations to the Fund's Share Capital**

The Fund may, by an ordinary resolution of the Shareholders, (*i.e.*, a simple majority of those Shareholders present and entitled to vote, who do vote in favor of the resolution) increase its authorized share capital. By a special resolution of the Shareholders (*i.e.*, a resolution passed by a two-thirds (2/3rds) majority of those persons present and entitled to vote thereon) the Fund may reduce its authorized share capital subject to confirmation by the courts of the Cayman Islands.

**Variation of Class Rights**

The rights that attach to any Class of shares issued, or to be issued, by the Fund (unless otherwise provided by the terms of issue of the shares of that Class) may, whether or not the Fund is being wound up, be varied only with the consent in writing of not less than two thirds of the holders of the issued shares of any such Class of shares which may be affected by such variation or by a special resolution passed at a separate Class meeting of the holders of the shares of such Class. It will not be deemed to be a variation of the rights attaching to any particular Class of shares for the Fund to create or issue further shares ranking pari passu therewith, the redemption or repurchase of any shares, by the passing of any Directors' resolution to change or vary any investment objective, investment technique and strategy and/or investment policy in relation to a Class of shares or any modification of the fees payable to any service provider to the Fund.

**Amendment of Articles of Association**

Subject as provided herein, the Articles of Association of the Fund may only be altered or amended by the passing of a special resolution of the Shareholders to that effect.

**Directors' Interest in Contracts**

A Director of the Fund may be or become a director or other officer of, or otherwise interested in, any company promoted by the Fund or in which the Fund may be interested as shareholder or otherwise, and no such Director will be accountable to the Fund for any remuneration or other benefits received arising from the foregoing.  Provided he first declares his interest to the Fund, a Director may hold any office or place of profit under the Fund or under any company in which the Fund will be a shareholder or otherwise interested, may contract with the Fund, be interested in any contract or arrangement entered into by or on behalf of the Fund and retain any profit arising from any such office or place of profit or realized by any such contract or arrangement.  Provided notice is given as described above, a Director, notwithstanding his interest, may be counted in the quorum present at any meeting and he may vote on any appointment or arrangement in which he is interested other than his own appointment or the arrangement of the terms thereof.

A general notice that a Director or officer is a member of any specified firm or company, and is to be regarded as interested in all transactions with that firm or company, will be a sufficient disclosure under the terms of the Fund's Articles of Association as regards such Director or officer and the said transactions.  After such general notice it will not be necessary for such Director or officer to give a special notice relating to any particular transaction with that firm or company.

**Directors' Powers**

Save as provided in the Companies Law, as specifically set out in the Articles of Association or as may be determined by the Shareholders from time to time by the passing of a special resolution, the business of the Fund will be managed by the Board, who may pay all expenses incurred in setting up and registering the Fund and may exercise all the powers of the Fund.  In particular, the Board may exercise all the powers of the Fund to borrow money, and to mortgage or charge the Fund's undertaking, property and uncalled capital, or any part thereof, and to issue debentures, debenture stock, bonds and other securities whether outright or as security for any debt, liability or obligation of the Fund or of any third party.

**Removal of Directors**

The Directors hold office subject to and in accordance with the terms of the Articles of Association.  A Director may be removed from office at any time by an ordinary resolution of the Shareholders either passed at a properly convened and quorate meeting of the Shareholders or adopted in writing and signed by all of the Shareholders.

**Reports to the Shareholders**

The Fund will furnish annual reports to its Shareholders containing financial statements audited by the Fund's independent auditors prepared in accordance with U.S. GAAP (or international financial accounting standards, if the Fund determines in the Board's sole discretion).  The accounting date of the Fund is December 31 of each year.  Annual reports of the Fund are published and sent to their respective Shareholders.  The Administrator also communicates the Net Asset Value for the Shares to Shareholders on a monthly basis.  In the event the Fund offers shares issued in a currency other than U.S. Dollars, any statements and reports sent to the shareholders of such Class shall reflect the Fund's performance in terms of the currency of the Class of shares held by such shareholders.

**Meetings of Shareholders**

Meetings of Shareholders will be held at such time and place as may be determined by the Board in accordance with the Articles of Association and otherwise in accordance with Cayman Islands law.

**Inquiries**

Inquiries concerning the Fund and the Shares, including information concerning subscription and redemption procedures and current Net Asset Value, should be directed to the Administrator at the address set forth in the DIRECTORY appearing elsewhere in this Memorandum.

**EXHIBIT I**

**TREMONT PARTNERS, INC.'S FORM ADV PART II**

## EXHIBIT II

## PRIVACY NOTICE

At the Investment Manager we recognize the importance of protecting the Shareholders' privacy. As such, the Fund and the Investment Manager have policies in place to maintain the confidentiality and security of our Shareholders' information.

### Categories Of Information We May Collect

In the normal course of business, we may collect the following types of information:

- Information you provide in the subscription documents and other forms (including name, address, date of birth, income and other financial-related information)
- Data about your transactions with us (such as the types of investments you have made and your account status)

### How We Use Your Information That We Collect

Any and all nonpublic personal information received by the Investment Manager with respect to the Shareholders who are natural persons, including the information provided to the Fund by a Shareholder in the subscription documents, will not be shared with nonaffiliated third parties which are not service providers to the Fund or the Investment Manager without notice to or prior consent from such Shareholders. In the normal course of business, we may disclose the kinds of nonpublic personal information listed above to nonaffiliated third party service providers involved in servicing and administering products and services on our behalf. Such service providers include but are not limited to the Administrator, the auditors and the legal advisors of the Fund. Additionally, the Fund and the Investment Manager may disclose such nonpublic personal information as required by law (such as to respond to a subpoena or to prevent fraud). Without limiting the foregoing, the Fund and/or the Investment Manager may disclose nonpublic personal information about you to governmental entities and others in connection with meeting its obligations to prevent money laundering. In addition, if the Fund chooses to dispose of any Shareholder's nonpublic personal information that the Fund is not legally bound to maintain, then the Fund will do so in a manner that reasonably protects such information from unauthorized access.

The same privacy policy will also apply to the former Shareholders who are natural persons.

### Confidentiality and Security

We restrict access to nonpublic personal information about our customers to those employees and agents who need to know that information in order to provide products and services to you. We maintain physical, electronic and procedural safeguards to protect your nonpublic personal information.

For questions about this privacy policy, please contact the Investment Manager.