

A Division of Tremont Group Holdings, Inc.

# Rye Select Broad Market XL Fund, LP

## Amended and Restated Confidential Private Placement Memorandum

Name of Recipient _____

[800970-7]

Memorandum Number_____

# RYE SELECT BROAD MARKET XL FUND, LP

(A Delaware Limited Partnership)

**AMENDED AND RESTATED**
**CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM**

November 1, 2007

This Amended and Restated Confidential Private Placement Memorandum relates to an offering of limited partnership interests ("Interests") in Rye Select Broad Market XL Fund, LP (the "Partnership"). Prospective investors should carefully read this Memorandum and should retain it for their records. The day-to-day operations and the investment management of the Partnership is conducted by its general partner, Tremont Partners, Inc., a Connecticut corporation (the "General Partner"). The investors will be limited partners ("Limited Partners") of the Partnership. The General Partner and the Limited Partners are collectively referred to herein as the "Partners."

In making an investment decision regarding the Partnership, each investor must rely upon its own examination of the Partnership, the terms of this offering and the merits and risks involved.

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") NOR QUALIFIED, APPROVED OR DISAPPROVED UNDER ANY OTHER FEDERAL OR STATE SECURITIES LAWS. NEITHER THE SECURITIES AND EXCHANGE COMMISSION ("SEC") NOR ANY OTHER FEDERAL OR STATE REGULATORY AUTHORITY HAS PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THE SECURITIES OFFERED HEREBY MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF BY AN INVESTOR UNLESS THEY ARE REGISTERED UNDER THE SECURITIES ACT AND, WHERE REQUIRED, UNDER THE LAWS OF OTHER JURISDICTIONS, UNLESS SUCH PROPOSED SALE, TRANSFER OR DISPOSITION IS EXEMPT FROM SUCH REGISTRATION.

THIS OFFERING IS AVAILABLE ONLY TO "QUALIFIED PURCHASERS" AS THAT TERM IS DEFINED PURSUANT TO THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "COMPANY ACT"), AND THE RULES AND REGULATIONS PROMULGATED THEREUNDER INCLUDING, WITHOUT LIMITATION, RULES 3c-5 (RELATING TO "KNOWLEDGEABLE EMPLOYEES") AND RULE 3c-6 (RELATING TO "INVOLUNTARY TRANSFERS OF INTEREST").

THE GENERAL PARTNER IS EXEMPT FROM REGISTRATION WITH THE COMMODITY FUTURES TRADING COMMISSION AS A COMMODITY POOL OPERATOR PURSUANT TO RULE 4.13(A)(4) AND THEREFORE, UNLIKE A REGISTERED COMMODITY POOL OPERATOR, IT IS NOT REQUIRED TO DELIVER A DISCLOSURE DOCUMENT AND A CERTIFIED ANNUAL REPORT TO PARTICIPANTS IN THE POOL.

## GENERAL NOTICES

THIS IS A PRIVATE OFFERING MADE PURSUANT TO APPLICABLE FEDERAL AND STATE "PRIVATE PLACEMENT" EXEMPTIONS.  THE INTERESTS HAVE NOT BEEN, AND WILL NOT BE, REGISTERED UNDER THE SECURITIES ACT, OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION.  THE OFFERING MADE UNDER THIS MEMORANDUM IS BEING MADE IN RELIANCE ON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT FOR OFFERS AND SALES OF SECURITIES THAT DO NOT INVOLVE ANY PUBLIC OFFERING, AND SIMILAR EXEMPTIONS UNDER STATE LAW.  TO QUALIFY FOR SUCH EXEMPTIONS, THE INTERESTS MUST BE ACQUIRED FOR INVESTMENT PURPOSES.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS UNLAWFUL.  THIS MEMORANDUM CONSTITUTES AN OFFER ONLY IF DELIVERY OF THIS MEMORANDUM IS PROPERLY AUTHORIZED BY THE GENERAL PARTNER.   THIS MEMORANDUM HAS BEEN PREPARED BY THE GENERAL PARTNER SOLELY FOR THE BENEFIT OF PERSONS INTERESTED IN THE PROPOSED SALE OF THE INTERESTS, AND ANY DISTRIBUTION OR REPRODUCTION OF THIS MEMORANDUM, IN WHOLE OR IN PART, WITHOUT THE PRIOR WRITTEN CONSENT OF THE GENERAL PARTNER, IS PROHIBITED.

NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATIONS OR PROVIDE ANY INFORMATION WITH RESPECT TO THE INTERESTS EXCEPT SUCH INFORMATION AS IS CONTAINED IN THIS MEMORANDUM.  PROSPECTIVE LIMITED PARTNERS SHOULD NOT RELY ON ANY INFORMATION NOT CONTAINED IN THIS MEMORANDUM.  NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE MADE UNDER IT SHALL UNDER ANY CIRCUMSTANCES IMPLY THAT INFORMATION CONTAINED IN THIS MEMORANDUM IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

THE CONTENTS OF THIS MEMORANDUM SHOULD NOT BE CONSTRUED AS INVESTMENT, LEGAL OR TAX ADVICE.  A NUMBER OF FACTORS MATERIAL TO A DECISION WHETHER TO INVEST IN THE INTERESTS HAVE BEEN PRESENTED IN THIS MEMORANDUM IN SUMMARY OR OUTLINE FORM ONLY IN RELIANCE ON THE FINANCIAL SOPHISTICATION OF THE OFFEREES.  EACH PROSPECTIVE INVESTOR IS URGED TO SEEK INDEPENDENT INVESTMENT, LEGAL AND TAX ADVICE CONCERNING THE CONSEQUENCES OF INVESTING IN THIS PARTNERSHIP.

THE INTERESTS OFFERED HEREIN ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM, AND MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REQUIREMENTS AND CONDITIONS SET FORTH IN THE PARTNERSHIP AGREEMENT.  INVESTMENTS GENERALLY MAY BE REDEEMED ONLY AS PROVIDED IN THE PARTNERSHIP AGREEMENT.   THE GENERAL PARTNER RESERVES THE RIGHT TO SUSPEND WITHDRAWALS UNDER CERTAIN CIRCUMSTANCES.  INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

THIS MEMORANDUM IS A SUMMARY ONLY AND DOES NOT PURPORT TO BE COMPLETE. ACCORDINGLY, REFERENCE IS MADE TO THE PARTNERSHIP AGREEMENT, AND THE OTHER AGREEMENTS, DOCUMENTS, STATUTES, AND REGULATIONS REFERRED TO HEREIN FOR THE EXACT TERMS OF THE PARTNERSHIP AGREEMENT, AND SUCH OTHER AGREEMENTS, DOCUMENTS, STATUTES AND REGULATIONS.

THIS MEMORANDUM CONSTITUTES AN OFFER ONLY IF THE NAME OF THE OFFEREE APPEARS IN THE APPROPRIATE SPACE PROVIDED ON THE SECOND PAGE OF THIS MEMORANDUM AND ONLY IF DELIVERY HEREOF HAS BEEN PROPERLY AUTHORIZED. THIS MEMORANDUM IS CONFIDENTIAL AND IS INTENDED SOLELY FOR USE BY THE INTENDED RECIPIENT. THIS MEMORANDUM CANNOT BE REPRODUCED OR DISTRIBUTED TO ANY OTHER PERSONS. THE RECIPIENT OF THIS MEMORANDUM, BY ACCEPTING DELIVERY THEREOF, AGREES TO RETURN IT AND ALL RELATED DOCUMENTS TO THE PARTNERSHIP IF THE RECIPIENT ELECTS NOT TO PURCHASE ANY OF THE SECURITIES OFFERED HEREBY.

INTERESTS ARE AVAILABLE ONLY TO PERSONS WILLING AND ABLE TO BEAR THE ECONOMIC RISKS OF THIS INVESTMENT. THE INVESTMENTS IN THE PARTNERSHIP ARE SPECULATIVE, ILLIQUID AND INVOLVE A HIGH DEGREE OF RISK (SEE "CERTAIN RISK FACTORS"). THE INTERESTS ARE SUITABLE AS AN INVESTMENT ONLY FOR A LIMITED PORTION OF THE RISK SEGMENT OF A SUBSCRIBER'S PORTFOLIO.

INVESTORS (AND EACH EMPLOYEE, REPRESENTATIVE OR OTHER AGENT OF INVESTORS) MAY DISCLOSE TO ANY AND ALL PERSONS, WITHOUT LIMITATIONS OF ANY KIND, THE TAX TREATMENT AND TAX STRUCTURE OF THE TRANSACTION AND ALL MATERIALS OF ANY KIND (INCLUDING OPINIONS OR OTHER TAX ANALYSIS) THAT ARE PROVIDED TO INVESTORS RELATING TO SUCH TAX TREATMENT AND TAX STRUCTURE. THIS AUTHORIZATION OF TAX DISCLOSURE IS RETROACTIVELY EFFECTIVE TO THE COMMENCEMENT OF THE FIRST DISCUSSIONS BETWEEN SUCH INVESTOR AND THE PARTNERSHIP REGARDING THE TRANSACTIONS CONTEMPLATED HEREIN.

DISCUSSIONS IN THIS MEMORANDUM AS THEY RELATE TO CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES ARE NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING UNITED STATES FEDERAL TAX PENALTIES. SUCH DISCUSSIONS WERE WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED IN THIS MEMORANDUM, AND ANY TAXPAYER TO WHOM THE TRANSACTIONS OR MATTERS ARE BEING PROMOTED, MARKETED OR RECOMMENDED SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**Table of Contents**

**Page**

DIRECTORY ..........................................................................................................................vii

SUMMARY OF TERMS ......................................................................................................viii

THE PARTNERSHIP .............................................................................................................. 1

INVESTMENT OBJECTIVE AND STRATEGIES .............................................................. 1

MANAGEMENT...................................................................................................................... 4

ALLOCATIONS....................................................................................................................... 8

TERMS OF THE OFFERING ................................................................................................. 9

WITHDRAWALS .................................................................................................................... 9

SUITABILITY ....................................................................................................................... 10

DETERMINATION OF NET ASSET VALUE .................................................................... 15

FEES AND EXPENSES......................................................................................................... 17

CERTAIN RISK FACTORS.................................................................................................. 18

CONFLICTS OF INTEREST ................................................................................................ 29

TAX CONSIDERATIONS .................................................................................................... 31

MISCELLANEOUS MATTERS ........................................................................................... 43

LEGAL AND ACCOUNTING MATTERS .......................................................................... 44

ACCESS TO INFORMATION.................................................................................................................44

**EXHIBITS**

| | |
|---|---|
| I. | LIMITED PARTNERSHIP AGREEMENT OF RYE SELECT BROAD MARKET XL FUND, LP |
| II. | TREMONT PARTNERS, INC.  FORM ADV PART II |
| III. | PRIVACY POLICY |

## DIRECTORY

**Partnership:**

Rye Select Broad Market XL Fund, LP
c/o Tremont Partners, Inc.
555 Theodore Fremd Avenue, Suite C-300
Corporate Center at Rye
Rye, New York 10580

**General Partner:**

Tremont Partners, Inc.
555 Theodore Fremd Avenue, Suite C-300
Corporate Center at Rye
Rye, New York 10580
Telephone: (914) 925-1140
Telecopier: (914) 925-4090

**Auditors:**

KPMG LLP
345 Park Avenue
New York, NY 10154
Telephone: (212) 954-3994
Telecopier: (212) 409-8072
Attn: Christine M. Buchanan

**Administrator:**

BNY Alternative Investment Services, Inc.
101 Barclay Street
13th Floor West
New York, New York 10286
Telephone: (212) 815-4090
Telecopier: (212) 644-6669

**Legal Counsel:**

Tannenbaum Helpern
Syracuse & Hirschtritt LLP
900 Third Avenue
New York, New York 10022
Telephone: (212) 508-6700
Telecopier: (212) 371-1084
Attn: Michael G. Tannenbaum, Esq.

## SUMMARY OF TERMS

The following is a summary of the terms and conditions of an investment in Rye Select Broad Market XL Fund, LP (the "Partnership"). This summary is qualified by the more detailed information appearing elsewhere in this Amended and Restated Confidential Private Placement Memorandum (the "Memorandum") and by the terms of the Partnership's Amended and Restated Limited Partnership Agreement dated as of November 1, 2007, as may be further amended and restated (the "Partnership Agreement"). The description of any document is qualified by reference to such document.

**The Partnership**

Rye Select Broad Market XL Fund, LP is a Delaware limited partnership formed on July 13, 2006. The Partnership is offering Limited Partnership Interests. As of the date set forth hereof, the Partnership is offering Limited Partnership Interests in two (2) classes, the Class A Interests and the Class B Interests (collectively, the "Interests"). The Class B Interests are subject to an Investor Servicing Fee (as defined herein).

**Investment Objective
and Strategy**

*General.* The Partnership seeks to provide investors with long-term capital growth through exposure, on an approximate three times levered basis, to the economic performance of the Rye Select Broad Market Fund, LP (the "Reference Entity"). The Partnership intends to achieve this return by entering into one or more total return or price return swaps and/or options (or transactions similar to any of the foregoing) with one or more designated counterparties (each a "Counterparty") on a leveraged basis (collectively, the "Swaps"). Furthermore, if, at any time, it becomes advantageous to achieve the foregoing investment objective by utilizing another type of investment transaction (e.g., note, option, etc.), the Partnership may, in its sole discretion, discontinue its use of a, or enter into a new or different or additional, Swap, in whole or in part. At present, the General Partner (as defined herein) also serves as general partner to the Reference Entity. The General Partner may, from time to time in its sole discretion, invest the Partnership's assets directly in the Reference Entity (and other investment vehicles of which the General Partner may or may not serve as investment manager) or in any other manner that the General Partner, in its sole discretion, believes is consistent with the investment objective of the Partnership. For a complete description of the Partnership's investment objective and strategy, see "INVESTMENT OBJECTIVE AND STRATEGY" herein.

*The Swaps.* The Partnership will enter into one or more Swaps with one or more Counterparties, whereby each Counterparty will contract to pay the Partnership, on a leveraged basis, an amount equal to the increase in the net asset value of the Reference Entity subject to the Swap; in exchange, the Partnership, will pay each Counterparty floating or fixed rate payments on any leverage embedded in the Swap. Each Counterparty, or an affiliate thereof, is expected, but is not obligated, to invest directly in the Reference Entity in order to hedge the Counterparty's obligations to the Partnership. All payment calculations

are to be determined by the relevant Counterparty (or an affiliate thereof) to each Swap in accordance with the relevant Swap Documents (as defined herein).

*Swap Documents.* Each Swap will be evidenced by a Confirmation as referenced in the relevant ISDA Master Agreement along with any other documents between the Counterparty and the Partnership and/or other parties (collectively, the "Swap Documents").

*Derivatives; Leverage.* The Partnership is authorized to use derivatives and leverage to enhance the returns to Limited Partners. It is expected that a Swap will provide an enhanced return (or loss, as the case may be) for the Partnership by providing for a return (or loss, as the case may be), subject to the terms of such Swap. It is intended that each Swap will provide the Partnership with a return equal to approximately three times (3x) the economic performance of the Reference Entity on a notional amount equal to the Partnership's investment in the Swap, less associated costs and fees (including , without limitation, the above-referenced floating or fixed rate payments).

*No assurance can be given that the strategy or strategies utilized will be successful under all or any market conditions or that the Partneship will outperform a direct investment in the Reference Entity.*

*There can be no assurance that the General Partner will be successful in pursuing the Partnership's investment objective or that the strategies set forth herein will be successful. **Past results of the General Partner or its respective principals are not necessarily indicative of the future performance of the Partnership.***

**General Partner**

Tremont Partners, Inc. (the "General Partner") is responsible for managing the day-to-day operations and investment management of the Partnership. The General Partner may engage other persons or entities to perform similar functions, as it deems necessary from time to time. The General Partner is registered as an investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act"), and serves as the "Tax Matters Partner" for Internal Revenue Service purposes. Additionally, the General Partner has attached hereto a copy of Part II of its most recent Form ADV.

The General Partner is an unregistered commodity pool operator and commodity trading advisor that has filed for an exemption from that has filed for an exemption from registration pursuant to Rule 4.13(a)(4) and 4.14(a)(8) of the Commodity Exchange Act, as amended.

**Administrator**

The Partnership has entered into an agreement (the "Services Agreement") with BNY Alternative Investment Services, Inc. to provide administration and custodial services. The Administrator performs various administrative services for the Partnership, including calculation

of the Net Asset Value (as defined herein) on a monthly basis. See "MANAGEMENT – Administrator."

**Term**

The term of the Partnership will expire on December 31, 2050, subject to earlier termination.

**Minimum Investment**

The minimum investment in the Partnership is $500,000. The General Partner may, in its sole discretion, accept lesser sums with respect to initial and/or additional capital contributions. The initial investment and additional capital contributions constitute capital contributions ("Capital Contributions") to the Partnership.

**Capital Accounts**

A capital account ("Capital Account") is established with respect to each Partner in the Partnership (including the General Partner). The opening value of the Capital Account is equal to the Partner's initial investment. Adjustments are made to the Capital Accounts in recognition of gains, losses, withdrawals, allocations, additional contributions and other such items.

**Net Asset Value**

In general, the Partnership's Net Asset Value is calculated by the Administrator as of the last Business Day (as defined herein) of each month (each a "Valuation Date") and is equal to the Partnership's assets, at fair value, less liabilities, and accrued but unpaid expenses. A "Business Day" is defined as any day when the securities markets in the United States are open for business (other than a Saturday or Sunday). See "DETERMINATION OF NET ASSET VALUE."

**Fees and Expenses**

*Management Fees.* There is no management fee payable to the General Partner by the Partnership. However, there is an annual 1.00% management fee charged at the Reference Entity level on all assets invested in the Reference Entity. Because the return to the Partnership under a Swap will be based on the amount a hypothetical investor in the Reference Entity would receive upon redeeming its interest in the Reference Entity (i.e. net of the 1.00% management fee on the hypothetical investor's levered investment), the Partnership (and thus indirectly the Limited Partners) will effectively bear a 1.00% annual management fee on the amount of the Partnership's investment in each Swap as fully levered pursuant to each Swap's terms.

