UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------x

MERIDIAN HORIZON FUND, LP,
MERIDIAN HORIZON FUND II, LP,
MERIDIAN DIVERSIFIED FUND, LP,
MERIDIAN DIVERSIFIED FUND, LTD.,
MERIDIAN DIVERSIFIED ERISA FUND,
LTD., MERIDIAN DIVERSIFIED
COMPASS FUND, LTD., and MERIDIAN
ABSOLUTE RETURN ERISA FUND, LTD.,

  Plaintiffs,

- against -

TREMONT GROUP HOLDINGS, INC.,
TREMONT PARTNERS, INC., TREMONT
(BERMUDA) LIMITED, OPPENHEIMER
ACQUISITION CORPORATION, KPMG
LLP, and KPMG (CAYMAN),

  Defendants.

------------------------------------------------x

09 Civ. 3708 (TPG)

**OPINION**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/31/10

   This action arises from Bernard L. Madoff's massive Ponzi scheme. Plaintiffs are hedge funds that invested all of their assets in two hedge funds managed by Tremont Partners, Inc. ("Tremont Partners"), which served as feeder funds by investing the funds' assets with Madoff and his investment firm, Bernard L. Madoff Securities LLC ("BMIS").

Plaintiffs

   Three of the plaintiff funds are Meridian Horizon Fund, L.P. ("Meridian Horizon"), Meridian Horizon Fund II, L.P. ("Meridian Horizon II"), and Meridian Diversified Fund, L.P. ("Meridian Diversified"),

1

sometimes referred to as the "On-Shore Plaintiffs." These are Delaware limited partnerships that invested in the Rye Select Broad Market XL Fund, L.P. (the "Market XL Fund"), a Delaware limited partnership in which Tremont Partners is the general partner.

The other plaintiff funds, referred to as the "Off-Shore Plaintiffs," are Meridian Diversified Fund, Ltd. ("Meridian Diversified Limited"), Meridian Diversified ERISA Fund, Ltd. ("Meridian Diversified ERISA"), Meridian Diversified Compass Fund, Ltd. ("Meridian Diversified Compass"), and Meridian Absolute Return ERISA Fund, Ltd. ("Meridian Absolute"). These function as partnerships but are technically Cayman Islands corporations. The Off-Shore Plaintiffs invested in Rye Select Broad Market XL Portfolio Limited (the "XL Portfolio Fund"), a hedge fund organized as a Cayman Islands corporation. Tremont Partners acted as the investment manager of the XL Portfolio Fund pursuant to an advisory agreement.

The Market XL Fund and the XL Portfolio Fund (collectively, the "XL Funds") did not invest directly with Madoff. Rather, the XL Funds' returns were derived from leveraged instruments in other single-manager hedge funds managed by Tremont Partners and Tremont (Bermuda) Limited ("Tremont Bermuda") referred to as the "Reference Entities." The Reference Entities were single-manager funds, for which all asset management decisions were delegated to Madoff and BMIS.

2

None of the plaintiffs alleges having invested directly in the Reference Entities.

Defendants

Defendants are Tremont Partners, Tremont Bermuda, Tremont Partners' and Tremont Bermuda's parent company, Tremont Group Holdings, Inc. ("Tremont Group") (collectively, the "Tremont Defendants"); Tremont Group's corporate parent, Oppenheimer Acquisition Corporation ("Oppenheimer"); and the XL Funds' auditors, KPMG LLP ("KPMG") and KPMG (Cayman) ("KPMG Cayman").

The Motions

This opinion addresses the motions to dismiss which defendants KPMG and KPMG Cayman have filed. KPMG and KPMG Cayman assert that plaintiffs' claims should be dismissed on multiple grounds pursuant to Rules 9(b), 12(b)(1), and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). Specifically, KPMG and KPMG Cayman argue that: (1) plaintiffs fail to plead with particularity a violation of Section 10(b) of the Exchange Act; (2) plaintiffs fail to plead their common law fraud claims with particularity; (3) plaintiffs' common law claims for negligence are preempted by the Martin Act, N.Y. Gen. Bus. Law § 352 et seq.; and (4) to the extent plaintiffs' claims are not dismissed, they are subject to mandatory arbitration. In addition, KPMG Cayman asserts that the

3

court lacks subject matter jurisdiction over the Off-Shore Plaintiffs' claims.