*Investor Servicing Fee.* The General Partner on behalf of the Partnership has entered into one or more agreements with one or more unaffiliated third party placement agents (each a "Placement Agent") to place investors in the Class B Interests. Any such Placement Agents who place investors in the Partnership will be entitled to receive a fee from Limited Partners holding Class B Interests in an amount up to 1.00% per annum of the Net Asset Value of the Capital Accounts of such Partners (the "Investor Servicing Fee"). The Investor Servicing Fee shall be payable monthly in arrears. The Investor Servicing Fee will be prorated based upon a Limited Partner's actual period of ownership of its Class B Interests. Payment of

the Investor Servicing Fee is due as of the last day of each calendar month and is payable by the Partnership with respect to Class B Interests within a reasonable time thereafter. The Investor Servicing Fee may waived or reduced in the General Partner's sole discretion.

*Administration Fee.* For its administrative duties the Administrator receives a monthly administration fee (the "Administration Fee") in an amount consistent with reasonable and customary administration fees. The Administration Fee is calculated and is payable as of the last Business Day of each calendar month. The Administrator is also entitled to reimbursement of actual out-of-pocket expenses incurred on behalf of the Partnership.

It should be noted that there is an annual administration fee of 0.50% charged on all assets invested in the Reference Entity. Because the return to the Partnership under a Swap will be based on the amount a hypothetical investor in the Reference Entity would receive upon redeeming its interest in the Reference Entity (i.e. net of the 0.50% administration fee on the hypothetical investor's levered investment, the Partnership (and thus indirectly the Limited Partners) will also effectively bear a 0.50% annual administration fee on the amount of the Partnership's investment in a Swap as fully levered pursuant to each Swap's terms.

*Organizational Expenses.* The Partnership will pay the organizational costs of the Partnership.

*Ongoing Expenses.* The Partnership pays for all routine and customary expenses associated with its administration and operation, including, but not limited to, the cost of maintaining the Partnership's registered office, brokerage commissions, communications, Partnership administration, other service providers expenses (including any custodian fees, if any), fees and expenses associated with the Swaps, insurance premiums, printing costs, and all tax, accounting (and audit) and legal, and similar ongoing operational expenses. Fees and expenses that are identifiable with a particular Class are charged against that Class in computing its Net Asset Value for the Partnership. Other fees and expenses will be charged to the Partnership as a whole or otherwise in the discretion of the General Partner.

**Allocation of Gains and Losses; Debiting of Management Fee**

At the end of each Accounting Period (as defined herein), (i) any Net Capital Appreciation or Net Capital Depreciation (as each term is defined herein) of the Partnership is allocated to all Partners (including the General Partner) in proportion to their respective Ownership Percentages (as defined in Section 3.4 of the Partnership Agreement) for such Accounting Period, and (ii) the aggregate amount of any and all Investor Servicing Fees payable during such Accounting Period with respect to

each Partner holding Class B Interests is charged to such Partner's Capital Account.

**Admissions**

Limited Partners may be admitted to the Partnership or may make Capital Contributions as of the first Business Day of each calendar month, or at such other times determined by the General Partner in its sole discretion.

**Suitability**

The purchase of Interests involves certain risks and may not be a suitable investment for all potential investors. Interests are not registered under the Securities Act of 1933, as amended (the "Securities Act"), in reliance on the private placement exemption set forth in Section 4(2) of the Securities Act and Regulation D thereunder. Investors in the Partnership must be "accredited investors" within the meaning of that term under Regulation D and "qualified purchasers" within the meaning of the Investment Company Act of 1940, as amended, and will be required to meet other suitability requirements as set forth in the Partnership's subscription documents. The foregoing suitability standards represent the minimum suitability requirements for prospective investors in the Partnership and satisfaction of these standards does not necessarily mean that an investment in the Partnership is a suitable investment for a prospective investor nor does it mean that the investor's subscription for Interests will be accepted by the Partnership. Prospective investors should consider whether the purchase of Interests is suitable for them in light of their investment objectives. See "SUITABILITY."

**Withdrawals**

Limited Partners have the right to request partial or total withdrawals from their Capital Accounts (a "Withdrawal Request") as of the last Business Day of each calendar quarter (a "Withdrawal Date"), at the then current Net Asset Value. Withdrawal Requests must be communicated in writing to the Administrator not less than forty-five (45) days prior to the Withdrawal Date. The General Partner may, in its sole discretion, determine whether or not to consent to a Withdrawal Request. If the General Partner consents to a Withdrawal Request, the General Partner shall, within thirty (30) days following the applicable Withdrawal Date, distribute not less than ninety percent (90%) of the General Partner's good faith estimate of the Net Asset Value of the Limited Partner's Capital Account (net of reserves, withdrawal fees and expenses for legal, accounting or administrative costs associated with such withdrawal) and distribute the balance of the proceeds, if any, upon the completion of the annual audit of the Partnership's financial statements. If the Partnership is unable to liquidate its investments, if the value of the assets and liabilities of the Partnership cannot be determined with reasonable accuracy or for any other reason, the Partnership may take longer than thirty (30) days to settle Withdrawal Requests.

The General Partner may require the compulsory withdrawal of a Limited Partner's Interest, in whole or in part, for any reason. Furthermore, the General Partner may suspend withdrawals for any reason, as discussed herein and in the Partnership Agreement. Please see the Partnership

Agreement and "WITHDRAWALS" herein for further restrictions and conditions on withdrawals.

The General Partner may make withdrawals from its Capital Account without notice to the Limited Partners.

Withdrawals may be settled in cash or in kind (or partially in cash and partially in kind) in the General Partner's sole discretion.

**Distributions**

The Partnership does not anticipate making distributions to the Limited Partners or the General Partner as all earnings of the Partnership are normally reinvested in the Partnership. However, in the event the Partnership does make distributions, they may be in cash or in kind in the sole discretion of the General Partner.

**Transfers of Interests**

No direct or indirect transfers, assignments or hypothecations of Interests may be made other than with the consent of the General Partner, which consent may be withheld in the sole and absolute discretion of the General Partner. Any transfer, assignment or hypothecation in violation of the foregoing shall be null and void. There is not, nor will there be, a market for the sale or transfer of Interests.

**Risk Factors; Conflicts of Interest**

Investment in the Partnership is speculative and involves a high degree of risk. The past performance of the General Partner or its affiliates is not indicative of future performance. There is no assurance that the Partnership will be profitable. Investment return and principal value will fluctuate, so that an investor's Interest, when withdrawn, may be worth more or less than its original cost. An investment in the Partnership may result in a total loss of the investment. The Partnership is subject to certain conflicts of interest. See "CONFLICTS OF INTEREST".

**Reports**

Limited Partners will receive monthly reports of the performance of the Partnership, and annual audited financial statements of the Partnership.

**Fiscal Year**

The Partnership's annual fiscal year end is December 31.

**Tax Consequences**

A prospective investor is responsible for, and should consider carefully, all of the potential tax consequences of an investment in the Interests and should consult with its tax advisor before subscribing for the Interests. Tax-exempt entities, including those governed by ERISA, that invest in the Partnership may be exposed to unrelated business taxable income, notwithstanding their otherwise tax-exempt status, depending upon the Partnership's or such investor's use of margin or other leverage. For a discussion of certain income tax consequences of this investment, see "TAX CONSIDERATIONS."

**Certain ERISA
Considerations**

Investment in the Partnership generally will be open to employee benefit plans and other funds subject to ERISA and/or Section 4975 of the Code (as defined herein). Except as described below under "Risk Factors - Compliance with ERISA Transfer Restrictions", the General Partner intends to use commercially reasonable efforts to cause "benefit plan investors" not to own a significant portion of any class of equity interests in the Partnership, so that the assets of the Partnership should not be considered "plan assets" for purposes of ERISA and Section 4975 of the Code, although there can be no assurance that non "plan asset" status will be obtained or maintained. The Partnership reserves the right to change this policy in its discretion with notice to the Limited Partners. Prospective purchasers and subsequent transferees of Interests in the Partnership may be required to make certain representations regarding compliance with ERISA and Section 4975 of the Code. See "Certain ERISA Considerations".

**EACH PROSPECTIVE PARTNER THAT IS SUBJECT TO ERISA AND/OR SECTION 4975 OF THE CODE IS ADVISED TO CONSULT WITH ITS OWN LEGAL, TAX AND ERISA ADVISERS AS TO THE CONSEQUENCES OF AN INVESTMENT IN THE PARTNERSHIP.**

**Privacy Notice**

Any and all nonpublic personal information received by the Partnership, the General Partner and/or the Administrator with respect to the Limited Partners which are natural persons, including the information provided to the Partnership by a Limited Partner in the subscription documents, will not be shared with nonaffiliated third parties which are not service providers to the Partnership and/or the General Partner without prior notice to such Limited Partners. Such service providers include but are not limited to the Administrator, the auditors and the legal advisors of the Partnership. Additionally, the Partnership, the General Partner and/or the Administrator may disclose such nonpublic personal information as required by law (such as to respond to a subpoena or to prevent fraud). In particular, this provision is subject at all times to the anti-money laundering rules promulgated by the jurisdictions wherein the Partnership is domiciled or operating, such as, without limitation, to the Executive Order on Terrorist Financing as issued by the United States of America, and to similar governmental action. See Exhibit III attached hereto.

# THE PARTNERSHIP

Rye Select Broad Market XL Fund, LP (the "Partnership"), a limited partnership formed under the laws of the State of Delaware, is offering by private placement through this Amended and Restated Confidential Private Placement Memorandum (the "Memorandum"), Limited Partnership Interests in the Partnership to a select group of sophisticated qualified investors (the "Limited Partners"). The Partnership is authorized to issue additional classes of interests from time to time pursuant to other offering materials containing financial terms and conditions that may differ from those set forth herein.  As of the date set forth hereof, the Partnership is offering Limited Partnership Interests in two (2) classes, the Class A Interests and the Class B Interests (collectively, the "Interests").  The Class B Interests are subject to an Investor Servicing Fee (as defined herein).   The Partnership's investment objective and strategy with regard to the Interests are set forth below.  The General Partner (as defined herein) may, from time to time, refine or change the Partnership's trading method or strategy without prior notice to, or approval by, the Limited Partners.  The information in this Memorandum is qualified in its entirety by the Partnership's Limited Partnership Agreement, as it may be further amended and/or supplemented from time to time (the "Partnership Agreement"), annexed hereto as an exhibit and deemed a part of this Memorandum, which should be carefully reviewed before a prospective investor invests in the Partnership.

# INVESTMENT OBJECTIVE AND STRATEGIES

## Investment Objective and Strategy

The Partnership seeks to provide investors with long-term capital growth through exposure, on an approximate three times levered basis, to the economic performance of the Rye Select Broad Market Fund, LP (the "Reference Entity").  The Partnership intends to achieve this return by entering into one or more total return or price return swaps and/or options (or transactions similar to any of the foregoing) with one or more designated counterparties (each a "Counterparty") on a leveraged basis (collectively, the "Swaps").  Furthermore, if, at any time, it becomes advantageous to achieve the foregoing investment objective by utilizing another type of investment transaction (e.g., note, option, etc.), the Partnership may, in its sole discretion, discontinue its use of, or enter into new or different or additional Swaps, in whole or in part.  At present, the General Partner (as defined herein) serves as general partner to the Reference Entity.  The General Partner may, from time to time in its sole discretion, invest the Partnership's assets directly in the Reference Entity (and other investment vehicles of which the General Partner may or may not serve as investment manager) or in any other manner that the General Partner, in its sole discretion, believes is consistent with the investment objective of the Partnership.

## The Swaps; Counterparty

*The Swaps.*  The Partnership will enter into one or more Swaps with one or more Counterparties, whereby each Counterparty will contract to pay the Partnership, on a leveraged basis, an amount equal to the increase in the net asset value of the Reference Entity subject to the Swap; in exchange, the Partnership, will pay each Counterparty floating or fixed rate payments on any leverage embedded in the Swap.  Each Counterparty, or an affiliate thereof, is expected, but is not obligated, to invest directly in the

Reference Entity in order to hedge the Counterparty's obligations to the Partnership.  All payment calculations are to be determined by the relevant Counterparty (or an affiliate thereof) to each Swap each Swap in accordance with the relevant Swap Documents (as defined herein).

It is expected that the Swaps will provide an enhanced return (or loss, as the case may be) for the Partnership by providing for a return (or loss, as the case may be), subject to the terms of the relevant Swap.  It is intended that each Swap will provide the Partnership with a return equal to approximately three times (3x) the economic performance of the Reference Entity on a notional amount equal to the Partnership's investment in the Swap, less associated costs and fees (including , without limitation, the above-referenced floating or fixed rate payments).  Further details of the floating or fixed rate payments to the Counterparty will be available to Limited Partners on request.  The Swaps do not and will not directly or indirectly grant any rights of ownership in the Reference Entity or any other rights in the Reference Entity to any Limited Partners of the Partnership.

*Swap Documents.*  A Swap may be evidenced by an ISDA Master Agreement with a Schedule, a Credit Support Annex, definitions, a General Partner or Partnership or Reference Fund letter, a Confirmation (as further described below) and any other document between the Counterparty and the Partnership and/or other parties relating to any of the foregoing(collectively, the "Swap Documents").  A Swap may be governed by a confirmation or other documentation evidencing or confirming the Swap (a "Confirmation").  In the case of any discrepancy between this Memorandum and the Swap Documents, the Swap Documents shall prevail.  The General Partner will make available to Limited Partners, at its office, those documents comprising any Swap Documents or summaries thereof which are not subject to confidentiality restrictions in accordance with such Swap Document's terms.

*Termination of the Swaps prior to its Scheduled Termination.*  Generally, each Swap will be subject to early termination by the Counterparty on the occurrence of certain events (i.e. Events of Default or other Termination Events as provided for by each Swap, and optional early termination by the Partnership) as provided for in each Swap Document.  Upon termination of a Swap, the Partnership may no longer have the leverage it needs to provide leveraged returns or may have reduced leverage, unless it is able to obtain alternative financing or an alternative Counterparty.

*Counterparty.*  With respect to each Swap, the Partnership will retain an "eligible counterparty" (as defined below) to serve as Counterparty for each such Swap (an "Eligible Counterparty").   The Partnership reserves the right, in its discretion and without Limited Partner consent, to change the appointment of Eligible Counterparties with additional and/or replacement Eligible Counterparties. In addition, the Partnership may enter into replacement and/or additional derivative instruments, as the case may be (including, but not limited to, other swaps and options) with other Eligible Counterparties. The Partnership may also discontinue such relationships without prior notice to the Limited Partners.

An "Eligible Counterparty" means a bank or other financial institution which has a rating at the effective date of the Swap transaction or other derivative instruments, which is in one of the three highest long-term credit rating categories or one of the two highest short-term credit rating categories, utilized by at least one rating agencies rating the securities and which has total assets of at least USD 1 billion.  An "Eligible Counterparty" may also be an affiliate of a bank or other financial institution described immediately above.

**The Reference Entity**

Through each Swap, the Partnership will indirectly receive the returns of the Rye Select Broad

Market Fund, LP (the "Reference Entity").  The Partnership's General Partner also serves as general partner to the Reference Entity. The Reference Entity's objective is to seek to (i) achieve long term capital appreciation and (ii) consistently generate positive returns irrespective of stock market volatility or direction, while focusing on preservation of capital.  The Reference Entity attempts to accomplish its investment objective by presently investing the majority of the assets with one investment manager (the "Manager") who employs a "split strike conversion" strategy.  However, the Reference Entity's general partner reserves the right to allocate the Reference Entity's assets to other managers other than the Manager at any time in its sole discretion.  The Reference Entity's offering materials will be made available to Limited Partners upon request.

**Borrowing and Lending**

The Partnership is authorized to borrow in order to fund withdrawal requests.  The Partnership may use a Credit Facility (as defined below) for this purpose.  There are no restrictions on the Partnership's borrowing capacity other than limitations imposed by lenders, Swap Counterparties and any applicable credit regulations.  Loans are generally secured by securities or other assets of the Partnership pledged to lending institutions (including a Counterparty).  Loans of cash or securities may also be made from or to other investment companies on such terms as are commercially reasonable, including without limitation, from or to investment companies similar to the Partnership.  While the presence of leverage increases the potential for profit, it also involves a higher degree of risk of loss. Currently, the Partnership has no Credit Facility.

**Information Regarding the Credit Facility**

Other than the Swaps, one or more banks, financial institutions or other entities (the "Credit Facility Lenders") may provide the Partnership with a revolving credit facility (a "Credit Facility") for short term borrowing (i.e. in order to fund withdrawals).  All fees relating to a Credit Facility with respect to the Partnership arrangement will be borne by the Partnership.  In the event of a default in the payment of any amount due under the Credit Facility, a higher default rate of interest will likely be charged on all amounts then outstanding.

Generally, a Credit Facility can be refinanced and other lenders brought in, at the Partnership's discretion, in each case at terms which may or may not be as favorable as the initial terms of such Credit Facility.

**Distributions and Reinvestment**

The Partnership does not intend that any dividends or other distributions will be paid to the Limited Partners out of the Partnership's current earnings and profits, but rather that such income will be reinvested. Potential investors should keep this limitation in mind when determining whether or not an investment in the Partnership is suitable for their particular circumstances.  The Partnership reserves the right to change such policy without the consent of the Limited Partners, and in the event the Partnership changes its policy regarding dividends or distributions such distributions or dividends may be made in cash or in kind.

**Plan of Distribution and Use of Proceeds**

Securities issued hereunder will be privately placed with a limited number of sophisticated investors (see "SUITABILITY").  The net proceeds of the private offering contemplated herein (after payment of expenses) are expected to be invested at all times in accordance with the policies set forth under "INVESTMENT OBJECTIVE AND STRATEGIES."

## Use of Cash and Cash Equivalents

The Partnership may hold cash or invest in cash equivalents.  Among the cash equivalents in which the Partnership may invest are: obligations of the U.S. Government, its agencies or instrumentalities (U.S. Government Securities; U.S. Treasury Bills); commercial paper; and repurchase agreements, money market mutual funds, and certificates of deposit and bankers' acceptances issued by U.S. branches of U.S. banks that are members of the Federal Deposit Insurance Corporation or other similar banks.  While not presently contemplated, the General Partner may also enter in repurchase and reverse repurchase agreements involving the preceding instruments, as well as invest in money market mutual funds.