As explained below, KPMG and KPMG Cayman's motions to dismiss are granted.

## THE COMPLAINT

The following allegations are taken from the complaint and the documents on which it relies. For the purpose of these motions, the allegations in the complaint are assumed to be true.

Madoff's Ponzi Scheme

The basic facts surrounding Madoff's fraudulent Ponzi scheme are well-known. For years, Madoff reported consistent, steady annual gains of 10 to 12 percent by purportedly investing his customers' assets through an options trading strategy called "split-strike conversion," which involved the supposed purchase and sale of stocks in the S&P 100 Index as well as options on that index.[1] Madoff sent account statements and trade tickets to his customers ostensibly reflecting this trading.

On December 11, 2008, news broke that Madoff's securities trades were a sham. Through BMIS, Madoff had created the impression that he was operating a legitimate investment advisory business, all the while masterminding a vast $50 billion Ponzi scheme for nearly 20 years. Rather than using his customers' money to purchase publicly traded

---

[1] The "split-strike conversion" strategy purportedly entailed the purchase of 30 to 40 large capitalization S&P 500 stocks and the simultaneous sale of out-of-the-money calls on the S&P 100 Index and the purchase of out-of-the-money puts on the S&P 100 Index.

4

securities, Madoff used principal from new customers to pay returns to other customers. In fact, he never purchased a single security, instead depositing client funds in, and paying redemptions from, an account at Chase Manhattan Bank. And the account statements and trade tickets that Madoff had been sending to customers were complete fabrications. Madoff admitted that the audited financial statements he filed with the SEC were false and misleading.

Upon the revelation of this fraud, the United States Attorney for the Southern District of New York charged Madoff with violations of the federal securities laws. On March 13, 2009, Madoff pleaded guilty to these charges. Bernard Madoff has since been sentenced to 150 years in prison for his crimes. While the conviction is not pled in the complaint, which was filed about two months before the sentencing, the court takes judicial notice of this fact as a matter of public record extensively and globally covered in news.

On April 6, 2009, the New York Attorney General brought civil fraud charges under New York's Martin Act against hedge fund operator J. Ezra Merkin based on his feeder funds' role in supplying money to Madoff. The Attorney General alleges that Merkin funneled his clients' money to Madoff without permission in exchange for management and incentive fees, failed to conduct sufficient due diligence, and ignored glaring "red flags" related to Madoff's investments. Although not alleged in the complaint, the court takes judicial notice of the New York Attorney

5

General's lawsuit as a matter of public record thoroughly covered in the media.

<u>Tremont Defendants and Oppenheimer</u>

Plaintiffs allege that the Tremont Defendants, through the funds, invested enormous amounts of money with Madoff and received fees for doing so. Plaintiffs allege that this was done with the knowledge, approval, support, and assistance of its parent company, Oppenheimer.

Plaintiffs allege that they invested in the XL Funds because the Tremont Defendants – in offering materials, responses to due diligence questionnaires, and direct conversations – represented that they were intimately familiar with Madoff's and BMIS's operations. The Tremont Defendants further assured that they closely monitored Madoff's and BMIS's transactions, internal controls, and operational risk. And through monthly performance reports, yearly financial statements, and discussions, the Tremont Defendants told plaintiffs that the assets Madoff and BMIS managed for the Reference Entities existed and were appreciating in value. Based upon these representations, plaintiffs made and ultimately retained their investments in the XL Funds.