* * * *

The foregoing description is general and is not intended to be exhaustive.  Investors must recognize that there are inherent limitations on all descriptions of investment processes due to the complexity, confidentiality and subjectivity of such processes.  In addition, the description of virtually every strategy must be qualified by the fact that investment approaches are continually changing, as are the markets invested in by the Partnership.  Finally, the General Partner may pursue additional strategies, in its individual and sole discretion, in its pursuit of the Partnership's investment objective.

## MANAGEMENT

### The General Partner

The Partnership is managed by Tremont Partners, Inc., a Connecticut corporation (the "General Partner").  The General Partner is principally engaged in the business of providing consulting and specialized investment services to financial institutions, mutual funds, other investment companies, investment managers and individuals.  The General Partner also develops, manages and provides consulting services to other of its own proprietary multi-advisor funds.  The General Partner is responsible for managing the day-to-day operations and investment management of the Partnership.  The General Partner may engage other persons or entities to perform similar functions, as it deems necessary from time to time. The General Partner is registered as an investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act"), and serves as the "Tax Matters Partner" for Internal Revenue Service purposes.  The General Partner has attached hereto a copy of Part II of its most recent Form ADV.  The General Partner is an unregistered commodity pool operator and commodity trading advisor that has filed for an exemption from registration pursuant to Rule 4.13(a)(4) and 4.14(a)(8) of the Commodity Exchange Act, as amended.

The following is a brief description of the principal decision-makers of the General Partner:

**Robert Schulman** joined Tremont Group Holdings, Inc. in 1994. Following his tenure as Chief Executive Officer of the Tremont organization, Mr. Schulman now serves as President and Chief Executive Officer of Rye Investment Management, Tremont's single manager division. He also serves as Chairman of the Board of Tremont Group Holdings, Inc. and is a member of the Tremont Capital Management Investment Advisory Board.

Mr. Schulman's Wall Street career spans more than 30 years, which includes a distinguished tenure at Smith Barney Inc. and predecessor firms, including Shearson Lehman Brothers, Inc. and E.F. Hutton & Company. Prior to joining Tremont, Mr. Schulman was a Senior Executive Vice President for Smith Barney in New York where he headed up Smith Barney's $60 billion Consulting Services Division, as well as the Retail New Product Development Group.

Mr. Schulman began his career in finance and investment management as a retail broker at E.F. Hutton. He went on to create the Leveraged Product Division at E.F. Hutton in 1982 and was responsible for the development of various derivative products, as well as growth index and financial futures and options trading. In 1986, Mr. Schulman assumed responsibility for all retail products offered at E.F. Hutton.

Mr. Schulman is a graduate of New York University and received a Master of Business Administration degree in finance from the Lubin School of Business.

**Stuart Pologe** is a Senior Vice President and the Director of Product Management at the General Partner and Tremont and is responsible for the origination of new products, product management, business development and strategic partnerships and acquisitions for all of the firm's global businesses. Mr. Pologe also serves as Chairman of the New Product Committee and is a member of the Executive Committee.

Previously, Mr. Pologe worked for Custom Fund Management in San Francisco, as Executive Vice President and Chief Operating Officer. Earlier, Mr. Pologe spent 14 years with Smith Barney in various capacities including as head of its Direct Investment Group. During his time with Smith Barney, Mr. Pologe was responsible for the development and co-development of a number of successful private placement offerings including hedge funds, real estate funds and private equity offerings.

Mr. Pologe holds a Bachelor of Science degree in Management from the State University New York at Buffalo's Jacobs School of Management.

**Patrick Kelly** is a Senior Vice President of Tremont and the General Partner and oversees the management of proprietary products. He coordinates the efforts of all departments involved in the development and management of the firm's funds. Additionally, Mr. Kelly works closely with financial services firms to develop new products, enhance existing products and distribution channels. Mr. Kelly has been with the firm for several years and has held several senior management positions including Director of Risk Management, Director of Manager Research, and Director of Investment Technology.

Previously, Mr. Kelly served as Vice President and Risk Manager for Parker Global Strategies. He managed risk in Parker's investment programs and directed the development of allocation, portfolio management and risk measurement analytics. Prior to that, Mr. Kelly worked as a Senior Portfolio Analyst at Ferrell Capital Management and as an analyst, for Kidder, Peabody, & Co.

Mr. Kelly earned a Bachelor of Science degree in Computer Science, Electrical Engineering and

Mathematics from Hofstra University and earned his Master of Business Administration degree in Finance from the Frank Zarb School of Business at Hofstra University. Mr. Kelly is a Chartered Financial Analyst, a member of the Association for Investment Management & Research, and of the Stamford Society of Investment Analysts.

See "FEES AND EXPENSES" herein for a general description of the fees payable to the General Partner.

**The Placement Agents**

Placement Agents (as defined herein) will be retained by the General Partner on behalf of the Partnership to place investors in the Class B Interests of the Partnership. Limited Partners holding Class B Interests will pay an Investor Servicing Fee (as defined herein) to any such Placement Agents. Limited Partners holding Class A Interests will not be subject to the Investor Servicing Fee.

**Administrator**

The Bank of New York ("BNY"), headquartered in New York and with offices globally has been appointed as administrator (the "Administrator") for the Partnership. BNY serves pursuant to a Services Agreement with the Partnership and provides the services through its Alternative Investment Services Division ("AIS").

AIS specializes in providing administration and related services to alternative investment entities including hedge funds. Its primary objective is to provide a quality accounting and administrative service tailored to complex investment vehicles. At this time AIS works with over 90 hedge funds and money management firms and services over 401 entities representing net assets of approximately $105.6 billion. AIS has offices located in Hamilton, Bermuda; New York, New York; Dublin, Ireland and San Francisco, California.

BNY is an established leader in global fund administration with over $814 billion in assets under administration. BNY, founded in 1784 by Alexander Hamilton, is the United States' oldest bank and is the principal subsidiary of The Bank of New York Company, Inc. (NYSE:BK), a financial holding company. With over $2.0 trillion in total assets as of December 2006, BNY provides a complete range of banking and other financial services to corporations and individuals worldwide through its basic businesses, namely, Securities Processing and Global Payment Services, Corporate Banking, BNY Asset Management and Private Client Services, Retail Banking, and Global Market Services.

The Administrator will assist the Partnership in performing certain day-to-day tasks on behalf of the Partnership, including: (i) calculating daily or periodic portfolio valuations using the pricing sources as agreed, (ii) reconciling cash and portfolio positions, (iii) providing portfolio reporting, (iv) maintaining books and records, (v) calculating all fees (performance and asset based), (vi) reconciling general ledger accounts, (vii) calculating and disseminating daily or periodic Net Asset Values, (viii) preparing periodic financial statements, (ix) coordinating annual audits, (x) communicating with Limited Partners, (xi) processing subscriptions and withdrawals, (xii) maintaining the Partnership's principal corporate records, (xiii) disbursing distributions with respect to the Interests, legal fees, accounting fees, and officers', directors' and/or General Partners' fees (as applicable) on behalf of the Partnership, and (xiv) participating in meetings of the Partnership's Limited Partners and/or General Partner.

The Administrator receives, as negotiated from time to time, an administration fee consistent with its customary charges for providing accounting, limited partner record keeping and administrative services to the Partnership and is also entitled to be reimbursed for actual out-of-pocket expenses incurred in the performance of its duties. The fees to be received by the Administrator for providing administrative services are based on the net assets of the Partnership subject to an annual minimum.

Either party may terminate the Services Agreement at any time provided that at least sixty (60) days' written notice has been given to the other party.

The Administrator will not, in the absence of gross negligence, willful default or fraud on its part or on the part of its directors, officers, employees or delegates, be liable to the Partnership or any Limited Partner for any act or omission, in the course of, or in connection with, the services rendered by it under the Services Agreement or for any loss or damage which the Partnership may sustain or suffer as the result of, or in the course of, the discharge by the Administrator or its directors, officers, employees or delegates of its duties under or pursuant to the Services Agreement.

Pursuant to the Service Agreement, the Partnership will separately indemnify the Administrator and its directors, officers, employees and delegates from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements or any kind or nature whatsoever (other than those resulting from the gross negligence, willful default or fraud on the part of the Administrator or its directors, officers, employees or delegates) which may be imposed on, incurred by, or asserted against the Administrator or its directors, officers, employees or delegates in performing its obligations or duties hereunder.

See "FEES AND EXPENSES" herein for a description of the fees payable to the Administrator pursuant to the Services Agreement.

**Brokerage**

Generally, the Manager's portfolio transactions will be cleared through and held in custody at brokerage accounts maintained at a selected broker-dealer. While the Manager is entitled to utilize various broker-dealers to execute, settle and clear securities transactions, it intends to only use the services of one broker-dealer, of which the Manager is the sole principal. In selecting broker-dealers to effect portfolio transactions, the Manager may also consider such factors as price, the ability of a broker-dealer to effect transactions, as well as a broker-dealer's facilities, reliability and financial responsibility. Accordingly, if the Manager determines in good faith that the amount of commissions charged by a broker-dealer is reasonable in relation to the value of the foregoing, the Reference Entity may pay commissions to such broker-dealer in an amount greater than the amount another broker might charge.

Section 28(e) of the United States Securities Exchange Act of 1934, as amended (the "Exchange Act"), permits the use of soft dollar items in certain circumstances, provided that the Reference Entity does not pay a rate of commissions in excess of what is competitively available from comparable brokerage firms for comparable services, taking into account various factors, including commission rates, financial responsibility and strength and ability of the broker to efficiently execute transactions. Non-research products and "soft dollars" which are not generated through agency transactions in securities are outside the parameters of Section 28(e)'s "safe harbor." The Manager may use soft dollars within the safe harbor if it believes it provides the Reference Entity with benefits.

## ALLOCATIONS

*Capital Account Establishment*.   A capital account ("Capital Account") is established for each Partner which reflects the Partner's interest in the Partnership (including the General Partner).  The Capital Account is then adjusted as provided herein and in accordance with the principles set forth in the Partnership Agreement.

*Allocations*.      At the end of each Accounting Period [1], (i) any Net Capital Appreciation[2] or Net Capital Depreciation[3] is allocated to all Partners (including the General Partner) in proportion to each Partner's Partnership Percentage, and (ii) the aggregate amount of any and all Investor Servicing Fees payable during such Accounting Period with respect to each Limited Partner that holds Class B Interests is charged to such Limited Partner's Capital Account.  "Partnership Percentage" means on any given date (i) the balance of a Partner's Capital Account divided by the aggregate balance in all of the Partners' Capital Accounts as of such date, multiplied by (ii) one hundred percent (100%).

*Miscellaneous*.  The Partnership Agreement may be amended by the General Partner without further notice to the Limited Partners if, among other things, the General Partner, in its discretion, determines to register as an investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act"), so as to comply with appropriate regulations.  In the event that the Partnership is terminated otherwise than at the end of a fiscal year, Net Capital Appreciation or Net Capital Depreciation, as the case may be, shall be determined for the period from the commencement of the Partnership's preceding full fiscal year through the termination date, and reallocated as aforesaid.

The Partnership Agreement provides that the General Partner may amend the provisions of the Partnership Agreement so that it conforms to any applicable requirements of the SEC, NASD, Commodity Futures Trading Commission, National Futures Association and other regulatory authorities.

---

[1]  The term "Accounting Period" will mean the following periods:  The initial Accounting Period will begin upon the initial opening of the Partnership and each subsequent Accounting Period will begin immediately after the close of  the immediately preceding Accounting Period.  Each Accounting Period will close at the close of business on the first to occur of (i) the date immediately prior to the effective date of the admission of a new Partner or an increase in a Partner's capital contribution; (ii) the effective date of any withdrawal by a Partner, (iii) the date when the Partnership dissolves and/or terminates, (iv) the last Business Day of each month (v) at such other time as may be required by governmental rules and regulations imposed upon the General Partner or the Partnership or (vi) at such other time as the General Partner, in its sole discretion, may determine.

[2]  "Net Capital Appreciation" will mean, with respect to any Accounting Period, the excess, if any, of the Ending Value over the Beginning Value (as such terms are defined in the Partnership Agreement).

[3]  "Net Capital Depreciation" will mean, with respect to any Accounting Period, the excess, if any, of the Beginning Value over the Ending Value (as such terms are defined in the Partnership Agreement).

## TERMS OF THE OFFERING

The minimum initial investment in the Partnership is $500,000. The General Partner may, in its sole discretion, decide to accept a lesser sums with respect to initial and/or additional capital contributions. The initial investment and additional capital contributions constitute capital contributions ("Capital Contributions") to the Partnership. Subscriptions must be paid in U.S. Dollars or, in the sole discretion of the General Partner, in-kind contributions may be accepted. Limited Partners may be admitted to the Partnership or may make additional Capital Contributions as of the first Business Day of each calendar month, or at such other times determined by the General Partner in its sole discretion. In the event that the General Partner elects to accept a subscription in the form of securities, such securities will be valued in accordance with the discussion herein under "DETERMINATION OF NET ASSET VALUE."

All subscriptions are subject to acceptance by the General Partner which may reject a subscription in whole or in part for any or no reason. The General Partner will promptly notify the subscriber of such acceptance or rejection. Subscribers may not withdraw or revoke their subscriptions. If the subscriber is not admitted to the Partnership, the General Partner will promptly return the amount of the subscription payment to the subscriber, without interest.

## WITHDRAWALS

Limited Partners have the right to request partial or total withdrawals from their Capital Accounts (a "Withdrawal Request") to the Administrator as of the last Business Day of each calendar quarter, (each a "Withdrawal Date") at the then current Net Asset Value. Withdrawal Requests must be communicated in writing to the General Partner not less than forty-five (45) days prior to the Withdrawal Date. The General Partner may, in its sole discretion, determine whether or not to consent to a Withdrawal Request. If the General Partner consents to a Withdrawal Request, the General Partner shall within thirty (30) Business Days following the applicable Withdrawal Date, distribute not less than ninety percent (90%) of the General Partner's good faith estimate of the Net Asset Value of the Limited Partner's Capital Account (net of reserves, withdrawal fees and expenses for legal, accounting or administrative costs associated with such withdrawal) and distribute the balance of the proceeds, if any, upon the completion of the annual audit of the Partnership's financial statements for the fiscal year in which the withdrawal is made. If the Partnership is unable to liquidate its investments, if the value of the assets and liabilities of the Partnership cannot be determined with reasonable accuracy or for any reason, the Partnership may take longer than thirty (30) days to settle Withdrawal Requests. A "Business Day" is any day when securities markets in the United States are open for business (other than a Saturday or Sunday).

The General Partner may require the compulsory withdrawal of a Limited Partner's Interest, in whole or in part, for any reason.

A distribution upon withdrawal may be made in cash or in kind in the General Partner's sole discretion.

In circumstances where the Partnership is unable to liquidate securities positions in an orderly manner in order to fund withdrawals, is unable to reduce or terminate or receive a required payment under a Swap, or where the value of the assets and liabilities of the Partnership cannot reasonably be determined, the Partnership may take longer than the aforementioned time periods to effect settlements of withdrawals.  In addition, the Partnership may extend the duration of the withdrawal notice period if the General Partner deems such an extension as being in the best interest of the Partnership and the non-withdrawing Limited Partners.

Withdrawals may be settled in cash or in kind (or partially in cash and partially in kind) in the General Partners' sole discretion.

The General Partner may also suspend the payment of withdrawal proceeds in certain circumstances.  See "DETERMINATION OF NET ASSET VALUE – Temporary Suspension of Dealings and Determination of Net Asset Value."

Please see the Partnership Agreement and "WITHDRAWALS" herein for further restrictions and conditions on withdrawals.

---

## SUITABILITY

---

**Investor Suitability Standards**

Each purchaser of an Interest must bear the economic risk of its investment for an indefinite period of time (subject to its limited right to withdraw capital from the Partnership as more specifically described in the Partnership Agreement) because the Interests have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), and, therefore, cannot be sold unless they are subsequently registered under the Securities Act or an exemption from such registration is available.  It is not contemplated that any such registration will ever be effected, or that certain exemptions provided by rules promulgated under the Securities Act (such as Rule 144) will be available.  There is no public market for the Interests now nor is one expected to develop in the future.  The Interests are being offered in reliance upon the exemption provided in Section 4(2) of the Securities Act and Regulation D thereunder.  The Interests have not been registered under the securities laws of any state or other jurisdiction and are not offered in any state of the United States except pursuant to an exemption from registration.  In addition, the Partnership is not registered under the Company Act.  The Partnership Agreement provides that a Partner may not assign, transfer or hypothecate its Interest (except by operation of law), nor substitute another person as a Partner, without the prior consent of the General Partner, which may be withheld for any reason.  The foregoing restrictions on transferability must be regarded as substantial, and are clearly reflected in the Partnership records.

Each purchaser of an Interest is required to represent that the Interest is being acquired for its own account, for investment, and not with a view to resale or distribution.  The Interests are suitable investments only for sophisticated investors for whom an investment in the Partnership does not constitute a complete investment program and who fully understand, are willing to assume, and who have the financial resources necessary to withstand the risks involved in the Partnership's specialized investment program and to bear the potential loss of their entire investment in the Interests.

Each potential investor must qualify as (a) an **"accredited investor"** within the meaning of Regulation D under the Securities Act and (b) a **"qualified purchaser"** within the meaning of the Investment Company Act of 1940, as amended.