*Private Placement Memoranda*

The Tremont Defendants sold limited partnership interests in the XL Funds pursuant to private placement memoranda ("PPMs"). The PPMs effectively identified Madoff as the Reference Entities' manager, stating that each "Reference Entity attempts to accomplish its

6

investment objective by investing the majority of the assets with one investment manager (the 'Manager') who employs a 'split-strike conversion strategy.'" The PPMs also informed potential investors that all investment functions would be concentrated with the chosen investment manager. Specifically, the PPMs explained that "[w]hile the Manager is entitled to utilize various broker-dealers to execute, settle, and clear securities transactions, it intends to only use the services of one broker-dealer, of which the Manager is the sole principal."

KPMG and KPMG Cayman

KPMG audited the 2006 and 2007 financial statements of the Market XL Fund and, in that capacity, issued unqualified audit opinions to the On-Shore Plaintiffs stating that its audits complied with Generally Accepted Auditing Standards ("GAAS"). KPMG Cayman audited the XL Portfolio Fund's 2006 and 2007 financial statements and sent allegedly GAAS-compliant audit opinions to the Off-Shore Plaintiffs.

Plaintiffs allege that KPMG and KPMG Cayman failed to conduct their audits in accordance with GAAS and knowingly and recklessly issued false and misleading audit opinions. Plaintiffs assert that because the Reference Entities, and thus the XL Funds, relied on BMIS for virtually all portfolio management, trade execution, and custodial services, GAAS required KPMG and KPMG Cayman to obtain sufficient independent audit evidence to corroborate the existence of the assets Madoff and BMIS claimed to hold for the funds. Consequently, by failing

7

to obtain this confirmatory evidence, KPMG and KPMG Cayman could not have complied with professional auditing standards because if they had, then they undoubtedly would have uncovered Madoff's Ponzi scheme by discovering that the audits performed by BMIS's accounting firm, Friehling & Horowitz, were a complete sham. Moreover, plaintiffs contend that KPMG and KPMG Cayman knew that investors in the XL Funds were relying on their audit opinions as assurance that the assets in the XL Funds were accurately reported. In fact, had KPMG or KPMG Cayman issued anything other than an unqualified audit opinion, plaintiffs would not have invested in the XL Funds and immediately would have redeemed any existing investments.

Plaintiffs do not suggest, however, that either KPMG or KPMG Cayman was engaged to audit the financial statements of Madoff's businesses at any time.

The Claims in This Action

The complaint contains 15 counts, however only Counts X-XV pertain to KPMG and KPMG Cayman. Counts X and XI allege violations of the federal securities laws, Section 10(b) of the Exchange Act and Rule 10b-5 of the Securities and Exchange Commission. Counts XII and XIII are for common law fraud, and Counts XIV and XV are for negligence. The claims against the Tremont Defendants and Oppenheimer – for securities fraud under Section 10(b) of the Exchange Act, control person

liability under Section 20(a) of the Exchange Act, fraud, breach of fiduciary duty, and negligence – are not addressed here.

**DISCUSSION**

Standard on a Motion to Dismiss

In reviewing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. See Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. While a complaint need not supply "detailed factual allegations," it must consist of more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Unless a plaintiff's well-pleaded allegations have "nudged [its] claims across the line from conceivable to plausible," the complaint must be dismissed. Id. at 570.

Section 10(b) of the Exchange Act (Counts X, XI)

Section 10(b) of the Exchange Act, 15 U.S.C. § 78(j)(b), prohibits conduct "involving manipulation or deception, manipulation being

9

practices ... that are intended to mislead investors by artificially affecting market activity, and deception being misrepresentation, or nondisclosure intended to deceive." Field v. Trump, 850 F.2d 938, 946-47 (2d Cir. 1988). To state a claim under Section 10(b) of the Exchange Act, a plaintiff must allege facts sufficient to show that, in connection with the purchase or sale of securities, the defendant made a false material representation or omitted to disclose material information, with scienter, upon which plaintiff relied, and that plaintiff's reliance was the proximate cause of the injury. See ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2008). A claim for relief under Section 10(b) is subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b) and the PSLRA. See ATSI Commc'ns v. Shaar Fund Ltd., 493 F.3d 87, 99 (2d Cir. 2007). Indeed, under both Rule 9(b) and Section 101(b) of the PSLRA, allegations must be made "with particularity" and give "rise to a strong inference that the defendant acted with the required state of mind," namely, "to deceive, manipulate or defraud." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313-14 (2007).