An **accredited investor** is:

1.　　Any U.S. bank or any banking institution organized under the laws of any State, territory or the District of Columbia, the business of which is substantially confined to banking and is supervised by the State or Territorial banking commission or similar official agency, any U.S. savings and loan association or other similar institution, whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Exchange Act; any U.S. insurance company; any investment company registered under the Company Act or a business development company as defined in the Company Act; any Small Business Investment Partnership licensed by the U.S. Small Business Administration under the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), if the investment decision is made by a plan fiduciary, as defined in ERISA, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000; or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

2.　　Any "private business development company" as defined in the Advisers Act;

3.　　Any organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total capital in excess of $5,000,000;

4.　　The General Partner and certain affiliates of the General Partner;

5.　　Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase, exceeds $1,000,000;

6.　　Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

7.　　Any trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Regulation D; or

8.　　Any entity all of whose equity owners satisfy one or more of such requirements (1) through (7) above.

A **qualified purchaser** is:

1.　　Any natural person who owns not less than $5,000,000 in Investments (as defined below), including any Investments held jointly, in community property or other similarly shared ownership interest with that person's spouse, including the amount of such person's Investments held in an individual retirement account or similar account and the Investments of which are directed by and held for

the benefit of such person;[4]

2.       Any company that owns not less than $5,000,000 in Investments, and that is owned directly or indirectly by or for two or more natural persons who are related as siblings or spouse (including former spouses), or direct lineal descendants or ancestors by birth or adoption, or spouses of such descendants or ancestors (each, a "Related Person"), the estates of such persons, or foundations, charitable organizations, or trusts established by or for the benefit of such persons (a "Family Company");

3.       Any trust that is not covered by requirement (2) above, that was not formed for the specific purpose of acquiring the Interests, as to which the trustee or other person authorized to make decisions with respect to the trust, and each settlor or other person who has contributed assets to the trust, as qualified purchasers (as defined herein);

4.       Any other person acting for its own account or the accounts of other qualified purchasers, who in the aggregate owns and invests on a discretionary basis, not less than $25,000,000 in Investments ("Institutional Investors");

5.       Any qualified institutional buyer as defined in Rule 144A under the Securities Act, acting for its own account, the account of another qualified institutional buyer, or the account of a qualified purchaser, provided that (i) a dealer described in paragraph (a)(1)(ii) of Rule 144A shall own and invest on a discretionary basis at least $25,000,000 in securities of issuers that are not affiliated persons of the dealer; and (ii) a plan referred to in paragraph (a)(1)(D) or (a)(1)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(F) of Rule 144A that holds the assets of such a plan, will not be deemed to be acting for its own account if investment decisions with respect to the plan are made by the beneficiaries of the plan, except with respect to investment decisions made solely by the fiduciary, trustee or sponsor of such plan;

6.       Any company that, but for the exceptions provided for in Sections 3(c)(1) or 3(c)(7) under the Company Act, would be an investment company (hereafter in this paragraph referred to as an "excepted investment company"), provided that all beneficial owners of its outstanding securities (other than short-term paper), determined in accordance with Section 3(c)(1)(A) thereunder, that acquired such securities on or before April 30, 1996 (hereafter in this paragraph referred to as "pre-amendment beneficial owners"), and all pre-amendment beneficial owners of the outstanding securities (other than short-term paper) or any excepted investment company that, directly or indirectly, owns any outstanding securities of such excepted investment company, have consented to its treatment as a qualified purchaser;

7.       Any natural person who is deemed to be a "knowledgeable employee" as such term is defined in Rule 3c-5(4) of the Company Act; or

8.       Any person ("Transferee") who acquires Interests from a person ("Transferor") that is (or was) a qualified purchaser other than the Partnership, provided that the Transferee is: (i) the estate of the Transferor; (ii) a person who acquires the Interests as a gift or bequest pursuant to an agreement relating to a legal separation or divorce; or (iii) a company established by the Transferor exclusively for the benefit of (or owned exclusively by) the Transferor and the persons specified in this paragraph.

9.       Any company, if each beneficial owner of the company's securities is a qualified purchaser.

For purposes of the foregoing description of qualified purchasers, the term **Investments** means:

---

[4] In determining whether spouses who are making a joint investment are qualified purchasers, there may be included in the amount of each spouse's Investments any Investments owned by the other spouses (whether or not such Investments are held jointly).

1.       Securities (as defined by Section 2(a)(1) of the Securities Act), other than securities of an issuer that controls, is controlled by, or is under common control with, a person seeking to purchase the Interests, unless the issuer of such securities is:

     (i)      an investment company as defined under Section 3(c)(1) of the Company Act, a company that would be an investment company but for the exclusions provided by Sections 3(c)(1) through 3(c)(9) of the Company Act, or the exemptions provided by Rule 3a-7 under the Company Act for issuers of asset-backed securities or a commodity pool as defined under the CEA;

     (ii)     a company that either files reports pursuant to Sections 13 or 15(d) of the Exchange Act (a "Public Company") or has a class of securities that are listed on a "designated offshore securities market" as such term is defined by Regulation S under the Securities Act; or

     (iii)    a company with shareholders' equity of not less than $50,000,000 (determined in accordance with generally accepted accounting principles) as reflected in such a company's most recent financial statements, provided that such financial statements present the information as of a date within sixteen (16) months preceding the date on which the prospective investor seeks to acquire Interests;

2.       Real estate held for investment purposes;[5]

3.       Commodity futures contracts, options on commodity futures contracts, and options on any physical commodity traded on or subject to the rules of any contract market designated for trading such transactions under the CEA, any board of trade or exchange outside the United States ("Commodity Interests"), entered into for investment purposes;

4.       Any physical commodity with respect to which a commodity interest is traded on a market specified in paragraph (3) above ("Physical Commodities"), and held for investment purposes;

5.       To the extent not securities as defined in paragraph (1) above, financial contracts (as defined in Section 3(c)(2)(B)(ii) of the Company Act) entered into for investment purposes;[6]

6.       In the case of a prospective investor that is a qualified purchaser, a company that would be an investment company under the Company Act but for the exclusion provided by Section 3(c)(1) thereunder, or a commodity pool under the CEA, any amounts payable to such prospective investor pursuant to a firm agreement or a similar binding commitment pursuant to which a person has agreed to acquire an interest in, or make capital contributions to, the prospective investor upon its demand therefore; and

7.       Cash or cash equivalents (including foreign currencies) held for investment purposes, including bank deposits, certificates of deposit, bankers acceptances and similar bank

---

[5] Real estate shall not be considered to be held for investment purposes by a prospective purchaser if it is used by the prospective purchaser or a Related Person (as defined herein) for personal purposes or as a place of business, or in connection with the conduct of the trade or business of the prospective purchaser or a Related Person, provided that real estate owned by a prospective purchaser who is engaged primarily in the business of investing, trading or developing real estate in connection with such business may be deemed to be held for investment purposes. Residential real estate shall not be deemed to be used for personal purposes if deductions with respect to such real estate are not disallowed by section 280A of the Code.

[6] For purposes of calculating Investments as described in paragraphs (3) through (5) above, a Commodity Interest or a Physical Commodity owned, or a financial contract entered into, by the prospective purchaser who is engaged primarily in the business of investing, reinvesting, or trading in commodity interest, physical commodities or financial contracts in connection with such business my be deemed to be held for investment purposes.

instruments held for investment purposes, as well as net cash surrender value of an insurance policy.

For purposes of determining whether a prospective investor is a qualified purchaser, the aggregate amount of Investments owned and invested on a discretionary basis by the prospective investor shall be the Investments' fair market value on the most recent practicable date or their cost, provided that:

(a)     In the case of Commodity Interests, the amount of Investments shall be the value of the initial margin or option premium deposited in connection with such commodity interests; and

(b)     The following amounts, as applicable, shall be deducted from the amount of Investments owned by the prospective investor:

    (i)     the amount of any outstanding indebtedness incurred to acquire or for the purpose of acquiring the Investments owned by such prospective investor; and

    (ii)    in determining whether a Family Company is a qualified purchaser, there shall also be deducted any outstanding indebtedness incurred by an owner of the Family Company to acquire Investments.

****

In addition, prospective investors resident in certain states of the United States may be required to meet more demanding suitability standards imposed by the securities laws of those states.  Each prospective investor will represent in its Subscription Agreement that it satisfies the above standards.

The foregoing suitability standards represent the minimum suitability requirement for prospective investors in the Partnership and satisfaction of these standards does not necessarily mean that an investment in the Partnership is a suitable investment for a prospective investor.  In all cases, the General Partner shall have the right, in its sole discretion, to refuse a subscription for Interests for any reason, including, but not limited to, its belief that the prospective investor does not meet the applicable suitability requirements or that such an investment is otherwise unsuitable for that investor.

Each prospective purchaser is urged to consult with its own advisers to determine the suitability of an investment in the Interests, and the relationship of such an investment to the purchaser's overall investment program and financial and tax position.  Each purchaser of an Interest is required to further represent that, after all necessary advice and analysis, its investment in an Interest is suitable and appropriate, in light of the foregoing considerations.

The method of subscription is described in the Subscription Documents.

## Purchases by Employee Benefit Plans

An ERISA Fiduciary should give appropriate consideration to the facts and circumstances that are relevant to an investment in the Partnership, and the role it plays in the employee benefit plans' (the "Plans," or singularly the "Plan") investment portfolio.

Investment by a Plan is subject to certain additional considerations because investments of Plans are subject to ERISA, as well as certain restrictions imposed by Section 4975 of the Code.  United States Department of Labor ("DOL") Regulation Section 2510.3-101 (the "Regulation") provides certain rules for

determining whether an investment in the Partnership by a Plan will be treated as investment by such plans in the underlying capital of the Partnership. Accordingly, the General Partner may be compelled to require the withdrawal of some or all of the Capital Accounts held by such Plans or accounts if necessary to comply with such policy.

Acceptance of subscriptions on behalf of employee benefit plans is in no respect a representation by the Partnership or the General Partner that this investment meets all relevant legal requirements with respect to investments by any particular Plan or that this investment is appropriate for any particular Plan. The person with investment discretion should consult with his or her attorney as to the propriety of such an investment in light of the circumstances of the particular Plan.

---

## DETERMINATION OF NET ASSET VALUE

---

**Net Asset Value**

In general, the Partnership's Net Asset Value as well as the Net Asset Value for each Class are calculated as of the last Business Day of each month, (each a "Valuation Date") and is equal to the Partnership's (or each Class' as the case may be) assets, at fair market value, less liabilities, and accrued but unpaid expenses.

1.  The value of the assets of the Partnership is based on the valuation of each Swap as calculated in each case by the Counterparty to each such Swap (or by an affiliate of such Counterparty).

2.  All other assets and liabilities of the Partnership (as applicable) are assigned such value as the Administrator, in consultation with the General Partner, may reasonably determine.

3.  Subject to the rights set forth in the Swap Documents, if the Administrator, in consultation with the General Partner, determines that any of the above valuation methodologies of any investments or other property does not fairly represent market value, the Administrator, in consultation with the General Partner, shall value such securities or other property as it shall reasonably determine and shall set forth the basis of such valuation in writing in the records of the Partnership.

4.  All values assigned to securities and other assets and liabilities by the Administrator, in consultation with the General Partner, shall be final and conclusive. Valuations provided by the Counterparties (or their affiliates) will not be subject to independent review or investigation by the Partnership and the Partnership and the General Partner are entitled to rely on such valuations without independent verification.

All accrued debts and liabilities are deducted from the value of the Partnership's assets in determining the Partnership's Net Asset Value and, to the extent possible, from the value of the assets attributable to the Interests in determining the Net Asset Value per Class. To the extent debts and liabilities cannot be determined to be attributable to any one Class, they are borne pro-rata by all Classes. These debts and liabilities include (a) any fees that have accrued, as of the date of computation, but are not yet payable (b) monthly amortization of organization costs (to the extent applicable), (c) the then current

amount of any fees that have been earned in prior years, (d) any allowance for the Partnership's estimated annual audit and legal fees and other operating expenses, and (e) any contingencies for which reserves are determined to be required.  Net Asset Valuations are expressed in United States Dollars and any items denominated in other currencies are translated at prevailing exchange rates as determined by the Administrator in consultation with the General Partner.

In computing the Net Asset Value in order to determine the fees for a current period, (i) the fees earned but not yet paid (*i.e.*, the amount referred to in clause (b) of the immediately preceding paragraph) shall not be subtracted and (ii) such current fee shall be computed with regard to investment activity only and without reference to other expenses of the Partnership.  The Partnership's auditors shall be entitled to rely on invoices from others (including, without limitation, the General Partner) with regard to allocations of expenses.

Prospective investors should be aware that situations involving uncertainties as to the valuation of portfolio positions could have an adverse effect on the Net Asset Value if judgments regarding appropriate valuations should prove incorrect.

**Temporary Suspension of Dealings and Determination of Net Asset Value**

The Partnership may temporarily declare a suspension of the determination of the Partnership's Net Asset Value and/or sale, allotment, issue or withdrawal of Interests or the payment of withdrawal proceeds during any period when in the opinion of the General Partner (after consultation with the Investment Manager):

(i)     the disposal by the Partnership of assets that constitute a substantial portion of its assets is not feasible;

(ii)    it is not possible to promptly transfer monies involved in the acquisition, disposition or realization of investments that constitute a material portion of the assets of the Partnership at normal rates of exchange;

(iii)   proceeds of any sale or withdrawal of the Interests cannot be transmitted to or from the Partnership's account;

(iv)    the Partnership is unable to reduce or terminate or receive a required payment under one or more Swaps;

(iv)    for any reason the prices of any investments that constitute a material portion of the assets of the Partnership cannot be reasonably, promptly or accurately ascertained;

(v)     any recognized exchange or market in which the Partnership's investments are normally dealt or traded is closed (other than customary holiday or weekend closings), or when trading thereon is restricted or suspended; or

(vi)    an event has occurred which may result in the dissolution of the Partnership.

# FEES AND EXPENSES

## Fees of the General Partner

*Management Fee*

There is no management fee payable to the General Partner by the Partnership.  However, there is an annual 1.00% management fee charged at the Reference Entity level on all assets invested in the Reference Entity.   Since the return to the Partnership under a Swap will be based on the amount a hypothetical investor in the Reference Entity would receive upon redeeming its interest in the Reference Entity (i.e. net of the 1.00% management fee on the hypothetical investor's levered investment), the Partnership (and thus indirectly the Limited Partners) will effectively bear a 1.00% annual management fee on the amount of the Partnership's investment in each Swap as fully levered pursuant to each Swap's terms.

*Investor Servicing Fee*

The General Partner on behalf of the Partnership has entered into one or more agreements with one or more unaffiliated third party placement agents (each a "Placement Agent") to place investors in the Class B Interests.  Any such Placement Agents who place investors in the Partnership will be entitled to receive a fee from Limited Partners holding Class B Interests in an amount up to 1.00% of the Net Asset Value of the Capital Account of Partners holdings Class B Interests per annum (the "Investor Servicing Fee").  The Investor Servicing Fee shall be payable monthly in arrears. The Investor Servicing Fee will be prorated based upon a Limited Partner's actual period of ownership of its Class B Interests.   Payment of the Investor Servicing Fee is due as of the last day of each calendar month and is payable by the Partnership with respect to Class B Interests within a reasonable time thereafter.  The Investor Servicing Fee may waived or in the General Partner's sole discretion.

*Administration Fee*

For its administrative duties the Administrator receives a monthly administration fee (the "Administration Fee") which will be in accordance with reasonable and customary administration fees. The Administration Fee will be calculated and is payable as of the last Business Day of each calendar month.  The Administrator is also entitled to reimbursement of actual out-of-pocket expenses incurred on behalf of the Partnership.

It should be noted that there is an annual administration fee of 0.50% charged on all assets invested in the Reference Entity.  Becuase the return to the Partnership under a Swap will be based on the amount a hypothetical investor in the Reference Entity would receive upon redeeming its interest in the Reference Entity (i.e. net of the 0.50% administration fee on the hypothetical investor's levered investment, the Partnership (and thus indirectly the Limited Partners) will also effectively bear a 0.50% annual administration fee on the amount of the Partnership's investment in a Swap as fully levered pursuant to each Swap's terms.

*Organizational Expenses*

17

The Partnership will pay the organizational costs of the Partnership.

*Ongoing Expenses*

The Partnership pays for all routine and customary expenses associated with its administration and operation, including, but not limited to, the cost of maintaining the Partnership's registered office, brokerage commissions, communications, Partnership administration, other service providers expenses (including any custodian fees, if any), fees and expenses associated with the Swaps, insurance premiums, printing costs, and all tax, accounting (and audit) and legal, and similar ongoing operational expenses. Fees and expenses that are identifiable with a particular Class are charged against that Class in computing its Net Asset Value for the Partnership. Other fees and expenses will be charged to the Partnership as a whole or otherwise in the discretion of the General Partner.

---

# CERTAIN RISK FACTORS

---

Prospective investors should give careful consideration to the following risk factors in evaluating the merits and suitability of an investment in the Partnership as they relate specifically to Interests or to the Partnership in general, as the context requires. The following does not purport to be a comprehensive summary of all of the risks associated with an investment in the Partnership. Accordingly, the following are only certain risks to which the Partnership is subject and that the General Partner wishes to encourage prospective investors to consult his own legal, tax and financial advisors regarding the desirability of an investment in the Partnership.

It should be noted that risks associated with the Reference Entity (and thus the Manager in which the Reference Entity invests with) are set forth below as the Partnership, through the Swaps, will realize, on a leveraged basis, the investment returns of the Reference Entity which, in turn, invests with the Manager.

It should be further noted that all investments in securities are speculative and subject to risk of loss of capital as does an investment in the Partnership.

**General Considerations**

1. *Achievement of the Partnership's Investment Objective*. No assurance can be given that the Partnership will achieve its overall investment objective of seeking substantial capital appreciation. Additionally, the profitability of a significant portion of the Partnership's investment program depends to a great extent on correct assessments of the future course of the price movements of securities and other investments. There can be no assurance that Manager retained on behalf of the Reference Entity will be able to accurately predict such price movements. The securities markets have in recent years been characterized by volatility and unpredictability. In addition to market risk, there is unpredictability as to changes in general economic conditions which may affect the profitability of the Partnership's investment program. With respect to the investment strategies utilized by Manager retained by the Reference Entity, there is always some, and occasionally a significant, degree of market risk.

2.      *Lack of Certain Registration and Regulatory Protection.*  The Manager chosen by the Reference Entity to manage assets may, but need not, be registered investment advisers under the Advisers Act.  The Manager is not likely to be offered pursuant to registration statements effective under the Securities Act, nor are they likely to be subject to the periodic information and reporting provisions under the 1934 Act or the Company Act.  As a result, the amount of publicly available information that may be used by the Reference Entity's general partner in selecting the Manager may be relatively small.

Also, the Manager investments may not be subject to any substantive or effective regulatory oversight and may be established in jurisdictions where there are no established or effective investor protection laws and therefore will not have the equivalent level of investor protection as that provided under laws, regulations and conditions governing registered collective investment vehicles.

3.      *Dependence on Managers.*  The Reference Entity is highly dependent upon the expertise and abilities of the underlying Manager who has investment discretion over the Reference Entity's (and thus the Partnership's) assets and, therefore, the death, incapacity or retirement of any key personnel of the Manager may adversely affect investment results.