KPMG and KPMG Cayman challenge the validity of the complaint on scienter, loss causation, and reliance grounds. As discussed in detail below, because the court finds that plaintiffs have failed to plead scienter adequately, the court need not consider the issues of loss causation and reliance.

Scienter

For purposes of stating a Section 10(b) claim, scienter means an actual intent "to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976). A plaintiff may satisfy the requirement to plead scienter by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness. See Ganino v. Citizens Utils. Co., 228 F.3d 154, 168-69 (2d Cir. 2000). Moreover, for an inference of scienter to be strong, it must be more than merely plausible or reasonable -- it must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 310. In short, to determine whether a plaintiff's purported inferences of scienter are sufficiently "strong," the court must consider both the inferences urged by the plaintiff and any competing inferences rationally drawn from all the facts alleged, taken collectively. See ECA, 553 F.3d at 198.

The standard for pleading auditor scienter is demanding. See In re IMAX Secs. Litig., 587 F. Supp. 2d 471, 483 (S.D.N.Y. 2008). Allegations of GAAS violations without corresponding fraudulent intent are insufficient to state a securities fraud claim against an independent accountant. See Rothman v. Gregor, 220 F.3d 81, 98 (2d Cir. 2000); Chill v. Gen. Elec. Co., 101 F.3d 263, 270 (2d Cir. 1996).

> For recklessness on the part of a non-fiduciary accountant to satisfy securities fraud scienter, such recklessness must be

11

> conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care. It must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company.

Rothman, 220 F.3d at 98. Put another way, a plaintiff must allege that the accounting practices were so deficient that the "audit amounted to no audit at all, or an egregious refusal to see the obvious, or investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." In re Scottish Re Group Secs. Litig., 524 F. Supp. 2d 370, 385 (S.D.N.Y. 2007).

A complaint might reach the "no audit at all" threshold by alleging that the auditor disregarded specific "red flags" that would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors. See In re AOL Time Warner Secs. & "ERISA" Litig., 381 F. Supp. 2d 192, 240 n.51 (S.D.N.Y. 2004). Under this framework, however, merely alleging that the auditor had access to the information by which it could have discovered the fraud is not sufficient. See Rothman, 220 F.3d at 98; see also In re aaiPharma Inc. Secs. Litig., 521 F. Supp. 2d 507, 513 (E.D.N.C. 2007) (rejecting theory that auditor's access to information could support an inference of scienter, noting that "merely because a person has broad access to every book in a library does not mean that the person has read and chosen to ignore facts contained in a particular book in the library").

Plaintiffs allege that KPMG and KPMG Cayman misrepresented that they performed audits that complied with GAAS because if they had in fact adhered to GAAS, they necessarily would have discovered Madoff's fraudulent conduct. Specifically, plaintiffs contend that the concentration of advisory, brokerage, and custodial functions at BMIS necessitated "heightened professional skepticism" on the part of KPMG and KPMG Cayman, and their failure to verify the reported assets and trades from independent sources "in the face of known dangers" amounted to a meaningless audit. And Friehling & Horowitz's unreliable audits of BMIS were easily discoverable and thus should have caused KPMG and KPMG Cayman to view BMIS's role as custodian suspiciously.

As described above, merely alleging a shoddy audit in violation of GAAS does not establish the necessary intent to defraud sufficient to impose Section 10(b) liability. Moreover, plaintiffs' reference to the concentration of functions at BMIS as a "red flag" indicator of fraud is equally unavailing – the XL Funds' PPMs plainly disclosed to investors that the investment manager (i.e., Madoff) would use a firm in which he was the sole principal to perform brokerage and custodial duties. And plaintiffs fail to allege that KPMG or KPMG Cayman was aware of any of concrete facts indicative of Madoff's fraud. Rather than plaintiffs' theory that KPMG and KPMG Cayman could not have acted innocently when they told plaintiffs that they conducted GAAS-compliant audits, the more compelling inference as to why Madoff's fraud went undetected for two

decades was his proficiency in covering up his scheme and deceiving the SEC and other financial professionals. KPMG and KPMG Cayman were similarly in the dark.