4.      *ERISA Considerations.*  The General Partner intends to use commercially reasonable efforts to cause employee benefit plans subject to ERISA and/or Section 4975 of the Code and other "benefit plan investors," as defined in the Plan Asset Regulation, in the aggregate hold less than 25% of each class of shares in the Partnership and of any other class of shares in the Partnership.  The General Partner shall use commercially reasonable efforts to restrict transfers of any shares in the Partnership so that ownership of each class of interests in the Partnership by benefit plan investors will remain below the 25% threshold contained in the Plan Asset Regulation.  In this event, although there can be no assurance that such will be the case, the assets of the Partnership should not constitute "plan assets" for purposes of ERISA and Section 4975 of the Code.  Notwithstanding the foregoing, the General Partner may exceed 25% at any time in its sole discretion.

If the assets of the Partnership were to become "plan assets" subject to ERISA and Section 4975 of the Code, certain investments made or to be made by the Partnership in the normal course of its operations might result in non-exempt prohibited transactions and might have to be rescinded (see "CERTAIN ERISA CONSIDERATIONS").  If at any time the General Partner determines that assets of the Partnership may be deemed to be "plan assets" subject to ERISA and Section 4975 of the Code, the General Partner may take certain actions it may determine necessary or appropriate, including requiring one or more investors to redeem or otherwise dispose of all or part of their Interests in the Partnership or terminating and liquidating the Partnership.  See "CERTAIN ERISA CONSIDERATIONS."

5.      *Concentration of Assets with a Single Prime Broker.*  All or a substantial proportion of the assets of the Manager may be held by a single prime broker. Cash held by such prime broker will not be treated as client money and will not be segregated from the prime broker's own money and will be used by the prime broker in the course of its investment business and the Manager account(s) would therefore rank as one of the prime broker's general creditors in relation thereto.  In relation to the Manager's rights to the return of assets equivalent to those of the investments which the prime broker borrows, lends or otherwise uses for its own purposes, the Manager's account(s) will rank as unsecured creditors of the prime broker and, in the event of the insolvency of the prime broker, the account(s) may not be able to recover such equivalent assets in full. The Reference Entity may, through its investment with the Manager, be exposed to credit risk of the prime broker. The Reference Entity may be subject to the possibility of the insolvency of the prime broker which could result in substantial losses to the Reference Entity (and indirectly the Partnership through the Swap).

The Manager may use substantial leverage for its investments.  During periods when its fund is leveraged, any event which may adversely affect the value of the fund could significantly affect the net assets of the Reference Entity (and indirectly the Partnership through a Swap).

6.      *Restriction on Transfer*.  Because of the limitations on redemptions and the fact that Interests are not tradeable, an investment in the Partnership is an illiquid investment. The consent of the General Partner must be obtained prior to any transfers of Interests.  In light of the restrictions imposed on the transfer of Interest and in light of the limitation's placed on a Partner's ability to withdraw all or part of its capital from the Partnership, an investment in the Partnership is an illiquid investment.

7.      *Reserve for Contingent Liabilities*.  Under certain circumstances, the General Partner may find it necessary to establish a reserve for contingent liabilities or withhold a portion of the Limited Partner's settlement proceeds at the time of withdrawal, in which case, the reserved portion would remain at the risk of the Partnership's activities.

8.      *Liquidation*.  If the Partnership should become insolvent, the Limited Partners may be required to return with interest any property distributed that represented a return of capital or distributions wrongfully made to them and forfeit undistributed profits.

9.      *Current Income*.  The Partnership's investment policies should be considered speculative, as there can be no assurance that the General Partner's assessments of the short-term or long-term prospects of investments will generate a profit.  In view of the fact that the Partnership will likely not pay dividends, an investment in the Partnership is not suitable for investors seeking current income for financial or tax planning purposes.

10.     *Registration*.  The Partnership is not registered as an investment company under the Company Act (or any similar state laws).  Investors, therefore, will not be accorded the protective measures provided by such legislation. Further, the General Partner is not registered with the Commodity Futures Trading Commission ("CFTC") as a commodity pool operator or a commodity trading advisor and is not a member of the National Futures Association ("NFA"). Registered commodity pool operators and commodity trading advisors are subject to extensive regulation and disclosure requirements. Investors, therefore, will not be accorded the protective measures they would have if the General Partner were registered.

11.     *Counsel does not represent Limited Partners*.   Tannenbaum Helpern Syracuse & Hirschtritt LLP (for purposes of this paragraph "THSH") acts as counsel to the Partnership in connection with this offering of Interests; THSH also acts as counsel to the General Partner.  In connection with this offering of Interests and ongoing advice to the Partnership, the General Partner and its affiliates, THSH has not and will not be representing the Limited Partners.  No independent counsel has been retained to represent the Limited Partners.  THSH's representation of the Partnership and its General Partner and their affiliates is limited to those specific matters upon which it has been consulted.  There may exist other matters which would have a bearing on the Partnership and its General Partner and their affiliates upon which THSH has not been consulted.  THSH does not undertake to monitor the compliance of the Partnership and its General Partner and their affiliates with the investment program, valuation procedures and other guidelines set out herein, nor does it monitor compliance with applicable laws.  Additionally, in all cases, including the preparation of this Memorandum, THSH relies upon information furnished to it by the Partnership and its General Partner and their affiliates, and does not investigate or verify the accuracy and completeness of such information.  In the course of advising the Partnership and its General Partner and their affiliates, there may be times when the interests of the General Partner may differ from those of the Limited Partners.  THSH does not represent the interests of the Limited Partners in resolving such issues.

## Risks of Certain Investments Made by the Manager

The Reference Entity is engaged in a diversified investment strategy concentrating primarily on investing in securities through the Manager, some of which may not be marketable.  The securities business is speculative, prices are volatile, and market movements are difficult to predict.  Supply and demand for securities change rapidly and are affected by a variety of factors, including interest rates, merger activities and general economic trends.

In addition to these general investment risks, the Manager may use investment techniques that may subject the Manager's portfolio as well as the Reference Entity to certain risks; some, but not all, of these techniques and risks are summarized below.

1.     *Options*.   The Manager may engage from time to time in various types of options transactions.  An option gives the purchaser the right, but not the obligation, upon exercise of the option, either (i) to buy or sell a specific amount of the underlying security at a specific price (the "strike" price or "exercise" price), or (ii) in the case of a stock index option, to receive a specified cash settlement.  To purchase an option, the purchaser must pay a "premium," which consists of a single, nonrefundable payment.  Unless the price of the securities interest underlying the option changes and it becomes profitable to exercise or offset the option before it expires, the Manager may lose the entire amount of the premium.  The purchaser of an option runs the risk of losing the entire investment.  Thus, the Manager may incur significant losses in a relatively short period of time.  The ability to trade in or exercise options also may be restricted in the event that trading in the underlying securities interest becomes restricted.  Options trading may also be illiquid in the event that the Manager's assets are invested in contracts with extended expirations.  The Manager may purchase and write put and call options on specific securities, on stock indexes or on other financial instruments and, to close out its positions in options, may make a closing purchase transaction or closing sale transaction.

2.     *Short Selling*.   The Manager may engage in the short-selling of securities in certain circumstances.  Short-selling is the selling of securities the seller does not own.  Short sales may only be maintained if the securities can be borrowed.  If the security cannot remain borrowed, the Partnership could be required to cover the short sale at a loss or at an inopportune time for the Manager.  If securities are sold

short, the Manager would fulfill its obligation to deliver such securities with borrowed securities. It would only profit from such a practice if it could fulfill their obligation to the lender of the securities by repaying the lender with securities which they have purchased at a price lower than the price they received for the short sale. If the price of a security that has been sold short increases, there is no limit to the loss that could be incurred in covering a short sale.

3.    *Forward Trading.* The Manager may invest in forward contracts and options thereon. Such contracts and options, unlike futures contracts, are not traded on exchanges and are not standardized; rather banks and dealers act as principals in these markets, negotiating each transaction on an individual basis. Forward and "cash" trading is substantially unregulated; there is no limitation on daily price movements and speculative position limits are not applicable. The principals who deal in the forward markets are not required to continue to make markets in the currencies or commodities they trade, and these markets can experience periods of illiquidity, sometimes of significant duration. There have been periods during which certain participants in these markets have refused to quote prices for certain currencies or commodities or have quoted prices with an unusually wide spread between the price at which they were prepared to buy and that at which they were prepared to sell.

4.    *Futures.* The Manager may engage in futures transactions. Futures contracts are usually made on a futures exchange which call for the future delivery of a specified "commodity" at a specified time and place. These contractual obligations, depending on whether one is a buyer or a seller, may be satisfied either by taking or making physical delivery of the "commodity" or by making an offsetting sale or purchase of an equivalent futures contract on the same exchange prior to the end of trading in the contract month. Futures prices are highly volatile. Financial instrument and foreign currency futures prices are influenced by, among other things, interest rates, changes in balances of payments and trade, domestic and international rates of inflation, international trade restrictions and currency devaluations and revaluations. Profitability will depend on the Manager's ability to analyze price movements in those markets. Because low margin deposits are normally required, an extremely high degree of leverage is obtainable in futures trading. A relatively small price movement in a futures contract, consequently, may result in large losses. Thus, like other highly leveraged investments, any purchase or sale of a futures contract may result in losses which exceed the amount invested.

Most U.S. futures exchanges limit fluctuations during a single day in futures contract prices by regulations referred to as "daily price fluctuation limits" or "daily limits." During a single trading day, no trade may be executed at prices beyond the daily limits, and positions in a particular contract can neither be taken nor liquidated at a price beyond the applicable limit. Futures prices in various commodities have occasionally moved the daily limit for several consecutive days with little or no trading. Similar occurrences could prevent the Manager from promptly liquidating unfavorable positions and subject the Partnership to substantial losses, which could exceed the margin initially committed to such trades. In addition, even if futures prices have not moved the daily limit, the Manager may not be able to execute futures trades at favorable prices if little trading in the contracts the Manager wishes to trade is taking place. It is also possible that an exchange or regulatory authority may suspend trading in a particular contract or order that trading in a contract be conducted for liquidation of open positions only.

5.    *Use of Swap Agreements.* The Manager may use swap agreements. The use of swaps is a highly specialized activity that involves investment techniques and risks different from those associated with ordinary securities transactions. Interest rate swaps, for example, do not typically involve the delivery of securities, other underlying assets or principal. Accordingly, the market risk of loss with respect to an interest rate swap is often limited to the amount of interest payments that the Manager is contractually obligated to make on a net basis. If the other party to an interest rate swap defaults, the risk of credit loss

may be the amount of interest payments that such fund is contractually entitled to receive on a net basis. However, where swap agreements require one party's payments to be "up-front" and timed differently than the other party's payments (such as is often the case with currency swaps), the entire principal value of the swap may be subject to the risk that the other party to the swap will default on its contractual delivery obligations. If there is a default by the counterparty, the Manager may have contractual remedies pursuant to the agreements related to the transaction. The swap market has grown substantially in recent years, and has become relatively more liquid, with a large number of banks and investment banking firms acting both as principals and as agents utilizing standardized swap documentation. The investment performance of the Manager, however, may be adversely affected by the use of swaps if the Manager's forecasts of market values, interest rates or currency exchange rates are inaccurate.

6.      *Over-the-Counter Trading.*   The Manager may use derivative instruments. Derivative instruments that may be purchased or sold by the fund are expected to regularly consist of instruments not traded on an exchange. The risk of nonperformance by the obligor on such an instrument may be greater, and the ease with which the Partnership can dispose of or enter into closing transactions with respect to such an instrument may be less, than in the case of an exchange-traded instrument. In addition, significant disparities may exist between bid and asked prices for derivative instruments that are not traded on an exchange. Derivative instruments not traded on exchanges are also not subject to the same type of government regulation as exchange traded instruments, and many of the protections afforded to participants in a regulated environment may not be available in connection with such transactions.

7.      *Lack of Diversification.*   The Partnership has no requirements for diversification. At present, the only asset of the Partnership will be the Swaps.

8.      *Certain Non-U.S. Securities.*   The Manager may invest in securities and other instruments of certain non-U.S. corporations and countries. Investing in the securities of companies (and governments) in certain countries (such as emerging nations or countries with less well regulated securities markets than the U.S. or the UK or other European Union countries, for that matter) involves certain considerations not usually associated with investing in securities of United States companies or the United States Government, including among other things, political and economic considerations, such as greater risks of expropriation, nationalization and general social, political and economic instability; the small size of the securities markets in such countries and the low volume of trading, resulting in potential lack of liquidity and in price volatility; fluctuations in the rate of exchange between currencies and costs associated with currency conversion; certain government policies that may restrict the Manager's investment opportunities; and in some cases less effective government regulation than is the case with securities markets in the United States.

9.      *Leverage; Interest Rates.* The Manager may use leverage, including borrowing to buy securities on margin or make other investments. The Manager may also leverage assets by entering into reverse repurchase agreements whereby they effectively borrow funds on a secured basis by "selling" their interests in investments to a financial institution for cash and agreeing to "repurchase" such investments at a specified future date for the sales price paid plus interest at a negotiated rate. Other than the Swaps, the Partnership does not presently contemplate leveraging for investment purposes, however the Partnership may use leverage for other purposes, mainly to fund withdrawals. In such an instance, since margin interest would be an expense of the Partnership and margin interest rates tend to fluctuate with interest rates generally, the Partnership would be at risk that interest rates generally, and hence margin interest rates, will increase, thereby increasing the Partnership's expenses.

10.     *Transaction Expenses*.  The Manager may make frequent trades in securities.  Frequent trades typically result in correspondingly high transaction costs.  This could affect the returns of the Reference Entity.

11.     *Hedging Transactions*.  The Manager may utilize a variety of financial instruments such as derivatives, options, interest rate swaps, caps and floors and forward contracts, both for investment purposes and for risk management purposes. Hedging also involves special risks including the possible default by the other party to the transaction, illiquidity and, to the extent the Manager's assessment of certain market movements is incorrect, the risk that the use of hedging could result in losses greater than if hedging had not been used.  The Manager is subject to the risk of the failure or default of any counterparty to a fund's transactions. If there is a failure or default by the counterparty to such a transaction, the Manager will have contractual remedies pursuant to the agreements related to the transaction (which may or may not be meaningful depending on the financial position of the defaulting counterparty).

12.     *Risks of Derivatives*.  The Manager may trade derivatives.  The risks posed by derivatives include (1) credit risks (the exposure to the possibility of loss resulting from a counterparty's failure to meet its financial obligations); (2) market risks (adverse movements in the price of a financial asset or commodity); (3) legal risks (an action by a court or by a regulatory or legislative body that could invalidate a financial contract); (4) operations risks (inadequate controls, deficient procedures, human error, system failure or fraud); (5) documentation risks (exposure to losses resulting from inadequate documentation); (6) liquidity risks (exposure to losses created by the inability to prematurely terminate a derivative); (7) systemic risks (the risk that financial difficulties in one institution or a major market disruption will cause uncontrollable financial harm to the financial system); (8) concentration risks (exposure to losses from concentration of closely-related risks such as exposure to a particular industry or exposure linked to a particular entity); and (9) settlement risks (the risk that the Reference Entity and/or the Manager face when they have performed its obligations under a contract but have not yet received value from its counterparty).  Derivatives augment the potential for losses because of the high leverage provided by such transactions.  See "**Risks Associated with the Swaps**."

13.     *Illiquidity of Investments*.  Investments of the Partnership's assets will, in certain cases, be long-term in nature and may require several years before they are suitable for sale.  Realization of value from such investments may be difficult in the short-term, or may have to be made at a substantial discount compared to other freely tradeable investments.  The Partnership may be restricted in its ability to provide withdrawal requests by Limited Partners or to pay expenses or fees.

14.     *Performance-Based Fees*.  The Manager may receive performance based fees and/or incentive allocations.  It is possible that the Manager will earn a performance based fee or allocation while its fund's overall investments are at a loss.  Performance based fees or allocations may create an incentive for the Manager to engage in investment strategies and to make investments that are more speculative and riskier than would be the case in the absence of such performance-based fees or allocations.  This could affect the returns of the Reference Entity (and thus the Partnership).

**Risks of Investing in the Partnership**

1.     *No Operating History*.  The Partnership is a relatively new enterprise with a limited operating history.  Accordingly, an investment in the Partnership entails a high degree of risk.  **Past performance of the Manager or the success of the General Partner in any similar venture is no assurance of future success.**

2.      *Illiquidity.*  There is not now, and there is not likely to develop, any market for the resale of the Interests.  The Interests are subject to limited withdrawal rights.  Accordingly, since the Partnership does not plan to make any distributions, Limited Partners will be required to have sufficient liquid assets, separate from their investment in the Partnership, to meet their individual tax obligations.  Furthermore, the Partnership may be unable to liquidate some of its investments to fund withdrawals in a timely manner (see "*Illiquidity of Investments*" above).  Neither the Partnership, the General Partner nor each of their affiliates have agreed to purchase or otherwise acquire from any Limited Partner any Interests or assume the responsibility for locating prospective purchasers of Limited Partner's Interests.  Even if a purchaser for a Limited Partner's Interests were available, approval of the transfer by the Partnership and satisfaction of certain requirements specified in the Partnership Agreement would be required before any transfer may occur.  In addition, the Interests have not been registered under the securities laws of any jurisdiction and the Partnership have no plans to, and are under no obligation to, register the Interests under any such law.  Accordingly, Interests may not be transferred unless registered under applicable securities laws or unless appropriate exemptions from such laws are available (and the General Partner approves such transfer).

3.      *Lack of Management Control by Investors.*  Investors will become Limited Partners of the Partnership.  The Limited Partners cannot take part in the management or control of the Partnership's business, which is the sole responsibility of the General Partner.  The General Partner has wide latitude in making investment decisions.  The Limited Partners do not have such rights.  The General Partner may require any Limited Partner, at any time, to withdraw, in whole or in part, from the Partnership.

4.      *Dependence upon General Partner.*  The success of the Partnership and its ability to generate profits largely depends on the success of the General Partner.

5.      *Limited Liability.*  No Limited Partner will be liable for the losses or debts of the Partnership such Limited Partner is invested in beyond that Limited Partner's Interests, nor may any Limited Partner be assessed or otherwise required to contribute additional capital, provided that the Limited Partner does not enter into any contract on behalf of the Partnership or bind the Partnership in any way or permit his name to be used in the name of the Partnership.

6.      *Conflicts of Interest.*  Conflicts of interest between the Partnership on the one hand, and the General Partner and/or its officers and directors on the other hand, may raise issues discussed in "CONFLICTS OF INTEREST" below.