But most critically, plaintiffs' allegations of GAAS violations here are even less meaningful because neither KPMG nor KPMG Cayman was hired to audit Madoff's businesses or to issue an opinion on the financial statements of BMIS. Rather, KPMG and KPMG Cayman's only role was to audit the financial statements of the XL Funds. The notion that a firm engaged to audit the financial statements of one client (the XL Funds) must conduct audit procedures on a third party that is not an audit client (BMIS) on whose financial statements the audit firm expresses no opinion is unprecedented and has no basis.

Plaintiffs' failure to plead scienter is fatal to their federal securities claims. Accordingly, plaintiffs' Section 10(b) claims against KPMG and KPMG Cayman are dismissed.

Common Law Fraud (Counts XII, XIII)

To state a claim for common law fraud in New York, a plaintiff must show a material representation or omission of fact, made with knowledge of its falsity, with scienter or an intent to defraud, upon which the plaintiff reasonably relied, and that such reliance caused damage to the plaintiff. See May Dep't Stores Co. v. Int'l Leasing Corp., 1 F.3d 138, 141 (2d Cir. 1993). Courts in the Second Circuit have found that the elements of common law fraud are "essentially the same" as those that

must be pleaded to establish a claim under Section 10(b) and Rule 10b-5. See Fezzani v. Bear, Stearns & Co., 592 F. Supp. 2d 410, 423 (S.D.N.Y. 2008).

As noted above, the elements of Section 10(b) claims are essentially the same as those for common law fraud in New York. Since plaintiffs' Section 10(b) claims do not survive, plaintiffs' common law fraud claims, based on the same allegations of fact, must be dismissed as well.

Martin Act Preemption (Counts XIV, XV)

The Martin Act prohibits,

> (a) Any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale;
>
> (b) Any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;
>
> (c) Any representation or statement which is false, where the person who made such representation or statement: (i) knew the truth; or (ii) with reasonable effort could have known the truth; or (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement made.

N.Y. Gen. Bus. Law. § 352-c(1). New York courts construe the Martin Act liberally and have held that the statute vests the New York Attorney General with the sole authority to prosecute state law claims involving securities sounding in fraud that do not require proof of intent to defraud or scienter. See Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 190 (2d Cir. 2001); First Energy Leasing Corp. v. Attorney-General, 68 N.Y.2d 59, 64 (1986). There is no implied private right of action for any claim

covered by the Martin Act.  See CPC Int'l, Inc. v. McKesson Corp., 70 N.Y.2d 268, 275 (1987).

Courts routinely dismiss common-law securities claims under the Martin Act based on conduct that is "within or from" New York sounding in fraud or deception that do not require pleading or proof of intent.  See Owens v. Gaffken & Barriger Fund, LLC, No. 08 Civ. 8414 (PKC), 2009 WL 3073338, at *13 (S.D.N.Y. Sept. 21, 2009).  Limited partnership interests are considered securities for purposes of the Martin Act.  See N.Y. Gen. Bus. Law § 352(1); Mayer v. Oil Field Sys. Corp., 721 F.2d 59, 65 (2d Cir. 1993).  And a transaction qualifies as "within or from" New York for purposes of the Martin Act if a plaintiff alleges that a substantial portion of the events giving rise to a claim occurred in New York.  See, e.g., Sedona Corp. v. Ladenburg Thalmann & Co., Inc., No. 03 Civ. 3120 (LTS)(THK), 2005 WL 1902780, at *22 (S.D.N.Y. Aug. 9, 2005) (applying Martin Act where Complaint alleged proper venue in New York based on substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York).

Defendants contend that plaintiffs' non-fraud claims fall squarely within the Martin Act's preemptive scope because plaintiffs allege that they were deceived into purchasing interests in limited partnerships that were supposed to invest in securities, only to find themselves victims of Madoff's elaborate Ponzi scheme.  And plaintiffs' non-fraud claims for negligence do not require proof of scienter.