7.      *Early Termination.*  In the event of the early termination of the Partnership, the Partnership would have to distribute to the Limited Partners *pro rata* to their interest in the assets of the Partnership.  Certain assets held by the Partnership may be highly illiquid and might have little or no marketable value.

8.      *Effects of Substantial Withdrawals.*  Substantial withdrawals by Limited Partners within a short period of time could require the General Partner to arrange for the Partnership's positions to be liquidated more rapidly than would otherwise be desirable, which could adversely affect the value of the remaining Interests.  In addition, regardless of the period of time in which withdrawals occur, the resulting reduction in the Partnership's assets could make it more difficult to generate a positive rate of return or recoup losses due to a reduced equity base.

9.      *Valuations.*  Profits and losses are allocated to the Limited Partners for each accounting period which may end at times other than the end of the Partnership's fiscal and tax year.  Such allocations are based on the value of the assets at the time.  Where such values are established by trading on an active securities market or the equivalent, the General Partner, or a party designated by such, will use those values

in allocating the profits and losses.  In other cases, the General Partner, or the party designated by the General Partner, will exercise its best judgment as to value, based on all the facts known to it at the time.  However, the General Partner, or the party designated by the General Partner, might not be able to obtain full information about the values of assets invested with the Manager except as of the end of its fund's respective reporting periods, which may not necessarily be coterminous with the Partnership's fiscal or tax year or other accounting period.  Nevertheless, the valuations based on the best judgment of the General Partner, or the party designated by the General Partner, and the resulting allocations, are binding on the Limited Partners.

10.     *Changes in Applicable Law*.  The Partnership must comply with various legal requirements, including requirements imposed by the federal securities laws, tax laws and pension laws.  Should any of those laws change over the scheduled term of the Partnership, the legal requirements to which the Partnership and the Limited Partners may be subject could differ materially from current requirements.

11.     *Market Considerations*.  The investments of the Partnership are subject to normal market fluctuations and there can be no assurances that appreciation will occur.

12.     *Borrowing; Use of Leverage*.  The Partnership may use short term borrowing from a Credit Facility in order to fund redemptions.  The Partnership may also obtain leverage by entering into the Swaps.  If the assets under management are not sufficient to pay the principal of, and interest on, any debts or to satisfy any obligations when due, the Partnership could sustain losses.

13.     *Risk Factors Regarding Revolving Credit Facility*.  Loans to the Partnership under a Credit Facility bear interest at variable rates.  If interest rates under a Credit Facility should rise, then the Partnership's interest expense would be increased.  Illiquidity or declining market value of the Partnership's investments will decrease the amount of capital available to the Partnership to pay principal of or interest on its obligations to Credit Facility Lenders.  Since these obligations are secured by various liens, Credit Facility Lenders could institute foreclosure, thereby reducing the Partnership's Net Asset Value.  Furthermore, a foreclosure by a Credit Facility Lenders could result in the liquidation of the Partnership's assets in a manner that does not maximize investor value and will be senior to the interest of the Limited Partners.

Credit Facility Lenders have the discretion to decide which of the Partnership's investments qualify for loans under the agreement.  As such, there is a risk that the Partnership will not receive a loan under the Credit Facility and will not be able to make investments on a leveraged basis.  The decision to extend any loans under a Credit Facility is at such Credit Facility Lender's discretion.

In order to receive leverage under a Credit Facility, the Partnership's assets may be valued by Credit Facility Lenders to determine the amount of collateral securing capital borrowed by the Partnership.  As Credit Facility Lenders are not shareholders, they are not subject to the Net Asset Valuation procedures set forth therein.  Furthermore, in determining the value of the Partnership's assets, Credit Facility Lenders, in their discretion, will attach a fair market value to such assets.  Although the criteria in determining such fair market value are objective, if Credit Facility Lenders attach a low fair market value to the Partnership's assets, the Partnership may be required to (i) deposit additional collateral with a Credit Facility Lender, and/or (ii) make immediate prepayment of the then outstanding loans pursuant to such Credit Facility Agreements, thereby impairing the Partnership's ability to obtain the desired leverage for investment of its assets with the Reference Entity and reducing the capital of the Partnership available for investment.

Credit Facility Lenders hold security interests in the underlying assets of the Partnership.  If the

Partnership defaults on any interest payment, or there is otherwise an event of default under a Credit Facility, a Credit Facility Lender will have certain remedies such as foreclosing on its security interests. Credit Facility Lenders, when liquidating the Partnership's assets may sell such assets at a loss. Any remedy of a Credit Facility Lender could reduce the Partnership's Net Asset Value.

14.     *Reserve for Contingent Liabilities.*  Under certain circumstances, the Partnership may find it necessary to establish a reserve for contingent liabilities or withhold a portion of the Limited Partner's settlement proceeds at the time of redemption, in which case, the reserved portion would remain at the risk of the Partnership's activities.

15.     *Side Letters.*  The Partnership, by consent of the General Partner, may from time to time seek to induce investment in the Partnership by offering investment terms to certain prospective investors which are not available to existing investors in the Partnership. In such cases the parties will enter into a written side arrangement varying the standard terms of offer herein. Such variations may include, without limitation, variations to fees, minimum investment or withdrawals, with the effect that not all investors in the Partnership will invest on the same terms and some investors may be expected to enjoy more favorable terms than others.

16.     *Side Pockets.*  The General Partner may determine to create a "side pocket" within the Partnership at its absolute discretion and such "side pocket" shall be capable of being constituted as a separate division of Interests of the Partnership, to which the General Partner may determine to allocate or attribute particular investments or assets, including but not limited to investments or assets which are illiquid, difficult to value, subject to lock up or non-withdrawal provisions, subject to special circumstances in the opinion of the General Partner, or such assets and investments which it may be prudent, necessary or desirable in the opinion of the General Partner to segregate from other assets or investments of the Partnership. The General Partner may determine to apply and or impose particular investment restrictions with respect to the side pocketed assets.

**Risks Associated with the Swaps**

1.     *Counterparty Credit Risk.*  By entering into a Swap, the Partnership incurs the credit risk of the Counterparty, in addition to the risk of the Reference Entity.  Generally, the obligations of a Counterparty to the Partnership are unsecured.  Although the Reference Entity underlying a Swap may be successful, the Partnership will not benefit from any gain in the Reference Entity if the Counterparty is unable to meet its obligation under the respective Swap (this risk increases if the Counterparty does not hedge its obligations under a Swap by investing directly in the Reference Entity).  In the event the Counterparty is unable to fulfill its obligations under a Swap for whatever reason (i.e., bankruptcy, dissolution or if the Counterparty does not have sufficient assets to fulfill its obligations to the Partnership) any investment by the Partnership in connection with a Swap may also be lost, and the Partnership's liquidity could be materially impaired which could cause losses to the Partnership that the Partnership may not be able to recover from the counterparty.

2.     *Other Risks.*  In addition to counterparty credit risk, the Partnership faces other risks common to derivatives transactions.  See "**Risks Associated With The Managers-** *Risks of Derivatives*."

3.     *Risk of Termination and Events of Default.*  By its terms, a Swap terminates after a period of time as specified in the relevant Swap Documents.  In addition, under the relevant Swap Documents, a Counterparty may be able to terminate a Swap before the scheduled termination date upon the occurrence of specified Events of Default and Termination Events (as each term is defined in the respective Swap

Documents). Upon termination of a Swap, the Partnership may be subject to early termination fees and/or the Partnership will no longer have the enhanced returns unless it is able to obtain an alternative Counterparty.

4.      *No Guarantee of Profit*.   The Swaps entail a high degree of financial risk, which could result in loss of the Partnership's entire investment. There is no guarantee that the Partnership will profit from a Swap or any additional Swaps.

5.      *Lack of Centralized Clearing or Guaranty*.   As there is no central clearing or guaranty function for over-the-counter derivatives, if the Counterparty fails to make the cash payments required to settle the initial and any additional Swaps, the Partnership will lose any payments it has made under each Swap as well as any anticipated benefit of any such Swap.

6.      *Volatility of Swaps*.   The value of a Swap depends on the performance of the Reference Entity, and each Swap is expected to be highly leveraged. The Reference Entity and the Manager may, use leverage and may also utilize over-the-counter derivative instruments. As a result, relatively small movements in the market prices of the instruments traded by the Manager can result in immediate and substantial losses in the value. Such losses ultimately can adversely affect the economic return of a Swap.

7.      *Valuation Risks*.   The valuation of a Swap will not be subject to verification through price transparency, which typically results from secondary market trading. Instead, a calculation agent will determine the value of a Swap in its sole discretion. The value of a Swap will be based upon the economic performance of the Reference Entity and the securities held thereby. These securities can be illiquid and/or difficult to value. For purposes of valuing a Swap, a calculation agent may rely in whole or in part upon, among other things, verbal or written statements produced by the Reference Entity or unaffiliated third parties, and/or its own estimates. A calculation agent may adjust a Swap's value to reflect valuation uncertainty, liquidity restrictions and/or other factors that a calculation agent determines in its judgment to be necessary or appropriate. Generally, a calculation agent has the right to restate the value of a Swap based on new information it receives. All calculation, valuations and determinations made by a calculation agent with respect to a Swap are generally non-negotiable and binding on the Partnership.

8.      *Lack of Standardization and Regulation of a Swap*.   A Swap is not traded on exchanges and does not have standardized terms. A Swap is purchased from or sold to securities dealers, financial institutions or other counterparties through direct bilateral agreements, which are individually negotiated. Such other-the-counter transactions are substantially unregulated. This is in contrast to exchange-listed derivatives, which generally have standardized terms and performance mechanics.

9.      *Dependency on Counterparty for Leverage Strategy*.   The ability of the Partnership to use leverage through a Swap, and to maintain the desired leverage ratio, is dependent on a Counterparty's willingness and ability to execute a Swap and to releverage any gains or subsequent investments by Limited Partners in the Partnership. A Counterparty is under no obligation to execute any Swap with the Partnership, presently or in the future, and may not be required to releverage gains or subsequent investments by Limited Partners in the Partnership, and/or may cease doing so at any time and for any reason, without notice.

12.      *Lack of Secondary Market Liquidity*.   There is no established secondary trading market for a Swap and it is unlikely that a secondary market will develop.

13.     *Limited Liquidity.*  Limited Partners may be subject to limited liquidity by a Counterparty based on liquidity restrictions as set forth in the relevant Swap Documents (including, without limitation, if the Counterparty does not permit a Swap to be reduced or terminated and the result of such refusal suspends or prevents Limited Partner withdrawals).

## CONFLICTS OF INTEREST

### Other Investment Funds

The General Partner and one or more of its affiliates may and do manage, advise or are otherwise involved with other investment funds with investment objectives that may be similar to that of the Partnership.  As a result, the General Partner may have conflicts of interest in allocating management time, services, and functions among the Partnership and other business ventures.  The Partnership will not receive preferential treatment with respect to the allocation of investment opportunities.  In the event that the Partnership's investment portfolio is allocated to one or more Managers that are affiliates of the General Partner ("Affiliated Managers"), the General Partner may, directly or indirectly, receive a benefit as a result of their relationship with such Affiliated Managers separate and apart from the compensation they receive for their services to the Partnership.

The General Partner and/or its affiliates and/or its employees may from time to time have an interest, direct or indirect, in a security, the purchase or sale of which by the Partnership is recommended, or which in fact is purchased or sold by or otherwise traded for the Partnership.  Moreover, such recommendation, purchase, sale or trading may occur in connection with a transaction involving another fund or account managed by the General Partner.  Accordingly, the General Partner may sell or recommend the sale of a particular security for certain accounts, including accounts in which it has an interest, and it or others may buy or recommend the purchase of such security for other accounts, including accounts in which they have an interest, and, thus, transactions in particular accounts may not be consistent with transactions in other accounts or with the General Partner's investment recommendations.  For example, the General Partner may recommend that the Partnership sell a security, while not recommending such sale for other accounts in order to enable the Partnership to have sufficient liquidity to honor Limited Partners' withdrawal requests.  When there is a limited supply of investments, the General Partner will use its reasonable efforts to allocate or rotate investment opportunities, but the General Partner cannot assure equality among all of accounts and clients.

The General Partner believes that it will continue to have sufficient staff personnel and resources to perform all of its duties with respect to the Partnership.  However, because some of the officers of the General Partner may have duties in connection with other investment funds and other matters, such officers may have conflicts of interest in the allocation of responsibilities, services and functions among the Partnership and other entities similar to the Partnership.

### Other Activities

The General Partner and each of its affiliates may engage in other business activities and manage the accounts of clients other than the Partnership including those of other collective investment vehicles.  The investment strategy for such other clients may vary from that of the Partnership.  The General Partner and each of its affiliates are not required to refrain from any other activity nor disgorge any profits from any such

activity, including acting as general partner, investment manager or managing agent for such investment vehicles with objectives similar to those of the Partnership. The General Partner devotes such time and effort to the Partnership and its affairs as it deems necessary and appropriate.

Investors should be aware that the Manager selected by the Reference Entity may be subject to similar conflicts of interest as described above.

**General Partner**

The General Partner also serves as general partner to the Reference Entity. The General Partner (and/or any affiliate of the General Partner) may serve as a Manager to which the Reference Entity allocates assets. This creates an incentive for the investment manager of the Reference Entity to invest with a Manager of which it serves as general partner as it may receive fees with respect to such investments made by the Reference Entity.

Furthermore, as the General Partner serves as the Reference Entity's general partner, the General Partner will indirectly be entitled to receive fees from the Partnership (and thus the Limited Partners) if a Counterparty invests directly in the Reference Entity in order to hedge its obligations under the terms of a Swap.

**Manager**

The Manager will charge and retain brokerage commissions as it relates to the Reference Entity's securities trading transactions. As such, the Manager has an interest in acting as the broker-dealer.

**Counterparty**

Each Swap may terminate if any of the termination events (as set forth in the relevant Swap Documents) are triggered. It should be noted that the Reference Entity has no obligation to follow the guidelines established by a Swap for continuation of such Swap as such guidelines may conflict with the investment strategy pursued by the Reference Entity.

**Common Counsel**

The law firm of Tannenbaum Helpern Syracuse & Hirschtritt LLP, which serves as legal counsel to the Partnership and the General Partner has and will continue to serve as counsel to the Partnership, the General Partner and to one or more of their affiliates. Counsel has attempted to be fair and reasonable in dealing with all parties involved and believes that it has acted consistent with its professional responsibilities. Should a future dispute arise between the Partnership and the General Partner, the Partnership may retain separate counsel depending upon the particular circumstances then existing. Counsel does not represent the interests of the Limited Partners.

**General Partner as Fiduciary**

The General Partner is accountable to the Partnership as a fiduciary and consequently must exercise good faith and integrity in handling the Partnership's affairs. Where the question has arisen, courts have held that a limited partner may institute legal action on behalf of itself, or all other similarly situated limited partners (a class action), to recover damages for a breach by a general partner of its fiduciary duty or on behalf of the partnership (a partnership derivative action) to recover damages from third parties. In addition,

(i) Limited Partners may have the right, subject to procedural and jurisdictional requirements, to bring partnership class actions in courts to enforce their rights under the Federal securities laws and (ii) Limited Partners who have suffered losses in connection with the purchase or sale of their Interests may be able to recover such losses from the General Partner where the losses result from a violation by the General Partner of the anti-fraud provisions of the Federal securities laws.

Since the issue of the General Partner's fiduciary obligations involves a rapidly developing and changing area of the law, Limited Partners who believe that a breach of fiduciary duty by the General Partner has occurred should consult with their own counsel.

The Partnership Agreement provides that to the fullest extent permitted by law, the Partnership shall indemnify and hold harmless the General Partner and its affiliates and/or the legal representatives of any of them (an "Indemnified Party"), from and against (i) any loss or expense suffered or sustained by any or all of them by reason of the fact that they are or were an Indemnified Party, including without limitation any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action or proceeding, provided that such loss or expense resulted from an error of judgment on the part of an Indemnified Party, or from action or inaction which said Indemnified Party reasonably believed to be in the best interests of the Partnership, provided such error of judgment, action or inaction does not constitute willful misconduct, gross negligence, fraud or bad faith, and (ii) any loss due to the negligence, dishonesty or bad faith of any employee, broker or other agent of any Indemnified Party provided that such employee, broker or agent was selected, engaged or retained by the Indemnified Party with reasonable care.   Accordingly, Limited Partners may be entitled to a more limited right of action than they would otherwise be entitled absent such limitations in the Partnership Agreement. In the opinion of the SEC, indemnification for liabilities arising under the Securities Act is against public policy and therefore unenforceable.   Please see the Partnership Agreement for a full discussion of the indemnifications provided by the Partnership to the General Partner and its affiliates and representatives.

**Independent Client Representative**

The Partnership has the authority to appoint a person (the "Independent Client Representative") unaffiliated with the General Partner, the Manager or any of their affiliates to act as the agent of the Partnership to give or withhold any consent of the Partnership required under applicable law to a transaction in which either of the General Partner or the Manager causes the Partnership (i) to purchase securities or other instruments from, or sell securities or other instruments to, the General Partner or affiliates; or (ii) to engage in brokerage transactions in which any of the General Partner's or affiliates acts as broker for another person on the other side of the transaction as the Partnership.   If appointed, the Independent Client Representative may be paid an annual fee by the Partnership and will receive an indemnity from the Partnership.

## TAX CONSIDERATIONS

## Federal Income Tax Aspects

The following is a general summary of some of the federal income tax consequences to Limited Partners of an investment in the Partnership.   It is not intended as a complete analysis of all possible tax

considerations in acquiring, holding and disposing of a Limited Partnership Interest and, therefore, is not a substitute for careful tax planning by each investor, particularly since the federal, state and local income tax consequences of an investment in partnerships such as the Partnership may not be the same for all taxpayers. Except where otherwise indicated, this discussion has been prepared on the assumption that a Limited Partner is a U.S. resident individual or a U.S. domestic corporation that is not tax exempt. Prospective investors should consult their own tax advisors with respect to the tax consequences (including state and local and foreign tax consequences) of an investment in the Partnership.