16

While plaintiffs acknowledge that they allege misrepresentations and omissions by the defendants in connection with their federal securities claims, plaintiffs assert that their common law claims do not contain any allegations of dishonesty and deception. Moreover, plaintiffs cite Cromer Fin. Ltd. v. Berger, No. 00 Civ. 2498, 2001 WL 1112548, at *4 (S.D.N.Y. Sept. 19, 2001), Hamlet on Olde Oyster Bay Home Owners Ass'n, Inc. v. Holiday Org., Inc., 874 N.Y.S.2d 508, 512 (2d Dep't 2009), Caboara v. Babylon Cove Dev., LLC, 862 N.Y.S.2d 535, 538-39 (2d Dep't 2008), and Scalp & Blade, Inc. v. Advest, Inc., 722 N.Y.S.2d 639, 640 (4th Dep't 2001), to bolster their argument that the Martin Act does not preempt their otherwise well-pleaded claims even if the conduct comes within the Act's scope.

Plaintiffs' non-fraud claims fall squarely within the Martin Act's preemptive reach. First, plaintiffs' claims involve a security within the meaning of the Act based on their ownership of limited partnership interests and shares in the XL Funds. Second, the Martin Act's geographic prong is easily satisfied. Substantial acts in furtherance of the alleged wrongdoing indisputably occurred "within or from" New York -- plaintiffs were managed from and within the State of New York; the Tremont Defendants have their principal place of businesses in New York; defendants disseminated offering materials, financial disclosures, and audit reports to plaintiffs from New York; and Madoff's fraud was based in New York. As such, the securities at issue here have a

sufficient territorial nexus with New York for purposes of Martin-Act preemption. Third, the complaint is centered on plaintiffs' allegations of various misrepresentations and omissions with respect to the diligence performed on the funds. Indeed, plaintiffs' non-fraud based causes of action incorporate by reference all of the preceding allegations of fraud in the complaint. Finally, the fact that the New York Attorney General has brought claims under the Martin Act against Ezra Merkin and feeder fund Gabriel Capital Corp. for channeling fund assets to Madoff highlights the appropriateness of Martin Act-preemption here.

And the line of cases that plaintiffs advance has been rejected repeatedly by courts in this district. See, e.g., Kassover v. UBS AG, 619 F. Supp. 2d 28, 39 (S.D.N.Y. 2008) ("Plaintiff's reliance on Caboara is unavailing . . . Caboara appears to overlook a long-standing distinction between courts' treatment of common law fraud claims and that of other state law claims based on deceptive practices."); Nanopierce Techs., Inc. v. Southridge Capital Mgmt., LLC, No. 02 Civ. 0767 (LBS), 2003 WL 22052894, at *4 (S.D.N.Y. Sept. 2, 2003) ("Both Scalp & Blade and Cromer Finance stand as solitary islands in a stream of contrary opinion"). Indeed, although "there is some disagreement among New York's appellate courts as to whether the Martin Act preempts common law claims, the Second Circuit has adopted the First Department's rule that the Martin Act preempts common law tort claims in the securities context." Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc.,

No. 08 Civ. 7509 (SAS), 2009 WL 2828018, at *14 (S.D.N.Y. Sept. 2, 2009). Plaintiffs' argument -- drawn from case law outside the First Department -- is thus insufficiently persuasive in the face of substantial contrary authority.

Given the amount of legal authority in this district favoring Martin Act-preemption for non-fraud common law claims based on deceptive acts committed in connection with the sale of securities within or from New York, dismissal of these claims is warranted. Accordingly, plaintiffs' common law claims for negligence are precluded by the Martin Act.

Because it is unnecessary to do so, the court declines to address defendants' remaining arguments in support of dismissal.

## CONCLUSION

KPMG's and KPMG Cayman's motions to dismiss (Docket Nos. 21 and 27 on 09 cv. 3708) are granted.


Dated: New York, New York
       March 31, 2010

_____
Thomas P. Griesa
U.S.D.J.