The following statements are based upon the provisions of the United States Internal Revenue Code of 1986, as amended (the "Code"), the applicable existing and proposed regulations promulgated thereunder (the "Regulations"), existing judicial decisions and current administrative rulings and practice. It is emphasized, however, that no assurance can be given that legislative, judicial or administrative changes may not be forthcoming which would modify such statements. Accordingly, certain of the Code provisions discussed hereinafter may be further amended, modified or clarified by the U.S. Internal Revenue Service (the "IRS") or the courts, which may have an effect on the Partnership and the Limited Partners. Moreover, the availability and amount of deductions, credits and income attributable to the activities of the Partnership will depend not only on the legal principles described herein, but also upon the resolution of various factual issues. There can be no assurance, therefore, that some of the positions taken by the Partnership will not be successfully challenged by the IRS.

This discussion of the federal income tax consequences of an investment in the Partnership is based upon existing law. The existing law, as currently interpreted, is subject to change by new legislation, or by differing interpretations of existing law, either of which could, by retroactive application or otherwise, adversely affect a Limited Partner's investment in the Partnership.

THIS SUMMARY IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING UNITED STATES FEDERAL TAX PENALTIES. THIS SUMMARY WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN, AND ANY TAXPAYER TO WHOM THE TRANSACTIONS OR MATTERS ARE BEING PROMOTED, MARKETED OR RECOMMENDED SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**Classification as a Partnership**

Since, under the Regulations, and subject to the discussion of "publicly traded partnerships" herein, the Partnership is classified as a "partnership" for federal income tax purposes, no Federal income tax is payable by it as an entity. Instead, each Partner is required to take into account such Partner's distributive share of the items of income, gain, loss, deduction and credit of the Partnership.

If the Partnership were classified as an association taxable as a corporation, the Partnership would be subject to federal income tax on any taxable income at regular corporate tax rates, reducing the amount of cash available for distribution to the Partners. In that event, the Partners would not be entitled to take into account their distributive shares of the Partnership's deductions in computing their taxable income, nor would they be subject to tax on the Partnership's income. Distributions to a Partner would be treated as (i) dividends to the extent of the Partnership's current or accumulated earnings and profits, (ii) a return of basis to the extent of each Partner's basis in its Partnership Interest and (iii) gain to the extent any remaining distributions exceeded the Partner's basis in its Partnership Interest. Overall, treatment of the Partnership as an association taxable as a corporation would substantially reduce the anticipated benefits

of an investment in the Partnership.

A "publicly traded partnership"  (as defined in Section 7704 of the Code) is one in which the interests are (i) traded on an established securities market or (ii) readily tradable on a secondary market or the substantial equivalent thereof.  A "publicly traded partnership" is treated as a corporation unless a certain percentage of its gross income during certain prescribed periods is "qualifying income" (generally, interest, dividends, real estate rents, and gain from the sale of capital assets and certain other items).  It is highly likely, but not certain, that the Partnership will meet the qualifying income test.  In addition, interests in the Partnership will not be traded on an established securities market and likely will not be deemed to be readily tradable in a secondary market or the substantial equivalent thereof.  Accordingly, the Partnership should not be treated as a "publicly traded partnership" taxable as a corporation.

**Taxation of Partners on Income or Losses of the Partnership**

Since Limited Partners are required to include Partnership income in their respective income tax returns without regard to whether there have been distributions from the Partnership attributable to that income, Limited Partners may be liable for Federal and state income taxes on that income even though they have received no cash or other property from the Partnership.  While the Partnership Agreement may allow the Partners to withdraw amounts from their Capital Accounts actual withdrawals may not in fact be sufficient to pay all federal, state and local taxes arising out of a Limited Partner's investment in the Partnership.

It is possible that the Partnership might have a net loss for Federal income tax purposes during a taxable period.  Certain Limited Partners (generally, all limited partners subject to tax which are not widely held corporations) may be subject to limitations on the deduction of their shares of Partnership losses and deductions, including the at-risk rules, passive loss rules, rules restricting the deduction of investment interest, potential capital loss limitations and the rules governing the deduction of miscellaneous itemized deductions.  See "Limitations on Deductibility of Certain Expenses."  The deductions of any Limited Partner will not be deductible to the extent in excess of that Limited Partner's basis in its interest in the Partnership.  See "Basis of Limited Partnership Interest and Distributions."

**Allocations of Income and Loss**

A partner's distributive share of partnership income, gain, loss, deduction or credit for federal income tax purposes is usually determined in accordance with the allocation provisions of a partnership agreement.  However, under Section 704(b) of the Code, an allocation is respected only if it either has "substantial economic effect" or is in accordance with the partner's "interest in the partnership." If the allocation contained in the Partnership Agreement does not meet either test, the IRS will make the allocation in accordance with its determination of the Partner's interest in the Partnership.

The Regulations under Section 704(b) of the Code are extremely complex and in many respects subject to varying interpretations. The allocations contained in the Partnership Agreement may not comply in all respects with the Regulations' requirements for having substantial economic effect or for being deemed to be in accordance with the Partners' interests in the Partnership.  However, although the matter is not free from doubt, the General Partner believes that the allocations to the Partners contained in the Partnership Agreement are in accordance with the Partners' interests in the Partnership and is sustained in all material respects.  It should be noted, however, that there can be no assurance that the IRS will not claim that these allocations are not in accordance with the Partners' interests in the Partnership and, therefore, attempt to change the allocations to the Partners.  In such an event, some Partners'

distributive shares of the Partnership's taxable income may increase, while others' may decrease.

Under the Partnership Agreement, the General Partner has the sole and absolute discretion to allocate specially items of Partnership capital gain (including short-term capital gain) and capital loss for federal income tax purposes to a withdrawing Partner to the extent that its Capital Account exceeds or is less than, as the case may be, its adjusted tax basis in its Interest. There can be no assurance that, if the General Partner makes such a special allocation, the IRS will accept such allocation. If such allocation is successfully challenged by the IRS, the Partnership's gains or losses, as the case may be, allocable to the remaining Partners would be increased.

## Differences Between Book Income and Tax Income

Profits and losses allocated to the Partners will include their respective shares of unrealized gain or loss. However, such items may not be taken into account for federal income tax purposes until realized or, in some cases, even later. If the relative interests of the Limited Partners change in the interim (*e.g.*, because of the admission of a new partner or a withdrawal of a Partner), the gain or loss recognized for tax purposes on the disposition of an asset will be allocated, to the extent possible, to reflect the prior allocation of the unrealized gain or loss, which is not necessarily in the same nature as the interests of the Partners at the time of disposition. For these and similar reasons, it is possible for a Limited Partner to be allocated taxable income even though the Partnership (or that Limited Partner) suffers an economic loss, or be allocated tax losses at a time that the Partnership (or that Limited Partner) enjoys substantial economic profits. Usually, such discrepancies even out over a period of time, but, because of certain technical rules under subchapter K of the Code, it may be impossible to do so in all cases. The General Partner will make such corrective allocations as, consistent with the tax law and after consulting with the Partnership's tax advisors, may in its judgment be most appropriate to eliminate or minimize these differences between book and tax income.

## Basis of Limited Partnership Interest and Distributions

A Limited Partner's tax basis in its Partnership Interest will include the amount of money and/or its tax basis in securities or other property that the Limited Partner contributes to the Partnership, increased principally by (i) any additional contributions made by the Limited Partner to the Partnership, (ii) the Limited Partner's distributive share of any Partnership income, and (iii) the amount, if any, of the Limited Partner's share of Partnership nonrecourse indebtedness; and decreased, but not below zero, principally by (x) distributions from the Partnership to the Limited Partner, (y) the amount of the Limited Partner's distributive share of Partnership losses, and (z) any reduction in the Limited Partner's share of Partnership nonrecourse indebtedness. In the case of non-liquidating distributions other than cash (and other than certain ordinary income type assets, like accounts receivable) basis is reduced (but not below zero) by the basis of the property distributed.

It is possible that investors in the Partnership will contribute property to the Partnership in exchange for Interests in the Partnership. Generally, if the property contributed constitutes a diversified portfolio of stocks and securities for purposes of the Regulations under Section 351 of the Code as applicable to transfers under Section 721 of the Code, any gain realized on such contribution should not be recognized by an investor making such in-kind contribution. However, in view of the complexity of the rules governing the tax treatment of such transfer, a prospective investor contemplating a contribution other than cash to the Partnership (or such a contribution to the Partnership, if consented to by the Partnership) is urged to consult with its tax advisor with respect to the tax consequences thereof.

Special rules apply in determining the basis of an interest in a partnership which has been transferred in a taxable transaction or by reason of death. Each prospective investor should consult with his own tax advisor with regard to such transfers.

Generally, a cash distribution to a Partner will be taxable only to the extent it exceeds the Partner's basis in its Partnership interest. The amount of that excess generally would be taxable as capital gain. Distributions of property other than cash (or certain ordinary income type assets) are generally not taxable although any unrealized gain with respect to such property may be taxable upon the subsequent disposition of such property.

## Sale of an Interest or Withdrawal

A Limited Partner generally will recognize capital gain or loss on the sale of an Interest or upon a complete withdrawal from the Partnership. The amount of gain or loss recognized is determined by the difference between the amount realized and the Limited Partner's adjusted tax basis in its Interest. See "Basis of Limited Partnership Interest and Distributions" above. For this purpose, the amount realized includes the Limited Partner's share of outstanding Partnership nonrecourse liabilities, if any. Under certain circumstances, a portion of the gain may be taxable as ordinary income.

As discussed above, the Partnership Agreement provides that the General Partner may specially allocate items of Partnership capital gain (including short-term capital gain) and capital loss to a withdrawing Partner to the extent its Capital Account exceeds or is less than, as the case may be, its adjusted tax basis in its Interest. Such a special allocation may result in the withdrawing Partner recognizing capital gain, which may include short-term capital gain, in the Partner's last taxable year in the Partnership, thereby reducing the amount of long-term capital gain recognized during the tax year in which it receives its liquidating distribution upon withdrawal.

## Elections as to Basis Adjustments

The Partnership may be required to, or, at the request of a Limited Partner, the General Partner may, in its discretion, cause the Partnership, to make an election as to basis adjustments under Section 754 of the Code. In general, a Section 754 election, if made, would permit the Partnership to adjust the tax basis of its capital to reflect a transferee partner's basis in an interest in the Partnership sold or exchanged, or transferred upon the death of a Partner. Certain adjustments might also arise if assets are distributed in kind. These elections are usually beneficial if the Partnership's properties have appreciated in value. However, if there are many transfers or distributions to which the election applies, the calculation of the adjustments and the necessary record keeping become extremely complicated and costly. Consequently, unless such election is mandatory under the Code, the General Partner, in its discretion, may choose not to make the election.

Other elections may be available as well in accordance with applicable rules. The General Partner may exercise its discretion in making such elections.

## Limitations on Deductibility of Certain Expenses

Under Section 163(d) of the Code, the deduction of investment interest by an individual on indebtedness incurred to purchase or carry investment property is limited to the amount of the taxpayer's net investment income. Investment interest generally includes interest paid by the Partnership on its debt and would usually include interest paid by a Limited Partner on indebtedness incurred to purchase or

carry such Limited Partner's interest in the Partnership to the extent the Partner's interest in the Partnership is investment property. Property held for investment includes (1) any interest in an activity involving the conduct of a trade or business which is not passive and in which the taxpayer does not materially participate in the activity and (2) generally, partnership property that produces "portfolio" income. Thus, it is anticipated that the Limited Partners that are individuals are subject to the investment interest limitations.

It is anticipated that income earned by the Partnership (other than certain dividend income and long-term capital gain, except as described below) and passed through to the Limited Partners should be included in net investment income. If the income were not included in net investment income, a non-corporate Limited Partner might be denied a deduction for all or part of that portion of its distributive share of the Partnership's ordinary losses that is attributable to interest expense, unless such Limited Partner has sufficient investment income from other sources.

Certain dividend income and long-term capital gain which qualifies for the new maximum fifteen percent (15%) tax rate on dividends and long-term capital gain established under the Jobs and Growth Tax Relief Reconciliation Act of 2003 earned by the Partnership and passed-through to the Limited Partners may not be offset by investment interest expense, except to the extent that the taxpayer elects to take the dividend income or long-term capital gain into account as "investment income." To the extent that the taxpayer makes such an election, the dividend income or long-term capital gain will not be eligible for the fifteen percent (15%) rate.

A Limited Partner who could not deduct losses currently as a result of the application of Section 163(d) would be entitled to carry those losses forward to future years, when the same limitation would again apply. Thus, subject to certain limitations, investment interest expense which is not deductible in a taxable year can be carried forward until all disallowed amounts have been deducted.

Subject to certain enumerated exceptions, Section 67(a) of the Code provides that an individual taxpayer's miscellaneous itemized deductions, including investment expenses (but not investment and other interest deductible under Section 163 of the Code), are deductible only to the extent they exceed two percent (2%) of the taxpayer's adjusted gross income. Regulations issued by the Treasury Department prohibit the indirect deduction through partnerships and other pass-through entities of amounts that would not be deductible if paid by the individual. Thus, the limitation would apply to the Partnership's expenses if the Partnership were not considered to be engaged in a trade or business. While the Partnership's activities may constitute a trade or business for such purpose, such a determination is dependent upon an analysis of all facts and circumstances, and as such, there can be no assurance that the IRS will agree with this position. Accordingly, in view of such uncertain application to the Partnership and the Partners of the two percent (2%) floor on miscellaneous itemized deductions, prospective investors should consult their tax advisors regarding the potential impact of the two percent (2%) rule on their particular tax situations. In addition, certain itemized deductions of an individual are subject to reduction under Section 68(a) of the Code to the extent the individual's adjusted gross income exceeds $156,400 ($78,200 in the case of a married individual filing a separate return) as increased for inflation. The reduction is equal to the lesser of three percent (3%) of the excess of his adjusted gross income over the foregoing dollar amount or eighty percent (80%) of those itemized deductions otherwise allowable. This reduction occurs after the two percent (2%) rate is taken into account. Under the Economic Growth and Tax Relief Reconciliation Act of 2001, this limitation on itemized deductions is phased out by one-third in 2007 and two-thirds in 2008, and completely repealed in 2010.

Investor Servicing Fees payable with respect to Limited Partners in the Class B Interests will not

be currently deductible by such Partners.  Rather such expenses may be capitalized and added to the adjusted tax basis in each such Partner's Class B Interest.

**Gain or Loss on Disposition of Securities**

Gains and losses with respect to stock or securities generally will be recognized for tax purposes on the date of sale or other disposition of the stock or securities. Gains and losses recognized with respect to stock or securities will generally be capital gains and losses and will be long-term capital gains and losses if the property was held for more than the long-term holding period.  The minimum long term holding period is generally twelve (12) months.  The application of certain federal income tax rules relating to short sales, so called "wash sale" and "straddle" transactions, and trading of certain future and forward contracts may affect the manner in which the Partnership determines its holding period for certain securities, its characterization of the gain with respect to such securities as ordinary or capital and, if capital, as short-term or long-term, and the timing of the recognition of certain gains and losses with respect to certain securities. Under Section 1260 of the Code, the amount of gain recognized by the Partnership with respect to a Swap which may be treated as long-term capital gain will be limited to the amount which the Partnership would have recognized as net long-term capital gain if it had been holding an interest directly in the Reference Entity during the term of such Swap. Any gain in excess of such net underlying long-term capital gain will be treated as ordinary income and an interest charge will be imposed on the gain that is treated as ordinary income.  The interest charge is the amount of interest that would have been imposed under Section 6601 of the Code (currently 8% per annum) on the underpayment of tax if the recharacterized gain had been included in gross income during the term of the Swap.  Such gain is calculated as if it compounded annually at a constant interest rate equal to the applicable federal rate on the date the Partnership entered into the Swap.  Under the Jobs and Growth Tax Relief Reconciliation Act of 2003, net capital gains (the excess of long-term capital gain over short-term capital loss, if any) of individuals on capital assets (other than collectibles and small business stock) held more than twelve (12) months is taxed at a maximum rate of fifteen percent (15%). Gains arising from real estate depreciation recapture, however, are taxed at a maximum rate of no less than twenty-five percent (25%).  These rates are effective until January 1, 2009.

Net long-term capital gain may not be offset by investment interest expense, except to the extent that it arises from the disposition of property held for investment and the taxpayer elects to take the net long-term capital gain into account as "investment income."  To the extent that the taxpayer makes such an election, the net capital gain is not eligible for the maximum fifteen percent (15%) tax rate.

There may be circumstances in which a taxpayer eligible for the benefit of the fifteen percent (15%) marginal rate in effect forfeits both on a present and a carryover basis the benefits of certain losses and other deductions (including net operating loss carryovers).  This situation is likely to arise if the taxpayer's net capital gain is large relative to his available items of deduction and his income other than net capital gain.  However, other taxpayers may also find themselves in such a situation, as a result of their own individual tax attributes, and a particular taxpayer's situation may vary from year to year. Accordingly, each potential Limited Partner should consult with his tax advisor regarding whether there would be any benefit to him from the fifteen percent (15%) rate.

**Partnership Tax Returns; Audit**

The Partnership tax returns are subject to review by the IRS and other taxing authorities, which may dispute the Partnership's tax positions.  There can be no assurance that these authorities will not adjust the tax figures reported in the Partnership returns.  Any recharacterizations or adjustments resulting from an

audit may require each Limited Partner to pay additional income taxes and interest and possibly result in an audit of other items on the Limited Partner's own return, and any audit of a Limited Partner's return could result in adjustments of non-Partnership, as well as Partnership, income and deductions.  Any adjustment would give rise to interest and could give rise to penalties.

Generally, upon an IRS audit, the tax treatment of Partnership items are determined at the Partnership level pursuant to administrative or judicial proceedings conducted at the Partnership level. Each Limited Partner generally is required to file his tax returns in a manner consistent with the information returns filed by the Partnership or be subject to possible penalties, unless the Limited Partner files a statement with its return on IRS Form 8082 describing any inconsistency.  Pursuant to the Limited Partnership Agreement, the General Partner is the Partnership's "tax matters partner" and will have considerable authority with respect to the tax treatment of Partnership items and procedural rights of the Partners.  The General Partner is able to extend the statute of limitations on behalf of all Limited Partners with respect to Partnership items.  A Limited Partner may file with the IRS a statement that the General Partner does not have the authority to enter into a settlement agreement on behalf of that Limited Partner.

## IRS Reporting Requirements

Under the Regulations, funds and, in certain circumstances, investors in funds are generally required to disclose to the IRS their participation in certain transactions, including certain "loss transactions" which result in a loss of at least $2 million in any taxable year (or an aggregate of $4 million over a period of six taxable years) for certain partnerships and for individuals.  However, an individual or a trust will be treated as engaged in a "loss transaction" if it claims a loss from a foreign currency transaction, either directly or through a pass-through entity such as the Partnership, of at least $50,000 in any taxable year.  While the IRS has exempted many transactions from the reporting requirements, certain transactions, including certain straddle transactions and certain foreign currency transactions, are not so exempt.  The Partnership will notify any Partner who may have an IRS reporting requirement under the Regulations with respect to any non-exempt "loss transaction" entered into by the Partnership.  Each prospective investor should consult with his own tax advisor with regard to the possible application of the IRS reporting requirements under the Regulations to his investment in the Partnership.

## Unrelated Business Taxable Income

Generally, an exempt organization (such as, without limitation, a qualified pension or profit sharing plan exempt under Section 501(a) of the Code) is exempt from Federal income tax on its passive investment income, such as dividends, interest and capital gains, whether realized by the organization directly or indirectly through a partnership in which it is a partner.

This general exemption from tax does not apply to the "unrelated business taxable income" ("UBTI") of an exempt organization.  UBTI includes "unrelated debt-financed income," which generally consists of (i) income derived by an exempt organization (directly or through a partnership) from income-producing property with respect to which there is "acquisition indebtedness" at any time during the taxable year, and (ii) gains derived by an exempt organization (directly or through a partnership) from the disposition of property with respect to which there is "acquisition indebtedness" at any time during the twelve-month period ending with the date of such disposition.

The Partnership intends to incur "acquisition indebtedness" with respect to certain of its trans-actions, such as the purchase of securities on margin or the use of funds borrowed from others for the purpose of pursuing its investment objectives.  To the extent the Partnership recognizes income (*i.e.*,

dividends and interest) from securities with respect to which there is "acquisition indebtedness" during a taxable year, the percentage of such income which is treated as UBTI generally is based on the percentage which the "average acquisition indebtedness" incurred with respect to such securities is of the "average amount of the adjusted basis" of such securities during the taxable year.

To the extent the Partnership recognizes capital gains from securities with respect to which there is "acquisition indebtedness" at any time during the twelve-month period ending with the date of their disposition, the percentage of such gain which is treated as UBTI is based on the percentage which the highest amount of such "acquisition indebtedness" is of the "average amount of the adjusted basis" of such securities during the taxable year. In determining the unrelated debt-financed income of the Partnership, an allocable portion of deductions directly connected with the Partnership's debt-financed property is taken into account. Thus, for instance, a percentage of capital losses from debt-financed securities (based on the debt/basis percentage calculation described above) would offset gains treated as UBTI.

Since the calculation of the Partnership's "unrelated debt-financed income" is complex and will depend in large part on the amount of leverage used by the General Partner from time to time, it is impossible to predict what percentage of the Partnership's income and gains will be treated as UBTI for a Limited Partner which is an exempt organization. An exempt organization's share of the income or gains of the Partnership which is treated as UBTI may not be offset by losses of the exempt organization either from the Partnership or otherwise, unless such losses are treated as attributable to an unrelated trade or business (*e.g.*, losses from securities for which there is acquisition indebtedness).

To the extent that the Partnership generates UBTI, the applicable Federal tax rate for such a Limited Partner generally would be either the corporate or trust tax rate depending upon the nature of the particular exempt organization. However, if the Limited Partner is a charitable remainder trust, an excise tax would be imposed on the trust in an amount equal to one hundred percent (100%) of its share of the Partnership's UBTI. An exempt organization may be required to support, to the satisfaction of the IRS, the method used to calculate its UBTI. The Partnership is required to report to a Partner which is an exempt organization information as to the portion of its income and gains from the Partnership for each year which is treated as UBTI. The calculation of such amount with respect to transactions entered into by the Partnership is highly complex, and there is no assurance that the Partnership's calculation of UBTI will be accepted by the IRS.

In general, if UBTI is allocated to an exempt organization such as a qualified retirement plan or a private foundation, the portion of the Partnership's income and gains which is not treated as UBTI will continue to be exempt from tax, as will the organization's income and gains from other investments which are not treated as UBTI. Therefore, the possibility of realizing UBTI from its investment in the Partnership generally should not affect the tax-exempt status of such an exempt organization. However, the charitable contribution deduction for a trust under Section 642(c) of the Code may be limited for any year in which the trust has UBTI. A prospective investor should consult its tax advisor with respect to the tax consequences of receiving UBTI from the Partnership.

## State and Local Taxes

Each Partner may be liable for state and local income taxes payable in the state or locality in which it is a resident or doing business or in a state or locality in which the Partnership conducts or is deemed to conduct business. In addition, the Partnership may operate in states and localities which impose taxes on the Partnership's assets or income. The income tax laws of each state and locality may differ from the above

discussion of Federal income tax laws so each prospective Limited Partner should consult its own tax counsel with respect to potential state and local income taxes payable as a result of an investment in the Partnership.

**Foreign Partners**

A foreign (*i.e.*, non-U.S.) person or entity considering acquiring a Partnership Interest in the Partnership should consult its own tax advisors as to the Federal, state and local tax consequences of an investment in the Partnership, as well as with respect to the treatment of income or gain received from the Partnership under the laws of its country of citizenship, residence or incorporation.  As a general principle, an investment in the Partnership may not be suitable for non-U.S. persons because of certain potentially adverse withholding tax consequences.

**Other Jurisdictions**

In jurisdictions other than the U.S., foreign taxes may be withheld at the source on dividend and interest income derived by the Partnership at rates varying from jurisdiction to jurisdiction.  Capital gains derived by the Partnership in such jurisdictions may often be exempt from foreign income or withholding taxes at source, although the treatment of capital gains varies among jurisdictions.

THE FOREGOING IS A BRIEF SUMMARY OF CERTAIN MATERIAL INCOME TAX MATTERS WHICH ARE PERTINENT TO PROSPECTIVE INVESTORS.  THE SUMMARY IS NOT, AND IS NOT INTENDED TO BE, A COMPLETE ANALYSIS OF ALL PROVISIONS OF THE FEDERAL INCOME TAX LAW WHICH MAY HAVE AN EFFECT ON SUCH INVESTMENTS.  THIS ANALYSIS IS NOT INTENDED AS A SUBSTITUTE FOR CAREFUL TAX PLANNING. ACCORDINGLY, PROSPECTIVE INVESTORS ARE URGED TO CONSULT THEIR OWN RESPECTIVE TAX ADVISORS WITH RESPECT TO THEIR OWN RESPECTIVE TAX SITUATIONS AND THE EFFECTS OF THIS INVESTMENT THEREON .

## CERTAIN ERISA CONSIDERATIONS

The United States Employee Retirement Income Security Act of 1974, as amended ("ERISA"). imposes certain requirements on "employee benefit plans" (as defined in Section 3(3) of ERISA) subject to ERISA, including entities such as collective investment funds and separate accounts whose underlying assets include the assets of such plans (collectively, "ERISA Plans") and on those persons who are fiduciaries with respect to ERISA Plans.  Investments by ERISA Plans are subject to ERISA's general fiduciary requirements, including the requirement of investment prudence and diversification and the requirement that an ERISA Plan's investments be made in accordance with the documents governing the plan.  The prudence of a particular investment must be determined by the responsible fiduciary of an ERISA Plan by taking into account the ERISA Plan's particular circumstances, including the ERISA Plan's existing investment portfolio, and all of the facts and circumstances of the investment including, but not limited to, the matters discussed above under "Certain Risk Factors".

Section 406 of ERISA and Section 4975 of the Code prohibit certain transactions involving the assets of an ERISA Plan (as well as those plans that are not subject to ERISA but which are subject to Section 4975 of the Code, such as individual retirement accounts (together with ERISA Plans, "Plans")) and certain persons (referred to as "parties in interest" for purposes of ERISA and "disqualified persons"

for purposes of the Code) having certain relationships to such Plans, unless a statutory or administrative exemption is applicable to the transaction.  A party in interest or disqualified person who engages in a nonexempt prohibited transaction may be subject to excise taxes and other penalties and liabilities under ERISA and the Code, and the transaction might have to be rescinded.

The U.S.  Department of Labor has promulgated a regulation, 29 C.F.R. Section 2510.3-101 (the "Plan Asset Regulation"), describing what constitutes the assets of a Plan with respect to the Plan's investment in an entity for purposes of certain provisions of ERISA, including the fiduciary responsibility and prohibited transaction provisions of Title I of ERISA and the related prohibited transaction provisions under Section 4975 of the Code.  Under the Plan Asset Regulation, if a Plan invests in an "equity interest" of an entity that is neither a "publicly offered security" nor a security issued by an investment company registered under the Investment Company Act, the Plan's assets include both the equity interest and an undivided interest in each of the entity's underlying assets, unless it is established that the entity is an "operating company", which includes for purposes of the Plan Asset Regulation a "venture capital operating company", or that equity participation in the entity by "Benefit Plan Investors" (as defined below) is not "significant".

Under the Plan Asset Regulation, equity participation in an entity by Benefit Plan Investors (as defined below) is "significant" on any date if, immediately after the most recent acquisition of any equity interest in the entity, 25% or more of the value of any class of equity interests in the entity is held by Benefit Plan Investors.  The term "Benefit Plan Investor" is defined in the Plan Asset Regulation as: (a) any employee benefit plan (as defined in Section 3(3) of ERISA), whether or not it is subject to the provisions of Title I of ERISA; (b) any plan described in Section 4975(e)(1) of the Code; and (c) any entity whose underlying assets include plan assets by reason of the investment in the entity by such employee benefit plan and/or plan.  For purposes of this determination, the value of equity interests held by a person (other than a Benefit Plan Investor) that has discretionary authority or control with respect to the assets of the entity or that provides investment advice for a fee (direct or indirect) with respect to such assets (or any affiliate of any such person) is disregarded.

An Interest in the Partnership should be considered to be an "equity interest" in the Partnership for purposes of the Plan Asset Regulation, and the Interests will not constitute "publicly offered securities" for purposes of the Plan Asset Regulation.  In addition, the Partnership will not be registered under the Company Act and it is not expected to qualify as a "venture capital operating company."

The General Partner intends to monitor the investments in the Partnership and restrict transfers of any equity interest in the Partnership to ensure that ownership of each class of equity interests in the Partnership by Benefit Plan Investors will remain below the 25% threshold contained in the Plan Asset Regulation.  Although there can be no assurance that such will be the case, the assets of the Partnership should not constitute "plan assets" for purposes of ERISA and Section 4975 of the Code.

If the assets of the Partnership were deemed to constitute the assets of a Plan, the fiduciary making an investment in the Partnership on behalf of an ERISA Plan could be deemed to have improperly delegated its asset management responsibility, the assets of the Partnership could be subject to ERISA's reporting and disclosure requirements, and transactions involving the assets of the Partnership would be subject to the fiduciary responsibility and prohibited transaction provisions of ERISA and the prohibited transaction rules of Section 4975 of the Code.  Accordingly, certain transactions that the Partnership might enter into, or may have entered into, in the normal course of its operations might result in non-exempt prohibited transactions and might have to be rescinded.  A party in interest or disqualified person that engaged in a non-exempt prohibited transaction may be subject to nondeductible excise taxes and

other penalties and liabilities under ERISA and the Code.  In addition, such "plan asset" treatment would subject the calculation and payment of the General Partner's fees to applicable prohibited transaction and certain conflict of interest provisions of ERISA and the Code.  Consequently, if at any time the General Partner determines that assets of the Partnership may be deemed to be "plan assets" subject to ERISA and Section 4975 of the Code, the General Partner may take certain actions it may determine to be necessary or appropriate, including requiring one or more investors to redeem or otherwise dispose of all or part of their Interests in the Partnership or terminating and liquidating the Partnership.

Each Plan fiduciary who is responsible for making the investment decisions whether to invest in the Partnership should determine whether, under the general fiduciary standards of investment prudence and diversification and under the documents and instruments governing the Plan, an investment in the Interests is appropriate for the Plan, taking into account the overall investment policy of the Plan and the composition of the Plan's investment portfolio.  Any Plan proposing to invest in Interests should consult with its counsel to confirm that such investment will not result in a prohibited transaction and will satisfy the other requirements of ERISA and the Code.

The sale of any Interests to a Benefit Plan Investor is in no respect a representation by the General Partner, nor any of its affiliates that such an investment meets all relevant legal requirements with respect to investments by Plans generally or any particular Plan, or that such an investment is appropriate for Plans generally or any particular Plan.

Regardless of whether the assets of the Partnership are deemed to be "plan assets", the acquisition of an Interest by a Plan could, depending upon the facts and circumstances of such acquisition, be a prohibited transaction, for example, if any of the General Partner or any of its affiliates were a party in interest or disqualified person with respect to the Plan.  However, such a prohibited transaction may be treated as exempt under ERISA and the Code if the Interests were acquired pursuant to and in accordance with one or more "class exemptions" issued by the U.S.  Department of Labor, such as Prohibited Transaction Class Exemption ("PTCE") 84-14 (a class exemption for certain transactions determined by an independent qualified professional asset manager), PTCE 90-1 (a class exemption for certain transactions involving an insurance company pooled separate account), PTCE 91-38 (a class exemption for certain transactions involving a bank collective investment fund), PTCE 95-60 (a class exemption for certain transactions involving an insurance company general account), and PTCE 96-23 (a class exemption for certain transactions determined by an in-house asset manager).

Any insurance company proposing to invest assets of its general account in the Interests should also consider the extent to which such investment would be subject to the requirements of ERISA in light of the U.S.  Supreme Court's decision in <u>John Hancock Mutual Life Insurance Co.  v.  Harris Trust and Savings Bank</u> and under any subsequent legislation or other guidance that has or may become available relating to that decision, including Section 401(c) of ERISA and the regulations thereunder published by the U.S.  Department of Labor in January, 2000.

The General Partner will require a fiduciary of an ERISA Plan that proposes to acquire an Interest to represent that it has been informed of and understands the Partnership's investment objectives, policies, strategies and limitations, that the decision to acquire an Interest was made in accordance with its fiduciary responsibilities under ERISA and that neither the General Partner nor any of its affiliates has provided investment advice with respect to such decision.  The General Partner will also require any investor that is, or is acting on behalf of, a Plan to represent and warrant that its acquisition and holding of an Interest will not result in a nonexempt prohibited transaction under ERISA and/or Section 4975 of the Code.

Governmental plans and certain church plans, while not subject to the fiduciary responsibility provisions of ERISA or the provisions of Section 4975 of the Code, may nevertheless be subject to state or other federal laws that are substantially similar to the foregoing provisions of ERISA and the Code. The General Partner will require similar representations and warranties with respect to the purchase of an Interest by any such plan.  Fiduciaries of such plans should consult with their counsel before purchasing any Interests.

The discussion of ERISA and Section 4975 of the Code contained in this Memorandum is, of necessity, general and does not purport to be complete.  Moreover, the provisions of ERISA and Section 4975 of the Code are subject to extensive and continuing administrative and judicial interpretation and review.  Therefore, the matters discussed above may be affected by future regulations, rulings and court decisions, some of which may have retroactive application and effect.

**ANY POTENTIAL INVESTOR CONSIDERING AN INVESTMENT IN INTERESTS THAT IS, OR IS ACTING ON BEHALF OF, A PLAN (OR A GOVERNMENTAL PLAN SUBJECT TO LAWS SIMILAR TO ERISA AND/OR SECTION 4975 OF THE CODE) IS STRONGLY URGED TO CONSULT ITS OWN LEGAL, TAX AND ERISA ADVISORS REGARDING THE CONSEQUENCES OF SUCH AN INVESTMENT AND THE ABILITY TO MAKE THE REPRESENTATIONS DESCRIBED ABOVE.**

---

## MISCELLANEOUS MATTERS

---

### Exemption from the Investment Company Act

To ensure that the Partnership is exempt from registration under the Company Act, it will be necessary to limit the number of Limited Partners and the percentage interest in the Partnership that may be held by certain investors.

### Anti-Money Laundering Requirements

The United States, like many jurisdictions, is in the process of changing or creating anti-money laundering, embargo and trade sanctions, or similar laws, regulations, requirements (whether or not force of law) and regulatory policies (collectively, "Regulations"), and the Partnership, in keeping with its responsibility to prevent money laundering, may require more extensive information concerning a Limited Partner's or a prospective Limited Partner's identity and obtaining certain assurances from such persons before a subscription application or redemption request can be processed.  The Partnership will comply with the Bank Secrecy Act, the USA PATRIOT (Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism) Act of 2001 and any other anti-money laundering, anti-terrorism and similar Regulations, including those promulgated by the United States Treasury Department, and will disclose any information required or requested by authorities in connection therewith.  Each Limited Partner will be required to agree in the Subscription Agreement, and will be deemed to have agreed by owning any Interests, that such partner will provide additional information or take such actions as may be necessary or advisable for the Partnership (in the General Partner's sole judgment) to comply with any such Regulations.  Each Limited Partner, by executing the Subscription Agreement, consents, and by owning any

Interests, is deemed to have consented, to disclosure by the Partnership and its agents to relevant third parties of information pertaining to such partner in respect of any such Regulations or information requests related thereto.  The Partnership does not expect that its compliance with any Regulations referred to herein, including rules promulgated by the United States Department of the Treasury, will be in contravention or result in a violation of the General Partner's privacy policy, as outlined in the Privacy Notice annexed hereto as Exhibit III, or the rules and regulations applicable thereto.

## LEGAL AND ACCOUNTING MATTERS

Tannenbaum Helpern Syracuse & Hirschtritt LLP, 900 Third Avenue, New York, New York 10022, has acted as counsel to the Partnership and the General Partner in connection with the preparation of this Memorandum.  The Partnership has retained Ernst & Young LLP, 1111 Summer Street, Stamford, Connecticut 06905, as independent auditor for the Partnership.

## ACCESS TO INFORMATION

**Additional Information**

The offices of the Partnership and the General Partner are located at c/o Tremont Partners, Inc., Corporate Center at Rye, 555 Theodore Fremd Avenue, Rye, New York 10580.  The telephone number is (914) 925-1140.  Prospective investors are invited to review any materials available to the General Partner which can be acquired without unreasonable effort or expense that is necessary to verify the accuracy of any information relating to:  the Partnership; the operations of the Partnership; this offering; the General Partner and its affiliates; and any other matters relating to this offering.